**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**VLADLENA FUNK and EMANUEL**
**ZELTSER,**

*Plaintiffs,*

**BELNEFTEKHIM a/k/a CONCERN**
**BELNEFTEKHIM, and BELNEFTEKHIM**
**USA, INC.,**

*Defendants.*

Case 1:14-cv-00376 (BMC)

---

# FIRST AMENDED COMPLAINT
## PURSUANT TO F.R.C.P. 15(a)(1)(B)

---

**Respectfully submitted:**

    *Counsel for Plaintiffs:*

**STERNIK & ZELTSER**
**1562 First Avenue # 205-1817**
**New York, NY 10028-4004**
**tel/fax: +1.212.656.1810**
**email: lawmail@mail.ru**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VLADLENA FUNK and EMANUEL ZELTSER,

*Plaintiffs*,

BELNEFTEKHIM a/k/a CONCERN
BELNEFTEKHIM, and BELNEFTEKHIM USA,
INC., and JOHN DOES 1 - 50

*Defendants*.

Case 1:14-cv-00376 (BMC)

FIRST AMENDED COMPLAINT
(Fed.R.Civ.P. 15(a)(1)(B))

Plaintiffs **Vladlena Funk** and **Emanuel Zeltser** hereby amend their complaint as of right Pursuant to Fed.R.Civ.P. 15(a)(1)(B). This amended complaint is being filed pursuant to the Order of this Court, and at in order not to miss the statutory deadline, without prejudice to plaintiffs' pending motion for default judgment and not intending to waive any of the plaintiffs' rights associated with the defendants' default, or any other rights plaintiffs currently have, all of such rights are expressly reserved. Plaintiffs, for their first amended complaint, complaining of defendants **Concern Belneftekhim** and **Belneftekhim USA, Inc.** (collectively, "Belnetekhim Defendants" or "Belneftekhim") and John Does 1- 50, allege as follows:

## SUMMARY OF SUBSTANTIVE AMENDMENTS

1.    The substantive set of operative facts in this amended complaint remains largely the same as in the initial state court's complaint.  The amendments are primarily directed to those facts that form the basis of subject matter jurisdiction in view of defendants' asserting immunity under the FSIA (even though the plaintiffs do not believe that this case falls under the FSIA). Consequently, certain allegations of the initial state court complaint have been reformed, clarified and/or supplemented (a) to make them more conforming to the Federal venue in general, and (b) to correct the deficiencies identified in defendants' motion to dismiss in particular — focusing, particularly on the newly raised FSIA defense.

-1-

2.      Amended complaint has named new defendants under fictitious names "John Doe 1 - 50",
who aided, abetted and participated in the conduct of the defendants alleged herein (the "Doe
Defendants") (¶¶34, *et seq*). This amendment was made necessary, *inter alia*, because of the
declaration of Maksim Mardashou proffered by defendants (CEF CEF 7-6) and claiming that he "has
no knowledge of a person named Tatsiana Moysievich." The task of identifying the Doe Defendants
prior to discovery is made particularly difficult because it is a common practice in Belarus (and many
other former Soviet republics) to ascribe fictitious names to individuals, such as Belarusian
government officials or senior officers of large commercial enterprises, who are involved in sensitive
or unlawful matters, especially concerning matters outside Belarus — usually in conjunction with
the KGB and Belarusian state security council headed by Aleksandr Lukashenko's son Viktor
Lukashenko (also subject of the U.S. sanctions pursuant to Executive Order 13405).[1]

3.      Amended complaint has added a claim for fraud against all defendants alleging (a) fraud in
inducing the plaintiffs to travel from New York to London by representing that the purpose of such
trip was to continue the settlement negotiations concerning plaintiffs' clients' interest in
Belneftekhim, while in true and in fact defendants intended to abduct the plaintiffs and unlawfully
transport them to Belarus to permanently squelch plaintiffs' clients' claims to their ownership and
financial interest in Belneftekhim; and (b) fraud in diverting the ownership and financial interest of

---

[1]      Alternatively, the names of individuals involved in *special endeavors*, are routinely changed, once their identity
becomes known in connection with the matters that may expose Belarusian government, its agents and strategically
important enterprises in unfavorable light, or in the event that their illegal or immoral activities became known. This
practice has been routinely employed, since the Soviet era, in order to frustrate "outsiders" efforts of identifying the
persons engaged in Belarusian regime's misconduct and according the regime (and those under its protection) plausible
deniability. The term "special endeavor" or "special project" in Belarus refers to such tasks that are of particular
importance to Lukashenko and his ruling regime. Special endeavors usually are carried out in secrecy as covert
operations using all facilities of the country and all means necessary, including often by illegal and criminal acts,
including unlawful detentions, murders and disappearances of unwanted persons (the disappearances are specifically
noted in the Executive Order 13405, as one of the grounds for sanctions). Although plaintiffs will have no problem
showing (as alleged hereinafter) that Ms. Moysievich was present during the settlement discussions between defendants
and the plaintiffs in New York in person and London in person and by telephone, and held herself out to be a senior
officer of Belneftekhim and Mardashou's superior, plaintiffs suspect that the "no knowledge" routine may become
defendants' principal defense strategy.

plaintiffs' clients (including the interest in the funds blocked by OFAC) to defendants and certain individual members of Belarusian government.[2] Amended complaint alleges that all substantive elements of this fraud took place in the U.S. (*Id.*).

4.      Amended complaint has added the second claim of conversion against all defendants alleging that defendants converted ownership and financial interest in Belneftekhim from its rightful owners for the personal enrichment of defendants and certain individual members of Belarusian government — in derogation of the rightful owners' rights.

## PRELIMINARY STATEMENT

5.      This matter concerns the widely-reported abduction, unlawful detention and torture of plaintiffs, Emanuel Zeltser, a U.S. citizen and New York lawyer, and his assistant and freelance reporter Vladlena Funk, pursuant to an elaborate evil plan orchestrated and carried out by defendants acting in concert with the Belarusian KGB and Boris Berezovsky, a currently deceased notorious Russian "oligarch", Belneftekhim's shareholder and a long-time personal friend and business associate of Belarusian dictator Alyaksandr Lukashenko.[3]

6.      Belarus is a rogue state characterized by the U.S. Secretary of State as "the last remaining true dictatorship in the heart of Europe". With its nearly ten million population Belarus, a landlocked country, is one of the poorer former Soviet republic, thanks primarily to its dictatorial Soviet-style regime and large-scale corruption and theft of public assets by a small inner-circle of its ruling ingroup. A number of Belarus' individual government members, including its illegally elected

---

[2]      The amended complaint further alleges that plaintiffs, by a virtue of an arrangement with their clients also have a direct interest in Belneftekhim's ownership and property, including the interest in the funds blocked by OFAC.

[3]      The name of the Belarusian president is spelled both ways "Lukashenko" and "Lukashenka" — the former being the Russian-type spelling and the latter the Belarusian-type — both languages are official languages of Belarus. His first name may be spelled "Alexander" and "Alyaksandr". Likewise, the name of the country may be correctly spelled and pronounced as "Belarus", or "Byelorussia", or "Belorussia".

president Alyaksandr Lukashenko[4] and his son and national security advisor Viktor Lukashenko, are subject of U.S. sanctions for "human rights abuses, public corruption ... diverting or misusing Belarusian public assets or ... misusing public authority [and] constitut[ing] an unusual and extraordinary threat to the national security and foreign policy of the United States...", pursuant to *Executive Order 13405 - Blocking Property of Certain Persons Undermining Democratic Processes or Institutions in Belarus* (2006), and subsequent designations by the Director of Office of Foreign Assets Control (OFAC) of the U.S. Treasury.

7.    The sanctions, also specifically target, *inter alia*, the defendants Concern Belneftekhim and Belneftekhim USA, Inc. The basis of the defendants' designation for sanctions was the Director of OFAC's determination that the defendants are owned and/or controlled by Lukashenko and other members of his corrupt ruling elite.

8.    Boris Berezovsky, a Russian national and a twice-convicted felon in his home country, was wanted by Interpol for massive fraud, multimillion dollar embezzlement, money laundering and participation in international organized crime. Multiple reports have linked Berezovsky to child molestation, numerous high-profile murders and other high crimes. Berezovsky was a substantial shareholder in Concern Belneftekhim and was hired by the defendants as an "outside contractor" to assist in effecting the plaintiffs' kidnapping and unlawful rendition to Belarus. Berezovsky died on March 23, 2013, in his multimillion dollar home in Surrey, a fashionable suburb of London, under

---

[4]      According to the U.S. Department of State, "[i]n 2004 [Lukashenko] engineered a fraudulent referendum that removed term limits on the presidency" (*See*: *2009 U.S. Department of State Background Note on Belarus*) - - essentially appointing himself "president for life". The U.S. Government views Belarus as a "republic in name, although in fact a dictatorship" (*CIA World Factbook*). The United Nations Council on Human Rights has determined that Belarus' political system is "incompatible with the concept of human rights" (*The United Nations Human Rights Council Reports* of 2006 E/CN.4/2006/36) (GE.07-10197(E) 190107). Belarus has been determined to be a habitual violator of international laws of human rights and universally accepted norms of international behavior by the U.N., U.S., U.K., the Organization of Security and Cooperation in Europe (OSCE), the OSCE Parliamentary Assembly, the Council of Europe, the Parliamentary Assembly of the Council of Europe, the European Council, the European Parliament, the European Commission, and the NATO Parliamentary Assembly.

murky circumstances - - believed by many to have been murdered by members of his own inner circle. Berezovsky, for years had been a close friend and confidant of Mr. Lukashenko, and also acted as a "cashier" of Lukashenko's family's secret accounts in Western banks holding the monies given to Belarus by the IMF, the World Bank and other international institutions and stolen by Lukashenko and his son. The aggregate amount stolen by the Lukashenko family is estimated at over six billion U.S. dollars.

9.      In essence, the defendants, acting in concert with the Belarusian KGB and Mr. Berezovsky, lured the plaintiffs, residents of New York, to London, where Mr. Berezovsky resided at the time, as a fugitive from justice in Russia and Brazil. In London, during a meeting with the defendants and Mr. Berezovsky, plaintiffs were secretly drugged and sedated. Then defendants abducted plaintiffs and secretly and extra-judicially flew them across international borders to Belarus against their will - - aboard a private jet belonging to Boris Berezovsky.

10.      Upon landing in Minsk, plaintiffs were immediately detained by the awaiting personal guard of Mr. Lukashenko and transported to "*Amerikanka*", the most dreaded Belarusian KGB detention/torture facility of the Stalin era. There the plaintiffs were stripped bare and savagely beaten with truncheons, fists, boots, and belt buckles, and then thrown naked into 7' by 3' cold solitary confinement boxes. Subsequently, plaintiffs were repeatedly dragged to basement interrogation rooms, where they were subjected to further torture.[5] Defendants' representatives were present at, observed and directed the plaintiffs' interrogation and torture.

11.      The term "defendants' representatives" here and hereafter refers to senior officers of Concern

---

[5]      Plaintiffs do not elaborate here on the graphic and disturbing details of the inventively perverse methods of torture to which the plaintiffs were subjected at the hands of defendants. In the event it becomes necessary to provide such details, the plaintiffs will do so by a separate supplemental pleading and seek to file same under seal.

Belneftekhim and those appointed by them with full authority to act for the defendants. Defendants were fully aware of their representatives actions, closely monitored and directed their activity on contemporaneous basis.

12.    In committing these atrocities, defendants pursued two principal objectives. *First*, defendants sought to "resolve" an ongoing commercial dispute as to the ownership of Concern Belneftekhim and claims of the plaintiffs' clients to certain assets, including defendants' frozen U.S. assets — by eliminating the claimants' attorney and destroying the original ownership documents. *Second*, defendants intended to torture the plaintiffs, so that they would, under torture, plead with their clients to forfeit their ownership and financial interest in Belneftekhim. *Second*, defendants intended to hold plaintiffs hostage in order to pressure the United States into lifting sanctions against both Belneftekhim defendants, with the goal of resuming defendants' lucrative commercial activity in the U.S.

13.    Plaintiffs Funk and Zeltser were unlawfully held captive, without formal charges or trial, and continually tortured for 383 days and 483 days, respectively.[6]   As a direct consequence of defendants' sadistic acts, plaintiffs were put through a nightmare that continues to haunt them to this day and likely for the rest of their lives.

14.    Plaintiffs' kidnapping, torture and unlawful captivity, orchestrated and carried out by defendants and their agent and "subcontractor" Berezovsky, acting in concert with the Belarusian KGB, sparked international outrage and significant press coverage, apparently unexpected by the defendants and Mr. Lukashenko. The U.S. Department of State and members of the U.S. Congress repeatedly demanded the release of Emanuel Zeltser. Secretary of State Hillary Clinton said that she

---

[6]    At one point amidst the building international pressure to release plaintiffs from their unlawful captivity, the KGB press office released a false statement that the plaintiffs were held on charges of "commercial espionage" against Belarus.

was personally "focused" on what the State Department described as "a very troubling situation" involving the abuse of an American citizen. World leaders, the European Parliament and international human rights organizations joined in the U.S. call for plaintiffs' immediate release. Amnesty International repeatedly issued emergency alerts respecting "torture and other ill-treatment" of Mr. Zeltser.

15.    Amidst intense international pressure, Belarusian dictator Lukashenko released plaintiff Funk in March 2009. On June 30, 2009, a delegation of senior members of the US Congress, led by Sen. Ben Cardin, co-chair of Helsinki Committee, traveled to Minsk, Belarus to personally meet with Mr. Lukashenko and demand immediate release of Emanuel Zeltser. Succumbing to demands of the U.S.A. and international community and fearing the imposition of new harsher sanctions against himself, his family members and the defendants, Belarusian dictator ordered the release of Mr. Zeltser on that same date.

16.    The U.S. Department of State denied making any concessions to Lukashenka, and repeatedly said that it does not use its citizens as "bargaining chips". However, many in Belarus still believe that U.S. cut a deal with Lukashenko, inducing him to release hostages in exchange for IMF credits to Belarus. Appearing on NTV, a Russian television network, Anatoly Lebedko, Chairman of the Belarusian United Popular Party said: "Washington was forced to pay ransom for its citizen by providing Lukashenka the IMF credits, pure and simple; in essence, this is hostage-taking, the practice, which is wide-spread in Belarus, elevated to the new level, where Lukashenko is not only sending a political message but demands monetary compensation for human freedom".

## PARTIES

### Plaintiff Emanuel Zeltser

17.    Emanuel Zeltser is a U.S. citizen and New York attorney residing and practicing in the City

of New York.

18.     At all relevant times Mr. Zeltser was an attorney for an investment group, which, over the period of 10 years have made significant investment, in cash and in kind, in Belneftekhim defendants, in exchange for a block of stock of Belneftekhim and an option to acquire a controlling stake in Belneftekhim. By virtue of an wement with their clients Zeltser also havs a direct interest in Belneftekhim defendants' ownership and property, including the interest in the funds blocked by OFAC.

19.     Mr. Zeltser speaks native Russian (an official language of Belarus) and has been recognized as an expert on laws, customs and politics of Russia and former Soviet republics, including Belarus. At the request of Honorable James (Jim) Leach, chairman of the House Banking Committee, Mr. Zeltser provided expert testimony at the Congressional Hearings on Bank of New York, Russian Organized Crime and Money Laundering Matters, and numerously appeared in print and broadcast media as an expert on these matters.

20.     As a long-time attorney for the substantial investors in Belneftekhim plaintiff Zeltser was well familiar with the circumstances of their investment and ownership in Belneftekhim. Combined with his expertise in the Soviet and post-Soviet laws, practices and customs, Mr. Zeltser was in a unique position to institute his clients' claims against Belneftekhim, in connection with commercial conflict over their investment in Belneftekhim.

21.     In March 2008, following a series of telephone contacts and two meetings with defendants in New York City, in an attempt to settle commercial dispute between Belneftekhim defendants and his clients, Zeltser, pursuant to defendants' invitation, traveled to London in order to continue the settlement negotiations and possibly resolving the commercial dispute between the plaintiffs' clients and the defendants. In London, Mr. Zeltser was secretly drugged and forcibly abducted by defendants

acting in concert with Mr. Berezovsky and Belarusian KGB operatives. Mr. Zeltser was then, against his will, secretly flown to Belarus aboard a private jet belonging to Berezovsky. In Belarus Zeltser was unlawfully detained, systematically tortured, threatened, emotionally degraded and dehumanized, and held hostage, without charges or trial, for 473 days, until released in response to a continuous wave of worldwide outrage and threats of increased economic and political sanctions.

### Plaintiff Vladlena Funk

22.    Vladlena Funk at all relevant times was a resident of New York and New Jersey and was Mr. Zeltser's legal assistant, and also served as a freelance journalist. Ms. Funk was a permanent resident of the United States, until she was naturalized as an American citizen in June 2012.

23.    In March 2008, following a series of telephone contacts and two meetings with defendants in New York City, in an attempt to settle commercial dispute between Belneftekhim and her clients, Ms. Funk, pursuant to defendants' invitation, accompanied Mr. Zeltser to London in order to continue the settlement negotiations and possibly resolving the commercial dispute between the plaintiffs' clients and the defendants. In London, Ms. Funk was secretly drugged and forcibly abducted by defendants acting in concert with Mr. Berezovsky and Belarusian KGB operatives. Ms. Funk was then, against his will, secretly flown to Belarus aboard a private jet belonging to Berezovsky. In Belarus Funk was unlawfully detained, systematically tortured, threatened, emotionally degraded and dehumanized, and held hostage, without charges or trial, for 473 days, until released in response to a continuous wave of worldwide outrage and threats of increased economic and political sanctions.

### Defendant Concern Belneftekhim

24.    Belneftekhim a/k/a Concern Belneftekhim ("Concern Belneftekhim") is a commercial

petrochemical concern with headquarters at 73 Dzerzhinsky Ave., Minsk 220116 Belarus. At all relevant times, Concern Belneftekhim maintained a branch representative office in the U.S. at 13 Branch Street # 213, Methuen, MA 01844, 37 Sheridan Road, Andover MA 01810; and/or at 172 Haverhill Street, Andover, MA 01810.

25.     Concern Belneftekhim is one of the largest industrial complexes in Eastern Europe. It was created in April 1997, during privatization of Belarusian commerce and industry, primarily to attract much needed foreign investments into mismanaged and disintegrating Belarusian petrochemical industry, which is the nearly sole source of Belarus's export income, save for its arms sales[7]. Belneftekhim has since comprised essentially all Belarusian enterprises for crude oil production, refining and transportation, oil product sales, chemistry and petrochemistry. Belneftekhim manufactures over 500 kinds of petrochemical and chemical products and imports them to over 90 countries, including the U.S.A. Concern Belneftekhim's foreign trade surplus in 2013 increased to US$5.6 billion.

26.     Belneftekhim is a major contributor to the Belarusian economy and a principal source of wealth of "Lukashenko & Son" ruling regime.

27.     On November 13, 2007, the United States Treasury Department, froze the assets of Concern Belneftekhim and shut down its commercial activities in the U.S. and elsewhere pursuant to the Executive Order 13405.

28.     Upon information and belief, following the imposition of sanctions by the U.S. Government, defendants continued its commercial activity in the United States, both legally and otherwise, including but not limited to its interactions with plaintiffs and plaintiffs' clients for the purposes of

---

[7]     Dubbed "terrorists arms depot" by the International League for Human rights, Belarus has a history of close cooperation with and arms sales to rogue states, sponsors of terrorism. *See*: "*Belarus's Terrorist Ties*" Washington Post June 12, 2004.

settlement of the commercial dispute concerning ownership of Belneftekhim and its assets frozen in the U.S.[8]  In addition, of the approximately 500 companies comprising Concern Belneftekhim only a few were named as being subject to sanctions, thus nothing prevented Belneftekhim from doing business through the companies, not specifically named by OFAC. In fact, plaintiffs believe that Belneftekhim, at all relevant times continued to do such business. Moreover, For example, in 2008, the U.S. suspended sanctions with respect to two major Belneftekhim's companies - *Lakokraska* and *Polotsk Steklovolokno* – following the Lukashenko's ordering the release of a number of political prisoners. Upon information and belief, through these, *inter alia*, companies and a number of other Belneftekhim companies, which were not specifically named by OFAC, Concern Belneftekhim continued its commercial activity in the U.S., including directly marketing and mechanizing Belneftekhim's petrochemical products, and acting as an intermediary for marketing and sale in other countries.[9]

29.    Ownership of Concern Belneftekhim is in dispute. This dispute is one of the key factors giving rise to the events alleged here. According to the U.S. Government, the ownership and control of Belneftekhim vests in Belarusian dictator Alexander Lukashenko and several other individual members of his family and ruling inner-circle, which formed the basis for U.S. sanctions against the defendants. Defendant Concern Belneftekhim  has claimed in this action that it is owned by the government of Belarus and is an "instrumentality" of Belarus within the meaning of FSIA. In the past however, Belneftekhim made statements to members of the media that Belneftekhim is a

---

[8]    On its official website Belneftekhim characterized the U.S. sanctions as "protectionism" and "unfair competition" and gave interviews stating that the U.S. was "afraid" because Belneftekhim's sales in the U.S. had been "astronomical" in comparison with that of the U.S. producers.

[9]    The sanctions against these companies have been re-imposed since January 31, 2011, following Lukashenko's bloody crackdown on protesters of the December 2010 rigged presidential elections. *See*: Annex II (*Belarus Bloody Sunday*), incorporated by reference herein.

privately owned and even expressed its frustration that some media members depicted it as "government-owned", which hampered Belneftekhim's efforts to secure much needed private investments.[10]

30.    Plaintiffs do not dispute that all commercial enterprises in Belarus, including Concern Belneftekhim, are *de facto* controlled by Mr. Lukashenko, his family and corrupt inner-circle. In fact, the control exercised by Mr. Lukashenko and his regime over Belneftekhim defendants is of such a level as to render them mere *alter egos* of that regime. Plaintiffs however believe and hereby allege the majority of the true legal ownership interest in Belneftekhim vests in private investors, including the plaintiffs' clients.

### Defendant Belneftekhim USA, Inc.

31.    Belneftekhim USA, Inc., at all relevant times was a U.S. corporation formed under the laws of the Commonwealth of Massachusetts, having its offices at 13 Branch Street # 213, Methuen, MA 01844; 37 Sheridan Road, Andover MA, 01810, and 172 Haverhill Street, Andover, MA 01810. Belneftekhim USA, Inc.'s sole purpose was to act as a representative office in the U.S. of Concern Belneftekhim. Through Belneftekhim USA Concern Belneftekhim conducted a multimillion dollar business in the U.S.

32.    Belneftekhim USA, Inc. is controlled in all respects by the same individuals who control Concern Belneftekhim.

33.    In June 2006, the President issued Executive Order 13405, which blocked the property, and interest in property, within the United States or in the possession or control of United States persons, of Belarusian individuals who participated in " human rights abuses, public corruption ... diverting

---

[10]    The putative ownership of Concern Belneftekhim by Mr. Lukashenko and other Belarusian government officials does not accord Concern Belneftekhim immunity from suits under FSIA. The Supreme Court has ruled that FSIA's term "foreign state" does not include individual government officials. *See Samantar v. Yousuf*, 560 U.S. 305, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010).

or misusing Belarusian public assets or ... misusing public authority [and] constitut[ed] an unusual and extraordinary threat to the national security and foreign policy of the United States..." The individuals so sanctioned included (and still include) Belarusian president Alexander Lukashenko, his son and national security advisor Viktor Lukashenko, and other members of the Belarusian government. In November 2007, the Director of the Office of Foreign Assets Control (OFAC) designated Belneftekhim and Belneftekhim USA, Inc., as being the property of the designated nationals whose property and interests in property are blocked pursuant to Executive Order 13405. Lukashenko's ownership and control of Belneftekhim was the ground for the designation. As part of the sanctions imposed by the Executive Order approximately US$2 billion of Belneftekhim and Belneftekhim USA, Inc. was frozen in the U.S.

34.     Belneftekhim USA, Inc., actively aided, abetted, and participated in all phases of conduct alleged herein, to the same extent as defendant Concern Belneftekhim.

**Defendants "John Does 1 - 50"**

35.     Defendants John Does 1 - 50 (the "Doe Defendants") are individuals and entities sued here under fictitious name "John Doe". The Doe Defendants collectively and/or each and every one of them, aided, abetted and participated in all phases of conduct complained of herein.  Plaintiffs, at this point, do not know the identities of the Doe Defendants sufficiently in order to name them by names. Plaintiffs, upon information and belief, allege  that the Doe Defendants are Belarusian government agents, working directly or in the capacity of outside contractors for the Belarusian regime in carrying out its "*special endeavors*"[11]. Once the names are learned during the discovery process,

---

[11]     Term "special endeavor" or "special project" in Belarus refers to such tasks that are of particular importance to Lukashenko and his ruling regime. Special endeavors are accomplished under the direction of the KGB and the Belarusian state security council headed by Aleksandr Lukashenko's son Viktor Lukashenko (also subject of the U.S. sanctions pursuant to Executive Order 13405). Special endeavors usually are carried out in secrecy as covert operations using all facilities of the country and all means necessary, including most often by illegal and criminal acts, including

(continued...)

plaintiffs will seek leave of the court to substitute the real names of these defendants, as they become known.

## FACTS

36.    Over the period beginning in or about 1997 to in or about 2004, an investment group, a client of the plaintiffs, had made significant investment, in cash and in kind, in Belneftekhim defendants and companies comprising the Concern, in exchange for a block of stock of Concern Belneftekhim and an option to acquire a controlling stake in Belneftekhim. By virtue of an arrangement with their clients plaintiffs also have a direct interest in Belneftekhim defendants' ownership and property, including the interest in the funds blocked by OFAC. Following the imposition of U.S. and E.U. sanctions against the Belarusian dictator Lukashenko and Belneftekhim defendants in 2006-2007, which the U.S. Government determined to be Lukashenko's property, Belneftekhim defendants failed and refused to honor the agreement with the plaintiffs' clients, and failed and refused to return the plaintiffs' clients' investment, or provide any compensation theretofore.

37.    Since at least the latter part of 2006, defendants and plaintiffs' clients were involved in dispute over the ownership of Belneftekhim defendants and the plaintiffs' clients investment in Concern Belneftekhim. Multiple meetings between plaintiffs and plaintiffs' clients and defendants were held in New York in an effort to resolve the dispute — to no avail.

38.    Plaintiffs were instructed by their clients to take all lawful steps in recovering their clients' investment and enforcing the agreement between plaintiffs' clients and Belneftekhim, including, if necessary, bringing legal actions against Belneftekhim in the U.S. and other jurisdictions.

39.    Plaintiffs advised defendants that plaintiffs, on behalf of their clients contemplated bringing

---

(...continued)

unlawful detentions, murders and disappearances of unwanted persons (the disappearances are specifically noted in the Executive Order 13405, as one of the grounds for sanctions).

legal action(s) against the defendants in the U.S. and, possibly in other jurisdictions for controlling

stake in Belneftekhim defendants, and to assert interest in the defendants' funds blocked by OFAC.

40.      In the latter part of 2007 and January and February of 2008, defendants telephoned plaintiffs

in New York City to discuss with them potential resolution of the conflict between the defendants

and plaintiffs' clients.

41.      Following several phone conversations, in or about the first week of March 2008,

representatives of defendants contacted plaintiffs in New York City and requested a face-to-face

meeting with the plaintiffs to resolve the ongoing ownership and financial dispute between plaintiffs'

clients and defendants. Defendants' representatives met with plaintiffs in New York City in an

attempt to settle their dispute. Present from the defendants' side were four individuals, including

Viktor Voronin, who introduced himself as a legal advisor of Belneftekhim, and Tatsyana

Moysievich, who held herself to be a director and senior officer of Belneftekhim in charge of its U.S.

operations. Ms. Moysievich spoke to the plaintiffs previously by phone and took an apparently

leading role in the settlement discussions. Also present by telephone were two senior executives of

Belneftekhim in Minsk, and also Mr. Berezovsky. From the plaintiffs' side, in addition to the

plaintiffs, present were the plaintiffs' clients' Russian lawyer and their U.S. representative.

Conversation was conducted in Russian.

42.      Initially, defendants' showed to the plaintiffs a number of false documents, ostensibly filed

with U.S. federal and state authorities, including a "Letter of Agreement" on the letterhead of

Belneftekhim USA, Inc. purporting to be counter-signed by the plaintiff's client "agreeing" to return

their ownership interest in Belneftekhim in exchange for Belneftekhim's bonds of negligible value.

Plaintiffs pointed to the defendants the obvious inconsistencies in the defendants' documents and

a so-called "agreement", and further noted that the purported signature of their client was a crude forgery.

43.    Defendants' representatives then stated that Belneftekhim did not intend to honor its agreement with the plaintiffs' clients because of "political turbulence" caused by the U.S. sanctions relating to the defendants.  Defendants' representatives further stated as a result of the U.S. sanctions the defendant-companies suffered grave financial losses and are unable to return to the plaintiffs' clients their investment. Instead they offered to recompense the plaintiffs' clients ten cents on a dollar in a form of non-negotiable bonds and/or preferred stock of Belneftekhim, payable ten years from the time of issue.

44.    The above-referenced meeting did not result in a settlement. Indeed, plaintiffs again advised defendants' representatives that lawsuits would shortly be filed to assert ownership rights in Belneftekhim defendants and their frozen U.S. assets. Defendants' representatives however expressed their desire to continue negotiations. Another meeting was scheduled within a couple of days.

45.    The second meeting was also held in New York City with the same participants present, and appeared to be more positive, although it did not bring about any concrete resolution. Defendants however informed plaintiffs that president Lukashenko had signed or was about to sign a decree removing governmental control in management of private enterprises, including Belneftekhim — opening the door to plaintiffs' clients renewed ownership stake in Belneftekhim.[12] At the end of that meeting, defendants stated that they may have an agreement in principle and invited the plaintiffs to meet with directors of Belneftekhim in Minsk, Belarus, in order to continue negotiations and possibly conclude the settlement.  Plaintiffs declined stating that under the circumstances it would

---

[12]    Indeed, on March 4, 2008, Lukashenko signed a Decree    144, voiding his previous decree    125 providing for government right to ownership and management control over strategic commercial enterprises.

not be safe or appropriate for them to travel to Minsk at that time. Defendants then advised the plaintiffs that they appointed Mr. Berezovsky, a substantial shareholder in Concern Belneftekhim, as their principal agent to lead the continuing settlement negotiations on behalf of Belneftekhim and to conclude the transaction, and suggested that such would take place in the presence of Berezovsky and defendants' representatives in London.

46.     Unbeknownst to plaintiffs, following the first unsuccessful meeting defendants had no further interest in settling the ownership dispute with plaintiffs or their clients. Instead, defendants' intent was to "eliminate" plaintiffs, especially Emanuel Zeltser, a long-time attorney for the ownership claimants, who was in the best position to successfully assert the claims on behalf of his clients in the U.S. and other jurisdictions. Defendants indeed contracted with Mr. Berezovsky but not to conduct settlement discussions with plaintiffs, but to aid defendants in arranging for plaintiffs' "rendition" to Belarus, where they could be permanently silenced.

47.     In furtherance of defendants' nefarious scheme, Mr. Berezovsky contacted the plaintiffs by telephone in New York and also invited plaintiffs to come for further negotiations with him and defendants' representatives, and a possible "closing" in London, where Mr. Berezovsky resided at the time (as a fugitive from criminal charges and convictions in Russia and Brazil). Berezovsky stated that several senior officers of Belneftekhim would be present at the closing and requested that the plaintiffs bring with them the original documents relating to the plaintiffs' clients' ownership interest in Belneftekhim and its assets.

48.     Plaintiffs, believing that defendants in good faith wished to settle the matter agreed to continue the settlement discussions in London. Defendants expended US$11,100.00 for air travel, and further expended funds for booking rooms in London's Halkin Hotel, and on or about March 10,

2008, plaintiffs traveled from New York City to London to attend meetings with Mr. Berezovsky and other representatives of defendants.

49.     The first meeting took place during the daytime on March 11, 2008, at the Halkin Hotel in London, where the plaintiffs stayed. In addition to Berezovsky, from the defendants' side present were two men, who gave plaintiffs their business cards showing them to be employed by Belneftekhim as senior legal advisor and vice-president respectively. Two more individuals from Belneftekhim, including Tatsyana Moysievich, participated by phone. Belneftekhim's representatives, took a cursory look at the original documents evidencing the  plaintiffs' clients' ownership in Belneftekhim and appeared to be fully satisfied. Thereafter, Berezovsky proposed to continue negotiations and possibly conclude the transaction the same evening  at London's Nobu restaurant.

50.     At the meeting at Nobu, Berezovsky was accompanied by Mr. Voronin of Belneftekhim and two other men and a woman, whom he introduced as his "associates". During the meeting plaintiffs suddenly started feeling light-headed and sleepy, although neither of them drunk any alcohol. Plaintiffs requested to adjourn the meeting for the next day. Plaintiffs excused themselves and proceeded to the door of the restaurant intending to get a cab back to the Halkin Hotel. Instead, the two men accompanying Berezovsky ushered plaintiffs to Berezovsky's Maybach limousine standing at the entrance to Nobu with its motor running and quickly but forcefully "helped" the plaintiffs into the limousine and also got in. The limousine then drove the plaintiffs, who were effectively restrained, to a private airport in the outskirts of London. Berezovsky's  men accompanied them to Berezovsky's private jet - - *en route* to Minsk, Belarus. Plaintiffs were fully conscious of their being transported against their will but had been unable to resist because of the effect of what turned out to be sedative drugs placed in their coffee by the defendants' representatives at Nobu restaurant.

Later, during the plaintiffs' captivity in Belarus, defendants' representatives, visiting the plaintiffs in the KGB detention facility, explained that during the meeting at Nobu, plaintiffs' coffee was spiked with benzodiazepine-based drug (similar to "date-rape" drugs) in dozes sufficient to make the plaintiffs sleepy and unable to resist and/or call for help.

51.    Berezovsky's jet with plaintiffs onboard took off at approximately 1:00 AM and landed in Minsk, Belarus at approximately 4:30 AM on March 12, 2008. As noted, upon arrival plaintiffs were immediately detained and transported to the KGB detention facility. There, both Mr. Zeltser and Ms. Funk were repeatedly subjected to torture and other cruel, unusual, inhuman and degrading treatment. After being stripped bare and severely beaten they were placed in small solitary boxes without heat, windows or ventilation. Thereafter, plaintiffs were repeatedly dragged from their cells to basement interrogation rooms for lengthy "interrogation" sessions comprised of severe physical beatings and other, more imaginative torture methods. In addition, Ms. Funk was threatened with sexual assault and gang rape.  Between the sessions, plaintiffs were deprived of food, water and sleep.

52.    Defendants representative were present during many of the interrogations-torture episodes and observed and directed their KGB comrades' activities.

53.    Defendants demanded, *inter alia*, that plaintiff Zeltser telephone the Halkin Hotel in London and authorize the release of the original documents relating to his clients' ownership in Belneftekhim to representatives of Berezovsky, computer equipment containing copies of these documents, privileged documents relating to the plaintiffs' clients, and other personal effects. Defendants also demanded that plaintiff Funk telephone the plaintiffs' clients in the U.S. and Russia and beg them to renounce their ownership interests in Belneftekhim. Under torture, the plaintiffs succumbed to

both defendants' demands. While making the calls to clients, Ms. Funk was subjected to further acts of torture in order to induce her to scream.

54.     Defendants then demanded that the plaintiffs "confess" that they came to Minsk on their own free will on a spying mission. Plaintiffs' refusal prompted further acts of torture. In addition, plaintiff Zeltser, a diabetic who also suffered from arthritis, was denied critical medications, which gravely exacerbated his ailments and caused him severe pain and permanent damage to his health.

55.     Berezovsky also visited plaintiffs in the KGB detention facility. He was visibly proud of his successful operation in abducting the plaintiffs and delivering them to "his friend Lukashenko" in Belarus. Bursting with joy, Berezovsky provided plaintiffs with a detailed story of how he conceived of and executed "the mission" on behalf of Belneftekhim. Berezovsky suggested that the plaintiffs should comply with his "KGB friends' requests " if [they] still hope to see the light of day".

56.     From the outset, and throughout their unlawful KGB detention, both Mr. Zeltser and Ms. Funk were subject to torture, cruel, inhuman and degrading treatment.  Aside from repeated beatings and other form of torture designed to compel "confessions" and force plaintiffs to comply with defendants' demands, they were deprived of basic, life-sustaining necessities including food, water, sleep and medications.  The bedding in Mr. Zeltser's cell was removed altogether, compelling him to sleep on bare plank-bed.

57.     Mr. Zeltser was also denied access to the critical, physician-prescribed medications he arrived with for treatment of diabetes and arthritis.  Combined with inhumane prison conditions, this caused his health to rapidly deteriorate and placed him at risk of imminent death.

58.     On April 12, 2008, pursuant to the directives of defendants and their KGB henchmen, Mr. Zeltser was involuntarily transferred to a state psychiatric hospital for "psychological testing" - - which is a common tactic used by the KGB to demoralize political prisoners and amounted to further

physical and psychological torture of Mr. Zeltser. After two weeks of "psychological testing", Mr. Zeltser was returned to his KGB cell.

## WORLD'S REACTION

59.    As noted heretofore, fortunately for the plaintiffs, the outlandish actions of the defendants and the KGB, acting in concert with them, sparked international outrage.

60.    On March 20, 2008, U.S. Senator Charles E. Schumer alerted the U.S. Department of State of the abduction of Mr. Zeltser and the atrocious conditions of his detention, and requested that the State Department "do all in its power to see that Mr. Zeltser's serious medical conditions are attended to, and that his detention matter is brought to a quick, successful conclusion."

61.    On April 14, 2008, Tom Casey, Deputy Spokesman of the U.S. Department of State, released Statement No. 2008/280, entitled "Belarus: Access to Imprisoned U.S. Citizen", which provided:

> "The United States is concerned about the welfare of American citizen Emanuel Zeltser, imprisoned in Belarus. Mr. Zeltser suffers from serious pre-existing health conditions and requires daily medications. Despite repeated requests for consular access to Mr. Zeltser, we have been permitted only one visit on March 27. The Government of Belarus failed to provide timely notification of his arrest, information about his medical condition, and did not inform the U.S. Embassy of his recent transfer to a state psychiatric hospital. Consular access in Belarus has long been a concern for the United States. We urge the Government of Belarus to comply with their international legal obligations and provide immediate and regular consular access to Emanuel Zeltser."

62.    On April 23, 2008, Jonathan Moore, U.S. Chargé d'Affaires in Belarus, was summoned to the Belarusian Ministry of Foreign Affairs:

> "At the meeting, the Chargé was told that the Ministry "requested" that the Embassy provide a list of the five U.S. diplomats who would remain in Belarus on April 30. Mr. Moore protested this news, and noted that there would be grave consequences as a result of this unprecedented and unwarranted step by the Belarusian authorities. Mr. Moore also protested the continued lack of access to American citizen Emanuel Zeltser, whom the

Embassy has not been able to visit since March 27, and expressed concerns about the state of Mr. Zeltser's health."

63.    On that same day, the New York City Bar Association sent a strongly worded letter to Lukashenka condemning KGB abuse of Mr. Zeltser and Ms. Funk and demanding their immediate release.  The Bar Association Letter, signed by its president Barry Kamins, states:

> "I write ... to express our concern over the continued detention and physical mistreatment of Mr. Emanuel Zeltser, an American attorney, and the detention of his assistant, Ms. Vladlena Funk, a permanent resident of the United States, in Belarus."
>
> ***
>
> "It has … been reported, to the Association's great concern, that Mr. Zeltser has suffered severe physical and mental mistreatment while in detention. It has been reported that since being detained four weeks ago, he has been repeatedly subject to beatings in jail, including direct blows to the head … Most recently, Mr. Zeltser has reportedly been transferred to a state psychiatric hospital. We also understand that Mr. Zeltser, a patient of several medical conditions, including diabetes, arthritis, heart problems, and stomach ulcer, has been denied medications critical to his health. As reported, these medicines have been withheld ..., despite a medical report from Mr. Zeltser's physician provided to the Belarusian authorities stating that Mr. Zeltser may not survive without the medications indicated. We have been informed that due to his critical health condition, Mr. Zeltser has twice been taken by ambulance to an emergency room, although in neither case was he provided medical attention, as no physicians were on hand. Mr. Zeltser suffers from a severe form of arthritis, among other serious conditions, and is reportedly in constant pain without his medications. According to his Belarus-appointed lawyer, he is in increasingly precarious health.
>
> ***
>
> In addition to the physical mistreatment, we understand that Mr. Zeltser has been repeatedly denied access to a U.S. consul, despite diplomatic protests filed by the United States Department of State with the Belarus Ministry of Foreign Affairs. The one visit that was granted, more than two weeks after his arrest, was reportedly held in the presence of a KGB official and thus was not confidential."

64.    The Bar Association Letter further stated that the charge that the KGB claimed to have brought against Mr. Zeltser and Ms. Funk "appears to have no basis to it", lacks "any explanation or detail," and "concerns have thus been reported that this is a fabricated charge, created to justify

their unlawful detention," and that Boris Berezovsky "may have instigated action against Mr. Zeltser for his work on behalf of a particular client."[13]

65.    On April 25, 2008, the U.S. State Department summoned the Belarusian *chargé d'affaires* in Washington to call for Mr. Zeltser's release. That same day, U.S. consular officer Caroline Savage visited Mr. Zeltser in the KGB detention center.  Ms. Savage reported that Mr. Zeltser was "considerably weaker and thinner than when a consular officer was last permitted to visit him on March 27," according to a statement by the U.S. Embassy in Minsk issued on April 29, 2008.  The statement added that the U.S. Embassy is "deeply concerned for his health and welfare."

66.    On April 29, 2008, the U.S. Embassy in Minsk, following its second visit to Mr. Zeltser on April 25, 2008, issued a statement calling for Mr. Zeltser's release on humanitarian grounds:

> "The United States is deeply concerned about the deteriorating health of American citizen Emanuel Zeltser, imprisoned in Belarus. Since his detention on March 12, the U.S. Embassy in Minsk has only been permitted to visit him on two occasions, March 27 and April 25. During the visit on April 25, the consular officer from the U.S. Embassy noticed a significant physical deterioration of Mr. Zeltser's health since the previous visit on March 27. Mr. Zeltser lost a considerable amount of weight and was very weak. Despite all efforts by the U.S. Embassy, his lawyer, and his U.S. doctor to comply with prison procedures, Mr. Zeltser has not been permitted to take his required daily medications, which may be causing irreversible internal damage. The United States is extremely concerned for the health and safety of Mr. Zeltser should he remain in the care and custody of the Government of Belarus. On April 25, the Department of State requested the Government of Belarus to release Emanuel Zeltser on humanitarian grounds immediately. We urge the Government of Belarus to favorably consider this request in order to save the life of an American citizen suffering in its custody."

67.    On April 29, 2008, the U.S. Department of State officially requested by diplomatic note that the Government of Belarus release Mr. Zeltser on humanitarian grounds.

---

[13]    As addressed heretofore and hereafter, in reality, not even these fabricated charges have ever even been presented to the plaintiffs. Instead, responding to the unprecedented international pressure, the KGB press office released a false statements that Mr. Zeltser and Ms. Funk had been "detained," "tried" and "convicted" for "attempted economic espionage" against Belneftekhim, in a "close door trial".

68.    On May 2, 2008, Union of Councils for Jews in the Former Soviet Union (UCSJ), a human

rights NGO, forwarded a letter to Lukashenka concerning the unlawful abduction, detention and

torture of Mr. Zeltser and Ms. Funk.  The UCSJ letter stated that UCSJ was "extremely concerned

by reports that US citizen Emanuel Zeltser has been detained and imprisoned by the Belarusian

authorities, denied critically needed medical treatment, beaten and otherwise physically abused, then

involuntarily placed in a psychiatric institution."  The UCSJ letter further stated:

> We respectfully request that you immediately look into these allegations of
> abuse to determine the extent of Mr. Zeltser's injuries and order an
> investigation of those officers who may be responsible. The fact that Mr.
> Zeltser suffers from diabetes, a heart condition, and severely painful arthritis,
> makes the denial of proper medical treatment he has suffered while in
> custody especially alarming, to the point of putting his life in danger. Mr.
> Zeltser's placement in psychiatric detention raises a variety of questions
> about the legal bases for the state's case against him. Involuntary placement
> into psychiatric facilities was an especially horrific form of repression against
> dissidents during the Soviet period which resulted in an enormous amount of
> negative publicity around the world. Placing him in psychiatric custody
> leaves the impression that the state is striving to isolate Mr. Zeltser and deal
> with him in an extra-legal fashion. (emphasis added.)

69.    The USCJ letter pointed out that "serious concerns had been raised ... about the nature of the

charges that Mr. Zeltser and his secretary, Vladlena Funk, face" and urged Belarusian authorities "to

release Mr. Zeltser and Ms. Funk immediately, to allow Mr. Zeltser access to his medications, and

to ensure that they are subject to no further torture or cruel or degrading treatment, including

interrogation under inhumane conditions."

70.    On May 7, 2008, Amnesty International issued an emergent alert, UA 121/08, entitled:

"Torture and other ill-treatment/health concern", advising that Mr. Zeltser was "interrogated and

beaten, and has been denied the medicine he needs urgently to treat his diabetes and arthritis."

Amnesty International further advised that "the US Consul, Caroline Savage, reported that Emanuel

Zeltser's health was failing, noting that he had lost weight, was very weak and had difficulty walking

and talking, and that he had been beaten two or three times while in custody." Amnesty International advised all of its adherents to "send appeals to arrive as quickly as possible ... calling on the authorities to ensure that Emanuel Zeltser receives immediately the medication his doctor has prescribed ... to order an urgent, independent investigation of reports that Emanuel Zeltser has been tortured or otherwise ill-treated, and to bring those responsible to justice... [and] "urging the authorities to ensure that Emanuel Zeltser is protected from further torture and other ill-treatment, and given regular access to US consular representatives, lawyers of his choice and any medical attention he may require."

71.    On that same day, Hon. Jerrold Nadler, Chair of the House Subcommittee on Constitutional Civil Rights and Civil Liberty, wrote to the Belarusian prosecutor general Grigorii Vasilevich regarding the abuse of Mr. Zeltser by the Belorusian KGB, including the physical abuse and denial of regular access to medication.  In his letter, Congressman Nadler urged Mr. Vasilevich "to treat Mr. Zeltser in a fair and humane manner, as specified in Article 36 of the Vienna Convention" and stated that "Mr. Zeltser has the basic human right not to be beaten or physically banned [and] is entitled to food and medication which keep him from serious illness or death."

72.    On May 30, 2008, the Belarusian government turned down the U.S. government's request for the release of Mr. Zeltser.

73.    On June 15, 2008, MT~Newswire™ released a transcript of an interview with Marina Sivoy, who was then a recently released prisoner of Amerikanka, where Ms. Funk was held and who was a cellmate of Ms. Funk for nearly a month.  Ms. Sivoy reported that Ms. Funk was subjected by the KGB to psychological abuse that was "much worse than physical beating which [Sivoy] once received there."  "[Ms. Funk] was dragged to interrogations, sometimes four or five times a day, usually in the middle of the night", Sivoy said.  "After she was brought back to the cell she was

hysterical, often incoherent, could not talk … It would take her at least an hour to calm down but, as she was finally falling asleep, the guards would walk in and order her in a rude and insulting manner to go back to interrogation room, I was worried that she would lose her mind." Ms. Sivoy also described the humiliating and degrading conditions which female prisoners endured in KGB internment.

> "There are no separate male/female cellblocks in Amerikanka. Women and men are held in the same small ward... all prison guards are men. They conduct daily searches of the cells, our personal things, personal hygiene items ... do body frisks. Strip searches are done by the prison nurse but there are always two male guards present in the cell, even though they usually turn around, it was incredibly humiliating. Men accompanied us to the bathroom twice a day, 6 AM and 6 PM, sometimes they ordered us to leave the bathroom door open so that men-guards and men-inmates who would pass by could see the inside of the bathroom, when we were using it. .... Some cells have a toilette inside, which is not separated at all and less than a meter away from a small table where we ate. Guards open peephole every 2-3 minutes and the toilette is in plain view. Showers were permitted only once a week, often there was no hot water.... Male guards accompanied women to the shower room. When we entered the shower room, guards locked the door from the outside. But the shower room door had a window ... the entire shower room could be seen ... some guards sincerely felt embarrassed themselves even apologized to us, like, what can we do, here we are almost the same prisoners here as you...."

74.    On June 16, 2008, Amnesty International issued a second emergent alert, entitled "Further Information on Torture and other ill-treatment/serious ill health: Emanuel Zeltser", advising that: "Emanuel Zeltser is still being refused the medication that he desperately needs to treat his diabetes and arthritis. Since his arrest on 12 March 2008, the Belarusian authorities have denied Emanuel Zeltser the treatment he needs and he is now in a great deal of pain, is unable to walk and has difficulty talking."

75.    After numerous requests by the U.S. Department of State and calls of human rights organizations, on June 26, 2008, Belarusian authorities allowed Mr. Zeltser to be examined by an independent U.S. physician, Dr. Albert Benchabbat - - after Mr. Zeltser had been imprisoned for over

three months.  Dr. Benchabbat's report revealed the harrowing results of the torture – that Mr. Zeltser's continued physical degeneration had brought him near the point of death.  In his report of the examination of Mr. Zeltser, Dr. Benchabbat noted Mr. Zeltser's pain from debilitating gout and spondylosis, that Mr. Zeltser's joints were inflamed, that he had high blood pressure, hypercholesterolemia, microproteinuria, and hypocalcaemia; severe kyphosis of the spine and was unable to stand without assistance.  The medical report further noted that Mr. Zeltser was suffering from excruciating pain and stated that "it is imperative to resume the patient medications that were taken away before his incarceration," concluding: "Upon review and comparison of the patient's medical history, his chart from March 17, 2008 to June 3, 2008 and results of examination of the current condition of the patient, I can definitely conclude that the patient's health is in a very poor state, his medical condition is rapidly deteriorating and having taken into consideration the current medical treatment which is clearly rudimentary and insufficient for these serious illnesses, Emanuel Zeltser may not survive his detention ..."

76.    On June 26, 2008, the U.S. Department of State presented Dr. Benchabbat's report to Belarusian authorities.  On June 27, 2008, the KGB spokesman, Mr. Natodchaev, in a false press statement incredulously "interpreted" Dr. Benchabbat's report to mean that Mr. Zeltser was found to be "in satisfactory health and fit to remain in prison."  Mr. Natodchaev noted however, that Belarusian authorities had allowed for an independent medical exam of Mr. Zeltser to demonstrate to the U.S. its "goodwill [and] desire for an open dialogue."

77.    On July 31, 2008, Amnesty International renewed its emergent alert "Further Information on Torture and other ill-treatment/health concern: Emanuel Zeltser" advising the world of the "closed door trials" of Mr. Zeltser and Ms. Funk and the refusal of Belarusian authorities to permit presence of the representatives of the U.S. State Department. (Id.)

78.     On August 2, 2008, FrontierNews™ reported that a Belarusian court clerk confirmed that no trial of Mr. Zeltser and/or Ms. Funk is reflected in Belarusian court records.

79.     On September 16, 2008, at a Hearing of the Commission on Security and Cooperation in Europe (the US Helsinki Commission), Assistant Secretary of State, David J. Kramer stated:

> "In addition to the [undemocratic] conduct of elections in Belarus, another key issue in improving the relations between the U.S. and Belarus is Belarusian authorities' treatment of imprisoned U.S. citizen Emanuel Zeltser ... Despite our many repeated requests, we ... were denied access to his closed trial. And despite our many efforts, including facilitating an exam by an American doctor and even bringing his medications to prison officials, Mr. Zeltser reports he has not been allowed access to all his prescription medicines or their comparable Belarusian equivalents. Our consular officer and the American doctor reported such a severe deterioration to his health since his imprisonment that we have requested Mr. Zeltser's release on humanitarian grounds. With a real possibility for a significant improvement in the relationship between U.S. and Belarus, we hope there will be a quick, humanitarian resolution in Mr. Zeltser's case."

80.     On September 24, 2008, Amnesty International issued new alert stating: "Amnesty International is concerned that the U.S. Embassy officials were not granted access to any court hearings, and Emanuel Zeltser's lawyer was obliged to sign a non-disclosure clause."

59.     On November 4, 2008, Belarusian authorities moved the plaintiffs to a transit holding facility known as "Volodarka" while they awaited further transfers to KGB penal colonies.  Their lawyer, who observed Volodarka, reported that Mr. Zeltser and Ms. Funk "are deprived of the elementary sanitary facilities, there are no mattress, Emanuel is totally deprived of all his medications, his handcuffs are so tight that there is no blood circulation in his hands, he is denied food I brought to him … they are under totally inhuman, degrading conditions and are subject to constant humiliation."   Notably, Volodarka prison had been also observed by Oleg Volcheck, former prosecutor and member of the Minsk City Council, who reported in the June 2008 Report of the International Federation for Human Rights:

"I was shocked. Overcrowded cells, small windows, an hour of walking per day. The building of the detention facility is old, and 1800 people were kept in it, which exceeded the norm by 4.5 times. Some detainees had to sleep under the beds as there was not enough space for everybody. I was astonished by the windows: in the cell with 50 people (actually designed for 25), there was only one window measuring 50 by 50 cm, which was totally covered by so called 'eyelashes'. It was damp and moist in the cells, there was no fresh air, and sometimes the door had to be opened at night. The jail is miserable for non-smokers. All the walls were greasy, covered in dirt and moist. The toilet was in the general view and only separated by a small screen. It reminded me of stories about jails during Tsarist times. The top floors of the building had a better `climate', but those in the basement cells had their limbs rotting away, and their skin covered in boils."

81.    On or about November 10, 2008, a day before their transfer to the KGB penal colonies, Ms. Funk was driven blindfolded to a location approximately 30 minutes away from the Volodarka detention facility.  When her blindfold was removed, she found herself in a lavishly decorated room, where she had been apparently awaited by two well dressed men.  The men introduced themselves as principal executives of Belneftekhim and offered Ms. Funk a drink. One man, who identified himself as "Vladimir," explained to Ms. Funk that the U.S. sanctions against Belneftekhim are suffocating the company and the Belarusian economy, and causing the Belarusian people great hardship.  Vladimir advised that Mr. Zeltser's abduction in London was carried out at the request of Belneftekhim to bring the United States to its senses, and that Ms. Funk was simply in the wrong place at the wrong time.  The Belneftekhim representatives advised Ms. Funk that if she agreed to sign "confessions" regarding Mr. Zeltser's "spying" on Belneftekhim, explaining that such "confessions" would embarrass the U.S. and force it to lift its sanctions against Belneftekhim. "Vladimir" suggested that the signing should take place before consular representatives of the Russian Federation and, in exchange, Ms. Funk would be permitted to walk out with the consular representatives and leave Belarus.  Ms. Funk declined to sign false documents and was again blindfolded and driven back to Volodarka.

82.    On November 11, 2008, Mr. Zeltser was transferred to a KGB-operated penal colony near

Mogilev.  The train-cell in which Mr. Zeltser was transported, was designed to transport four

inmates; however the convoy squeezed in 19 (!) men, literally on top of one another.  There was no

food or drinking water and no one was allowed to go to the bathroom during the 11-hour trip.

Immediately upon arrival, Mr. Zeltser was brought to the prison hospital barrack with severe chest

pain and a sharp rise in blood pressure.  Yet, the Belarusian government continued to withhold his

physician-prescribed medications.  He received intravenous fluids for nutrition.  A nurse attended

to him, but no doctor was on staff.

83.    The following day, Ms. Funk was transported a women's KGB-supervised penal colony #

4 near the town of Gomel - - in a similar wretched manner.

84.    On December 18, 2008, an urgent letter signed by eight ranking Members of the U.S.

Congress was dispatched to Belarusian dictator Lukashenka demanding the immediate release of Mr.

Zeltser, stating:

> "... we are writing to you today to express our grave concern regarding the
> health and well-being of Emanuel Zeltser, a U.S. citizen imprisoned in
> Belarus... We are deeply troubled by Mr. Zeltser's arrest as well as the
> inhumane treatment he has received while in your government's custody...
> during Mr. Zeltser's internment in Belarus he has been denied regular
> independent medical evaluation and the U.S. consul in Minsk has reported
> that he has been physically assaulted and abused while in detention. This
> abuse is unconscionable and has been reported by Amnesty International,
> which has urged authorities in Belarus not to subject Mr. Zeltser to "further
> torture and other ill-treatment." As you know, the U.S. Department of State
> has also directly expressed "deep concerns about the state of his health," and
> has repeatedly called for Mr. Zeltser's release on humanitarian grounds, as
> has Representative Alcee L. Hastings, Chairman of the Commission on
> Security and Cooperation in Europe. We share their concerns and strongly
> urge your government to immediately and unconditionally release Mr.
> Zeltser..."

85.    On December 22, 2008, the Washington D.C. law firm, Patton Boggs, filed a complaint with

the United Nations Human Rights Committee on behalf of Mr. Zeltser. (The Complaint notes that

although the Complaint centers on Mr. Zeltser, the facts therein relate to Ms. Funk as well).  The

Complaint alleged that Belarusian authorities violated Mr. Zeltser's civil and political rights, noting

that Mr. Zeltser faced "physical beatings, inhumane and unsanitary treatment, including withholding

physician-prescribed medications" during his KGB detention.  The case of unlawful detention was

also brought up before the UN Special Rapporteur on Torture.

86.    On January 9, 2009, MSNBC aired a report ("Countdown with Keith Olbermann") which

accurately summarized the plight of Mr. Zeltser and Ms. Funk:

> "Number one, torture-gate. The story is all too familiar, a citizen of another
> country is drinking coffee at a café in a bustling city center. Before he passes
> out, he vaguely realizes the coffee has been spiked. Next thing he knows, he
> is on a private plane being renditioned to another country. He wakes next in
> a cold cell and when he tells them he needs medication for diabetes and
> arthritis and a heart condition, they instead torture him, and they move him
> from country to country and cell to cell, while at home, his desperate friends
> and neighbors try to find out what happened to him and how to save his life.
> Finally, he is tried in an extra-constitutional court, where he is permitted only
> the most perfunctory of defenses. He is convicted on manufactured evidence
> that he can neither see nor challenge and he is told he will stay in prison
> indefinitely. Some alleged terrorists rotting at Gitmo, awaiting the moment
> that we as a nation come to our senses? No, this is the journey of Emanuel
> Zeltser of New York. He's a lawyer. The city from which he was kidnapped
> last March was London. The place he was taken to was in Belarus. And the
> place he languishes to this day is a KGB penal colony. His alleged crimes?
> Economic espionage against Belarus, using false official documents, and
> possession of illegal drugs. Until he was renditioned, Zeltzer had never been
> in Belarus and the illegal drugs he was convicted of possessing, his
> medication for diabetes and arthritis and a heart condition.  A private law
> firm and Amnesty International and our State Department are doing all they
> can to rescue this New York attorney.

87.    On January 16, 2009, Amnesty International once again issued an emergent alert advising

that Mr. Zeltser was being held at a penal colony in Eastern Belarus: "His health has deteriorated

further, and the Belarusian authorities are continuing to deprive him of essential medication for

various ailments, including diabetes, heart problems and severe arthritis."

88.     In the beginning of January 2009, succumbing to international pressure, Belarusian

authorities permitted Mr. Zeltser to be examined again by an independent U.S. physician, Dr.

Benchabbat.  Dr. Benchabbat traveled to Belarus and examined Mr. Zeltser in prison.  His report

dated January 9, 2009, stated that "the problem must be addressed as soon as possible" and further

that Mr. Zeltser's continuing detention in Belarus "is equivalent to a death sentence."

89.     Notably, in addition to Dr. Benchabbat, Mr. Zeltser was examined by several top Belarusian

physicians personally appointed by Lukashenka.  Remarkably, their report was consistent with the

report of Dr. Benchabbat.

90.     On February 5, 2009, Robert Wood, acting U.S. State Department spokesman, said during

the daily briefing that the State Department continued calls for Mr. Zeltser's release, noting that he

was subjected to "abuse in prison" and that they have formally protested the mistreatment to the

Belarusian government.  "We don't use the word lightly," Wood said Thursday, referring to the

abuse.  "It's a very troubling situation there, and the Secretary [of State] is focused on this" Mr.

Wood added.

91.     On February 11, 2009, Chair of the Commission on Security and Cooperation in Europe

(The Helsinki Commission) Senator Benjamin L. Cardin denounced the purported "closed doors

trial" over Mr. Zeltser and Ms. Funk and noted:

> "The U.S. Embassy in Minsk criticized the proceedings, noting that it was
> denied the opportunity to observe the trial. The State Department has
> repeatedly called for Mr. Zeltser's release on humanitarian grounds. So have
> others in Congress, especially my colleague on the Helsinki Commission,
> co-chairman Representative Alcee Hastings."

Senator Cardin further stated:

> "The poor human rights record of President Lukashenka's regime is well
> known. No American--indeed no human being--should be subjected to the
> kind of treatment Mr. Zeltser has been forced to endure during his
> incarceration. Despite Mr. Zeltser's grave health condition--he suffers from

> heart disease, type 2 diabetes, severe arthritis, gout, and dangerously elevated blood pressure—Belarusian authorities have repeatedly refused to provide Mr. Zeltser with his prescribed medications."

92.    Pressure on Belarus intensified. "It's very exceptional," said Jonathan M. Moore, the U.S. chargé d'affaires in Belarus in his February 15, 2009 interview with the New York Times.  "This is the only time in my knowledge that a citizen of any country was arrested immediately upon arrival, held by the KGB, sentenced in a closed trial and has been held for so long when the state of his health is such a concern."  Mr. Moore noted that Belarusian authorities detained Mr. Zeltser, who was accompanied by his assistant Ms. Funk, "under mysterious circumstances ... moments after he landed at the airport in Minsk" and "tried him in closed court against the protests of American diplomats."

93.    After being held in various KGB detention facilities for 373 days, Ms. Funk was finally released on March 20, 2009, amidst international pressure and after the Russian ambassador to Belarus indicated that her continuous detention may have a negative impact upon the relationship between the two countries.

94.    Lukashenko however still sought to to use the U.S. concern over Mr. Zeltser as an opportunity and was delaying his release while trying to negotiate a deal with the U.S. Government to trade Mr. Zeltser's freedom for the lifting of U.S. sanctions against Belneftekhim.

95.    In the beginning of June of 2009, Emanuel Zeltser went on a hunger strike widely reported by international media.  Reuters in its report "US Citizen Jailed In Belarus On Hunger Strike" noted that Zeltser, "who once testified before Congress on Russian organized crime, was jailed in the ex-Soviet republic last year under murky circumstances".

96.    U.S. and international pressure on the government of Belarus to free Mr. Zeltser grew more

intense.  However, the U.S. government took a firm stance against using a citizen held hostage as a "bargaining chip" said Jonathan Moore, U.S. chargé d'affaires in Belarus.

97.     On June 12, 2009, President Barack Obama continued the sanctions imposed against Belneftechim pursuant to the *Notice on Continuation of the National Emergency With Respect to the Actions and Policies of Certain Members of the Government of Belarus and Other Persons That Undermine Democratic Processes or Institutions in Belarus*.

98.     On June 30, 2009, a delegation of U.S. Senators and Congressmen traveled to Belarus and demanded the immediate release of Mr. Zeltser.  Fearing additional harsher sanctions, Belarusian dictator Lukashenka signed an order decreeing Mr. Zeltser's release.  "I never thought that this man could become an issue in relations between our  states," Lukashenka said, "[but] if it is very important to America and our relations and may contribute to the normalization of our relations, I'll sign the edict today."  Mr. Zeltser was released from the KGB detention later the same day, after 473 days in captivity.

99.     Two hours prior to his release, Mr. Zeltser was brought to an office inside the KGB facility, where Mr. Voronin of Belneftekhim was awaiting. Voronin (legal advisor of Belneftekhim) started by saying he wanted to caution Zeltser "as one colleague to another". Voronin said that his "sincere advice" would be to be grateful to God and to U.S. intervention on Zeltser's behalf and to enjoy his freedom and forget the word "Belneftekhim".  Voronin said that as someone who was born and raised in Russia, Mr. Zeltser should realize that "Belneftekhim and the KGB are owned by the same master, Mr. Lukashenko" and therefore any attempted legal action against Belneftekhim would be futile. Belneftekhim has never heard of you, Voronin said. To Mr. Zeltser's remark that he certainly knew Mr. Voronin, the latter replied: "Belneftekhim has never heard of me either".

100.    Plaintiffs' wrongful captivity and torture had a grave impact on the plaintiffs' health,

especially on Mr. Zeltser. Plaintiff Zeltser is a diabetic who suffers from debilitating arthritis. As stated heretofore, defendants, through their KGB cohorts, for months deprived Emanuel Zeltser of his physician-prescribed medication, that were necessary to maintain his diabetes and arthritis stable. It took many months of treatment until Mr. Zeltser was able to return to practicing law on a limited basis.

101. Following the plaintiffs' release, defendants continued their terror campaign against Ms. Funk. They have made repeated death threats on Ms. Funk as a reprisal for any civil action ever commenced on plaintiffs' behalf. In addition, capitalizing on the fact that Ms. Funk's family resided in Russia, where Ms. Funk visited them on a regular basis. Defendants reminded Ms. Funk that Russia is an ally and a sponsor state of Belarus and threatened that Russian government would readily turn Ms. Funk over at Belarus's request, where she would again find herself in the KGB dungeons. Hence, defendants affirmatively delayed and frustrated the plaintiffs' ability to seek justice and the filing of this action. Until Ms. Funk became a U.S. citizen in June 2012, and could rely upon the protections accorded to the U.S. citizens, neither she nor Mr. Zeltser could take any such legal action without endangering her life or welfare. Only after Ms. Funk became a U.S. citizen, she no longer was forced to live in fear of the vicious credible threats.

102. As a result of the plaintiffs' unlawful captivity in inhumane conditions and acts of torture committed, aided, abetted and participated in by the defendants, plaintiffs suffered great mental and physical distress, in addition to personal injuries resulting in plaintiffs becoming sick, sore, lame and disabled and may continue be so sick, sore lame and disabled for some time to come; was obliged to and necessarily did engage and procure medical aid and attention in an endeavor to cure herself of her hurts and wounds and did necessarily pay and become liable therefore.

## CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF:
COMMON LAW FRAUD

103.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

104.    As heretofore alleged, in early March, 2008, at defendants request, plaintiffs and defendants, including Mr. Voronin and Ms. Moysievich met, first in Carnegie Club in New York City, and then in Mr. Zeltser's office on the Upper West Side in Manhattan. Defendants represented to the plaintiffs that the meetings were held for the purposes of settlement negotiations between the defendants and plaintiffs' clients with the objective of resolving ownership and financial dispute and avoiding litigation. Initially, defendants attempted to deny the plaintiffs' clients' ownership by showing the plaintiffs forged documents on the letterhead of Belneftekhim USA.

105.    At the conclusion of the meetings, defendants represented to the plaintiffs that they may have reached an agreement in principle and wanted to continue the discussion in London.

106.    Defendants reasonably relied upon the plaintiffs' representations, believing that defendants wanted to continue good faith settlement negotiations to conclusion in London.

107.    Unknown to the plaintiffs at the time, but in true and in fact, defendants requested that plaintiffs travel to London, not for the purposes of "settlement negotiations" but to facilitate their abduction and unlawful transportation to Minsk Belarus, using the facilities of their hired henchman Boris Berezovsky, including his private jet.

108.    Defendants knew of the falsity of their representations to the plaintiffs at the time of their meeting in New York City, *i.e*., defendants knew that the real purpose of their suggestion to continue the settlement discussion in London was the defendants' scheme to use Berezovsky and his private jet to effect the plaintiffs unlawful transportation to Belarus against their will. Defendants knew that

plaintiffs in Belarus would be unlawfully detained and tortured by the KGB, a notoriously nefarious Gestapo-like secret paramilitary force of the Soviet era.[14]  Indeed, defendants intended this very result in order to permanently squelch the plaintiffs and/or get them, under torture, to persuade their clients to renounce their commercial ownership interest.

109.    In the first month of their unlawful captivity, defendants explained to plaintiffs that after the plaintiffs declined defendants' "invitation" to a meeting in Minsk Belarus, defendants' next best bet was to bring them to Belarus against their will. Defendants further explained that effecting such scheme would be much more difficult from the U.S. for a number of reasons: [a] there are no direct flights from any U.S. city to Belarus; [b] transporting plaintiffs from New York to Belarus against their will by commercial airline would be too risky and too uncertain; [c] air travel time from London to Minsk is approximately three hours, approximately a quarter of air travel from New York.

110.    Defendants purposely misrepresented to the plaintiffs, intending for the plaintiffs to rely on their misrepresentations, so as to lure the plaintiffs to London and induce them to meet with defendants and Berezovsky under the circumstances more conducive to effect kidnapping of the plaintiffs and transporting them to Belarus against their will.

111.    As a direct and proximate cause of defendants' fraud, plaintiffs sustained grievous injuries including but not limited to suffering great mental and physical distress, pain, suffering and injury to their health as a result of continuous torture and detention in inhumane conditions; loss of income and business opportunities while remaining in unlawful custody; and significant expenses connected with their rescue.

112.    By virtue of an agreement with their clients plaintiffs also have a direct interest in Belneftekhim's ownership and property, including the interest in the funds blocked by OFAC.

---

[14]      Belarus is the only country of the former USSR republics to retain the name "KGB", deemed by many as synonymous to evil.

113.    As a direct and proximate consequence of defendants' fraud, defendants diverted the ownership and financial interest in Belneftekhim to themselves, for their own enrichment and/or enrichment of Lukashenko, his family and his corrupt inner-circle, all to the plaintiffs' detriment and damage.

114.    As a direct and proximate cause of the aforementioned fraud by the defendants, plaintiffs suffered great financial damages, the amount of which is still being ascertained.

SECOND CLAIM FOR RELIEF:
ASSAULT AND BATTERY

115.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

116.    As heretofore alleged, on or about March 11, 2008, defendants, acting in concert with Berezovsky and the KGB, unbeknownst to plaintiffs and without their consent, caused the plaintiffs to ingest benzodiazepine sedatives drugs in a doses sufficient to make them sleepy and unable to resist defendants' actions in furtherance of their abduction.

117.    Once plaintiffs were sufficiently sedated, defendants forced the plaintiffs in Berezovsky's limousine and transported them to and placed plaintiffs aboard a private jet bound for Belarus - - all against the plaintiffs' will.

118.    The above wrongful acts involved intentional touching of, administering illegal drugs, and application of force to, the bodies of the plaintiffs in a harmful and offensive manner, and without their consent.

119.    The defendants intended to cause a harmful or offensive contact in order to facilitate the plaintiffs' unlawful abduction and transportation to Minsk.

120.    In addition, during their unlawful captivity, for 12 and 16 months respectively, plaintiffs had

been subjected to torture, including severe physical beating and other forms of cruel, inhuman and degrading treatment involving application of physical force to the bodies of the plaintiffs in a harmful and offensive manner, and without their consent.

121.    The defendants intended to cause the above-described offensive contact in order to coerce the plaintiffs to comply with defendants' demands.

122.    The defendants orchestrated and in substantial manner aided, abetted, participated in and directed in the above mentioned assault and battery.

123.    As heretofore alleged, defendants utilized services and facilities of a private third-party contractor, Berezovsky, and his facilities in order to accomplish their afore-described nefarious objectives.

THIRD CLAIM FOR RELIEF:
FALSE IMPRISONMENT

124.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

125.    As heretofore alleged, on March 10, 2008, plaintiffs traveled to London for a business meeting with defendants' representatives, including Berezovsky. During their meeting, unbeknownst to plaintiffs, defendants, acting in concert with Berezovsky and the KGB laced their drinks with a sedative drug, forced them into Berezovsky's limousine, transported them to a private airport, placed them on a private jet, *en route* to Minsk, Belarus — all against their wills.

126.    By confining plaintiffs in Berezovsky's limousine and his private jet, leading to the plaintiffs' subsequent confinement in the Belarusian KGB facilities, defendants, acting in concert with the KGB, interfered with plaintiffs personal interest of freedom from restraint of movement.

127.    The defendants intended to unlawfully confine the plaintiffs.

128.    As heretofore alleged, plaintiffs were conscious of the confinement, and neither Zeltser nor

Funk consented to any of the aforementioned confinement.

129.   The defendants orchestrated and in substantial manner aided, abetted and participated in the above mentioned wrongful conduct, including but not limited to, the plaintiffs confinement in (i) Berezovsky's limousine; (ii) his jet; and (iii) subsequent confinement in the KGB facilities for 12 and 16 months respectively.

130.   The above-described confinements were wholly unlawful and were not privileged.

131.   As heretofore alleged, defendants utilized services and facilities of a private third-party contractor, Berezovsky, and his facilities in order to accomplish their afore-described confinements.

132.   Plaintiffs suffered damages as a result of the aforementioned conduct by the plaintiffs.

FORTH CLAIM FOR RELIEF:
INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS

133.   Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

134.   For reasons afore alleged, defendants, acting in concert with Berezovsky and the KGB, engaged, in extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society.

135.   The defendants, by their extreme and outrageous conduct intentionally caused severe emotional distress to the Plaintiffs.

136.   The defendants orchestrated and in substantial manner aided, abetted and participated in the above mentioned wrongful conduct.

137.   Plaintiffs suffered damages as a result of the aforementioned conduct by the plaintiffs.

FIFTH CLAIM FOR RELIEF:
TORTIOUS INTERFERENCE WITH
CONTRACTUAL RELATIONSHIP

138.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and

effect as if fully set forth at length herein.

139.    As heretofore alleged, at all relevant times, plaintiffs had valid contracts with a number of

clients for the provision of legal and advisory services.

140.    The defendants knew about the existence of these contracts and sought to cause the breach

of the contracts.

141.    By intentionally and unlawfully detaining the plaintiffs, for 12 months and 16 months,

respectively, the defendants, acting in concert with Berezovsky and the KGB procured the actual

breach of contracts.

142.    As heretofore alleged, the defendants orchestrated and directly participated in unlawful

abduction and rendition of Plaintiffs to Belarus, where the plaintiffs were, at the behest and with

active participation of the defendants, unlawfully detained and held for 12 and 16 months

respectively.

143.    As a direct result of defendants' actions, including plaintiffs' unlawful detention and

confinement, numerous breaches of contract for provision of legal and advisory services by plaintiffs

occurred, causing plaintiffs substantial ascertainable damages.

144.    The defendants, acting in concert with Berezovsky and the KGB, intended to harm plaintiffs

by interfering with their contractual relationship with clients.

145.    The defendants' actions were unlawful, criminal, wanton and actuated by malice and had

no privilege, excuse or justification.

146.    The defendants orchestrated and in substantial manner aided, abetted and participated in the

above mentioned wrongful conduct.

147.    Plaintiffs suffered damages resulting from the defendants' intentional interference with the contractual relationship alleged herein, the precise amount of which is still being ascertained.

> SIXTH CLAIM FOR RELIEF:
> TORTIOUS INTERFERENCE WITH
> PROSPECTIVE ECONOMIC ADVANTAGE

148.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

149.    As heretofore alleged, plaintiffs had an economic relationship with their clients, including but not limited to the plaintiffs' interest in their clients' investment interest in Belneftekhim defendants, their ownership and assets, including without limitations the funds blocked by OFAC.

150.    This economic relationship contained significant probability of future economic benefit to plaintiffs.

151.    The defendants knew of the existence of the relationship between plaintiffs and their clients and sought to disrupt this relationship.

152.    The relationship was actually disrupted.

153.    Defendants' actions were unlawful, criminal, wanton and actuated by malice and had no privilege, excuse or justification.

154.    Plaintiffs suffered actual damages directly and proximately caused by unlawful and malicious the acts of defendants.

> SEVENTH CLAIM FOR RELIEF: CONVERSION OF
> OWNERSHIP AND FINANCIAL INTEREST IN
> BELNEFTEKHIM DEFENDANTS AND THEIR ASSETS

155.    As heretofore alleged, plaintiffs' investor-clients had substantial interest in the ownership of

Belneftekhim defendants and their assets. By virtue of an agreement with their clients plaintiffs also have a direct interest in Belneftekhim's ownership and property, including the interest in the funds blocked by OFAC pursuant to the Executive Order 13405.

156.    As heretofore alleged, defendants, acting in concert with Berezovsky and the KGB, choreographed plaintiffs' abduction and rendition to Belarus. There defendants coerced plaintiff Zeltser under torture to telephone the Halkin Hotel in London and "authorize" the release plaintiffs' originals and copies of documents relating to their ownership in Belneftekhim defendants and their assets and further coerced plaintiff Funk, under torture, to telephone the plaintiffs' clients and plead with them to forfeit their ownership and financial claims and interest in Belneftekhim defendants and their assets,  including the interest in the funds blocked by OFAC pursuant to the Executive Order 13405.

157.    Plaintiffs had legal proprietary and possessory right and interest in this specific identifiable property taken by the defendants with intent to permanently deprive plaintiffs of their property.

158.    Belneftekhim defendants wrongfully took the plaintiffs' interest in ownership and assets of Belneftekhim defendants for their own enrichment, and/or enrichment of Lukashenko, his family and his corrupt inner-circle, intending to permanently deprive the plaintiff of their use and ownership.

159.    Defendants wrongfully exercised and continue to wrongfully exercise dominion over plaintiffs' interest in ownership and assets of Belneftekhim defendants in derogation of plaintiffs' rights, and in violation of international law.

160.     Defendants' actions constitute a distinct act of dominion wrongfully exerted over plaintiffs' interest in property in denial of or inconsistent with plaintiffs' rights therein.

161.    Plaintiffs suffered damages as a direct and proximate cause of defendants' conversion  in the

form of their loss of ownership and financial interest, in addition to economic loss in the amount to

be proven at trial.

> EIGHTH CLAIM FOR RELIEF:
> CONVERSION OF PLAINTIFFS'
> PERSONAL PROPERTY

162.    As heretofore alleged, defendants, acting in concert with the KGB, choreographed plaintiffs'

abduction and rendition to Belarus. There defendants coerced Zeltser by torture to telephone his hotel

in London and "authorize" the release plaintiffs' original documents , and personal effects left at the

hotel, to defendants' representatives in London.

163.    Such effects included original documents, computer equipment, valuable jewelry and

wristwatches, clothing and travel items, and £5,740 in cash.

164.    The defendants wrongfully took possession of the above referenced property with intent

to permanently deprive the plaintiff of their use and ownership.

165.    Plaintiffs had legal proprietary and possessory right and interest in this specific identifiable

property taken by the defendants with intent to permanently deprive plaintiffs of their property.

166.    Defendants wrongfully exercised and continue to wrongfully exercise dominion over

plaintiffs' personal property in derogation of plaintiffs' rights.

167.     Defendants' actions constitute a distinct act of dominion wrongfully exerted over plaintiffs'

personal property in denial of or inconsistent with plaintiffs' rights therein.

168.    Plaintiffs suffered financial damages as a direct and proximate cause of defendants' conduct.

> NINTH CLAIM FOR RELIEF:
> PRIMA FACIE TORT

169.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and

effect as if fully set forth at length herein.

170.    In the unlikely event, the Court finds that the defendants' acts and series of acts were lawful,

the defendants should be held liable under the *prima facie* tort doctrine.

171.    As afore alleged, the defendants, acting in concert with the KGB, engaged in intentional and malicious actions, causing the plaintiffs harm and special damages.

172.    As a direct and proximate cause of defendants' intentional, malicious, and wanton actions, the defendants inflicted harm upon the plaintiffs.

173.    The harm inflicted upon the plaintiffs by the defendants, acting in concert with the KGB was without excuse or justification.

174.    As a direct and proximate cause of the defendants' intentional, malicious, and wanton actions, Plaintiffs suffered special damages, such as legal fees and other direct expenses, expended by the plaintiffs in securing their release from the Belarusian KGB.  In addition, plaintiffs have suffered special damages in the form of unnecessary legal fees and related expenses in defending bogus proceedings in various jurisdictions, and further suffered loss of specific valuable property.

175.    The above alleged financial losses are specific and capable to be measured in money, and will be reduced to a specific documented sum at the time of the trial.

DEMAND FOR PUNITIVE AND EXEMPLARY DAMAGES

176.    Defendants' conduct as heretofore and hereinafter alleged was willful, wanton and outrageous beyond the ability of ordinary human beings to comprehend and such that the conduct of was oppressive and malicious, warranting punitive damages.

JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action and all issues so triable.

WHEREFORE, plaintiffs demand a final judgment against the defendants, on each and all causes of action in the complaint on behalf of each and all plaintiff(s), against each and all defendant(s), for compensatory damages in the sum to be evidenced at trial, and punitive

damages, along with interest, attorneys' fees, costs and disbursements of this action, and such other further and alternative relief as this Court may deem just and proper.

Dated:  April 4, 2014
New York, New York

STERNIK & ZELTSER

by:    */s/ Emanuel Zeltser*
119 West 72 Street #229
New York, NY 10023
(212) 656-1810
email: lawmail@mail.ru

Attorneys for plaintiffs
Vladlena Funk and Emanuel Zeltser