UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VLADLENA FUNK and EMANUEL
ZELTSER,

*Plaintiffs,*

BELNEFTEKHIM a/k/a CONCERN
BELNEFTEKHIM, and BELNEFTEKHIM
USA, INC.,

*Defendants.*

Case 1:14-cv-00376 (BMC)

Hon. Brian M. Cogan presiding

## SECOND AMENDED COMPLAINT
### (pursuant to the Order of the Court
### dated October 20, 2015 [CEF 77])

**Respectfully submitted:**

*Counsel for Plaintiffs:*

**STERNIK & ZELTSER**
**1562 First Avenue # 205-1817**
**New York, NY 10028-4004**
**tel/fax: +1.212.656.1810**
**email: lawmail@mail.ru**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VLADLENA FUNK and EMANUEL
ZELTSER,

                                    *Plaintiffs*,

BELNEFTEKHIM a/k/a CONCERN
BELNEFTEKHIM, and BELNEFTEKHIM
USA, INC., and JOHN DOES 1 - 50

                                    *Defendants*.

Case 1:14-cv-00376 (BMC)

SECOND AMENDED COMPLAINT
(pursuant to the Order of the Court
dated October 20, 2015 [CEF 77])

Plaintiffs **Vladlena Funk** and **Emanuel Zeltser**, for their Second Amended Complaint,

complaining of Defendants **Concern Belneftekhim** and **Belneftekhim USA, Inc.** (collectively,

"Belnetekhim Defendants" or "Belneftekhim") and John Does 1- 50, allege as follows:

## SUMMARY OF AMENDMENTS

1.      The substantive set of operative facts in this amended complaint remains the same as in the

First Amended Complaint. No substantive new allegations or causes of action have been added. The

amendments focus on setting forth with greater particularity those facts that constitute the Plaintiffs'

First Claim for Relief: Common Law Fraud, which the Court dismissed for lack of requisite

particularity (with leave to amend) and, specifically, for Plaintiffs' failure to attribute to particular

persons the statements constituting the fraud claim. Consequently, the allegations of the First

Amended Complaint related to the fraud claim have been reformed, clarified and supplemented in

order to correct the deficiencies identified by the Court in its Order dated October 20, 2015 [CEF

77]. These amendments appear primarily under the sub-section entitled *"Defendants Fraudulently*

*Induce Plaintiffs to Travel to from New York to London in Order to Effect Their Criminal Scheme*

*of Depriving Plaintiffs and Their Clients of Ownership in Belneftekhim Defendants"*, ¶¶58-71.

2.      Plaintiffs added the statement of subject matter jurisdiction based on the October 20, 2015

Order; and the statement of personal jurisdiction reciting the allegations of the Second Amended Complaint. (¶¶21-25).

3.      Certain non-substantive amendments were made for ease of reading and reference and to correct grammatical errors in the first amended complaint. Sub-section headed "*Belarus, "The Last Remaining True Dictatorship in the Heart of Europe*" (¶¶16-19) essentially repeats the allegations of the First Amended Complaint and cites to the 2012 U.S. Department of State Report on Belarus, previously cited by Plaintiffs in the affirmation of Emanuel Zeltser of September 8, 2015, submitted on Defendants' appeal to the U.S. Court of Appeals for the Second Circuit. This subsection alleges no specific wrongdoing by Defendants and provides background facts concerning the Republic of Belarus.

4.      The Second Amended Complaint does not name new Defendants and still lists fictitious names "John Doe 1 - 50", who aided, abetted and participated in the conduct of the Defendants alleged herein (the "Doe Defendants").  This is because Defendants failed to comply with multiple Orders of this Court to provide necessary discovery. The task of identifying the Doe Defendants in the absence of discovery is particularly difficult because it is a common practice in Belarus (and many other former Soviet republics) to ascribe fictitious names to individuals, such as Belarusian government officials or senior officials of large commercial enterprises, who are involved in sensitive, often unlawful activities, especially concerning matters outside Belarus — usually in conjunction with the KGB and Belarusian state security council headed by Viktor Lukashenko, son of the Belarusian dictator Alyaksander Lukashenko.[1] Sub-section entitled "Relevant Nonparties

---

[1]      Alternatively, the names of individuals involved in *special endeavors*, are routinely changed, once their identity becomes known in connection with the matters that may expose Belarusian government, its agents and strategically important enterprises in unfavorable light, or in the event that their illegal or immoral activities became known. This practice has been routinely employed, since the Soviet era, in order to frustrate "outsiders" efforts of identifying the persons engaged in Belarusian regime's misconduct and according the
(continued...)

(¶¶46-53) is added in order to more clearly identify the Defendants' representative, who uttered fraudulent statements to Plaintiffs.

## SUMMARY OF FACTS

5.    This is a removed action raising state law claims arising out of the well-publicized abduction and torture of the two Plaintiffs, U.S. citizens, by Belneftekhim Defendants, acting in concert with the Belarusian KGB and other individuals tied to officials in the Government of Belarus.[2]

6.    Plaintiff Emanuel Zeltser is a U.S. citizen and New York attorney ("Zeltser"). Zeltser represented an investment group which had made a significant long-term investment in Defendants Concern Belneftekhim ("the Concern" or "BNTK"), a Belarusian petrochemical conglomerate company, and Belneftekhim USA, Inc. ("Belneftekhim USA" or "BUSA"), its U.S. subsidiary and representative office. Plaintiff Vladlena Funk, a naturalized U.S. citizen, was Zeltser's legal assistant and also a freelance journalist.

7.    In essence, Defendants BNTK and BUSA, acting in concert with the Belarusian KGB and

---

(...continued)

regime (and those under its protection) plausible deniability. The term "special endeavor" or "special project" in Belarus refers to such tasks that are of particular importance to Lukashenko and his ruling regime. Special endeavors usually are carried out in secrecy as covert operations using all facilities of the country and all means necessary, including often by illegal and criminal acts, including unlawful detentions, murders and disappearances of unwanted persons (as specifically noted in the Executive Order 13405, as one of the grounds for sanctions).

[2]    Belarus is the only country of the former USSR republics to retain the name "KGB", deemed by many as synonymous to evil.

a now deceased notorious Russian *oligarch*[3] Boris Berezovsky, Belneftekhim's major shareholder and a long-time personal friend and business associate of Belarusian dictator Lukashenko,[4] lured the Plaintiffs, residents of New York, to London, where Berezovsky resided at the time, as a fugitive from justice in Russia and Brazil. In accordance with Defendants nefarious plan, In London, during a "settlement meeting" with the Belneftekhim Defendants and Berezovsky, Defendants, with the aid of the Belarusian KGB operatives, secretly drugged placed sedative drug in Plaintiffs' drinks. Then Defendants abducted Plaintiffs and secretly and extra-judicially flew them across international borders to Belarus against their will — aboard a private jet belonging to Berezovsky.

8.    Upon landing in Minsk, Plaintiffs were immediately and unlawfully detained by the awaiting personal guard of Mr. Lukashenko and transported to "*Amerikanka*", the dreaded Belarusian KGB detention/torture facility of the Stalin era. There Plaintiffs were stripped bare and savagely beaten with truncheons, fists, boots, and belt buckles, and then thrown naked into 7' by 3' cold solitary confinement boxes. Subsequently, Plaintiffs were repeatedly dragged to basement interrogation rooms, where they were subjected to further torture.[5]  Defendants' representatives were present at, observed and directed the Plaintiffs' interrogation and torture.

---

[3]    The English-language and western media have borrowed the term Russian oligarch (loosely synonymous of the term "business oligarch" or "business magnate") from Russian parlance to describe the huge, fast-acquired, usually by criminal means, wealth of some businessmen of the former Soviet republics during privatization in Russia after the disintegration of the Soviet Union in the 1990s.  Berezovsky was considered the "ultimate oligarch".

[4]    The name of the Belarusian illegally elected dictator is spelled both ways "Lukashenko" and "Lukashenka" — the former being the Russian-type spelling and the latter the Belarusian-type — both languages are official languages of Belarus. His first name may be spelled "Alexander" and "Alyaksandr". Likewise, the name of the country may be correctly spelled and pronounced as "Belarus", or "Byelorussia", or "Belorussia".

[5]    Plaintiffs do not elaborate here on the graphic and disturbing details of the inventively perverse methods of torture to which Plaintiffs were subjected at the hands of Defendants. In the event it becomes necessary to provide such details, the plaintiffs will do so by a separate supplemental pleading and seek to file same under seal.

9.      The term "Defendants' representatives" here and hereafter refers to senior officers of Concern Belneftekhim and those appointed by them with full authority to act for the Defendants. Defendants were fully aware of their representatives actions, closely monitored and directed their activity on contemporaneous basis.

10.     In committing these atrocities, Defendants pursued three principal objectives. *First*, Defendants sought to "resolve" an ongoing commercial dispute as to the ownership of Concern Belneftekhim and claims of the Plaintiffs' clients to certain assets, including Defendants' frozen assets in the U.S. — by eliminating the claimants' attorney and destroying the original ownership documents. *Second*, Defendants intended to torture the Plaintiffs, so that they would, under torture, plead with their clients to renounce their ownership and financial interest in Belneftekhim Defendants. *Third*, Defendants intended to hold Plaintiffs hostage in order to pressure the United States into lifting sanctions against both Belneftekhim Defendants, with the goal of getting the U.S. to unfreeze over two billion dollars frozen pursuant to the Executive Order 1345, and designation of the U.S. Treasury, and permitting Defendants to resume their lucrative commercial activity in the U.S.

11.     Plaintiffs Funk and Zeltser were unlawfully held captive, without formal charges or trial, and continually tortured for 383 days and 483 days, respectively. As a direct consequence of Defendants' sadistic acts, Plaintiffs were put through a nightmare that continues to haunt them to this day and likely for the rest of their lives. Plaintiffs' health was gravely damaged, some of this damage is permanent.

12.     The unlawful and barbaric actions of Defendants and acting in concert with them Belarusian KGB were sanctioned by Belarusian dictator Lukashenko, determined by the U.S. Government to be the principal owner of Belneftekhim Defendants.

13.     Plaintiffs' kidnaping, torture and other unlawful captivity, orchestrated and carried out by

Defendants and their agent and their "subcontractor" Berezovsky, acting in concert with the Belarusian KGB, sparked international outrage and significant press coverage, apparently unexpected by the Defendants and Belarusian dictator Lukashenko. The U.S. Department of State and members of the U.S. Congress repeatedly demanded the release of Emanuel Zeltser. Secretary of State Hillary Clinton said that she was personally "focused" on what the State Department described as "a very troubling situation" involving the abuse of an American citizen. World leaders, the European Parliament and international human rights organizations joined in the U.S. call for Plaintiffs' immediate release. Amnesty International repeatedly issued emergency alerts respecting "torture and other ill-treatment" of Zeltser.

14.    Amidst intense international pressure, Belarusian dictator Lukashenko released Plaintiff Funk in March 2009. On June 30, 2009, a delegation of senior members of the US Congress, led by Senator Ben Cardin, co-chair of Helsinki Committee, traveled to Minsk, Belarus to personally meet with Mr. Lukashenko and demand immediate release of Zeltser. Succumbing to demands of the U.S.A. and international community and fearing the imposition of new and harsher sanctions against himself, his family members and Defendants, Belarusian dictator ordered the release of Zeltser on that same date.

15.    The U.S. Department of State denied making any concessions to Lukashenka, and repeatedly said that it does not use its citizens as "bargaining chips". However, many in Belarus and elsewhere still believe that U.S. cut a deal with Lukashenko, inducing him to release hostages in exchange for IMF credits to Belarus. Appearing on NTV, a Russian and international television network, Anatoly Lebedko, Chairman of the Belarusian United Popular Party said: "Washington was forced to pay ransom for its citizen by providing Lukashenka the IMF credits, pure and simple; in essence, this is hostage-taking, the practice, which is wide-spread in Belarus, elevated to the new level, where

Lukashenko is not only sending a political message but demands monetary compensation for human freedom".

### Belarus, "The Last Remaining True Dictatorship in the Heart of Europe".

16.    Belarus is a rogue state characterized by the U.S. Secretary of State as "the last remaining true dictatorship in the heart of Europe". With its nearly ten million population Belarus, a landlocked country, is one of the poorer former Soviet republic, thanks primarily to its dictatorial Soviet-style regime and large-scale corruption and theft of public assets by a small inner-circle of its ruling elite.

17.    The U.S. Government views Belarus as a "republic in name, although in fact a dictatorship" (*CIA World Factbook*). The United Nations Council on Human Rights has determined that Belarus' political system is "incompatible with the concept of human rights" (*The United Nations Human Rights Council Reports* of 2006 E/CN.4/2006/36) (GE.07-10197(E) 190107). Belarus has been determined to be a habitual violator of international laws of human rights and universally accepted norms of international behavior by the U.N., U.S., U.K., the Organization of Security and Cooperation in Europe (OSCE), the OSCE Parliamentary Assembly, the Council of Europe, the Parliamentary Assembly of the Council of Europe, the European Council, the European Parliament, the European Commission, and the NATO Parliamentary Assembly.

18.    A number of Belarus' individual government members, including its illegally elected president Alyaksandr Lukashenko and his son and national security advisor Viktor Lukashenko, were designated subjects of U.S. sanctions for "human rights abuses, public corruption ... diverting or misusing Belarusian public assets or ... misusing public authority [and] constitut[ing] an unusual and extraordinary threat to the national security and foreign policy of the United States...", pursuant to *Executive Order 13405 - Blocking Property of Certain Persons Undermining Democratic Processes or Institutions in Belarus* (2006), and subsequent designations by the Director of Office

of Foreign Assets Control (OFAC) of the U.S. Treasury. Copies of the Executive Order and the

OFAC designation are attached as Exhibits A and are incorporated by reference herein.

19.     The sanctions, also specifically targeted, *inter alia*, the Defendants Concern Belneftekhim

and Belneftekhim USA, Inc. The basis of the Defendants' designation for sanctions was the Director

of OFAC's determination that the Defendants are owned and controlled by Lukashenko and other

members of his corrupt ruling elite.

20.     The U.S. Department of State has repeatedly stated that the United States does not recognize

Belarusian president Lukaskenko, his cabinet, his parliament, or his constitution. Attached as Exhibit

B and incorporated by reference herein is the 2012 U.S. Department of State Report on Belarus.

### STATEMENT OF JURISDICTION

21.     This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §l332(a)(2) because

there is complete diversity of citizenship between the plaintiffs and defendants and the amount in

controversy exceeds the sum of $75,000, exclusive of costs and interest.

22.     By Order dated October 20, 2015 [CEF 77]) the Court struck Defendants' defense of lack

of subject matter jurisdiction.

23.     Personal jurisdiction over each Defendant exists pursuant to 28 U.S.C. §1330(b), because

critical acts alleged herein were committed in New York and in the United States. Defendants

fraudulently lured plaintiffs from New York to Minsk via London, which satisfies the requirements

of specific jurisdiction, which is acquired when the suit arises out of or relates to the defendant's

contacts with the forum. (*Helicopteros Nacionales v. Hall*, 466 U.S. at 414, 408 n. 8 (1994)).

Defendants had multiple contacts with plaintiffs and their clients in New York City to discuss the

settlement of the plaintiffs clients' commercial claims respecting ownership of Belneftekhim and

its assets frozen in the U.S.

24.     Defendants are alter egos of the corrupt Lukashenko regime, which is the basis for the U.S.

sanctions against them. (*Frontera Res. Azer Corp. v. State Oil Co. of the Azer. Rep.*, 582 F.3d 393, 398-99 (2d Cir. 2009)). At all relevant times, Defendants had significant contacts with the United States and the State of New York. Belneftekhim USA, Inc. is a U.S. subsidiary of Concern Belneftekhim and its U.S. representative office for sales and marketing activities in the United States. Through this U.S. branch office, Concern Belneftekhim conducted multimillion dollar commercial activity in the U.S. and the State of New York. Defendants formed a Massachusetts corporation, which operated as Belneftekhim's U.S. branch office, and engaged in multimillion dollar sales and marketing activities in the U.S., including in the State of New York. Defendants' actions in furtherance of their commercial activities in New York were continuous and systematic enough to render it at home in the forum and satisfying the requirements of both specific jurisdiction and general jurisdiction. (*Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 n. 9 (2d Cir.2012)).

25.     Defendants waived their defense of defective service.

## PARTIES

### Plaintiff Emanuel Zeltser

26.     Emanuel Zeltser is a U.S. citizen and New York attorney residing and practicing in the City of New York.

27.     At all relevant times Mr. Zeltser was an attorney for an investment group, which, over the period of 10 years has made significant investment, in cash and in kind, in Belneftekhim Defendants, in exchange for a block of equity ownership of Belneftekhim and an option to acquire a controlling stake in Belneftekhim. As part of his fee arrangement with his clients, Zeltser also acquired an individual interest in Defendants' ownership and property. In addition, in 2006, in order to facilitate Zeltser's efforts in Belneftekhim Defendants, Plaintiffs' clients conveyed their investment and

ownership interest in Belneftekhim to Plaintiffs as trustees. Plaintiffs remain trustees of their clients' investment and ownership in Belneftekhim Defendants to this day.

28.    Zeltser speaks native Russian (an official language of Belarus) and has been recognized as an expert on laws, customs and politics of Russia and former Soviet republics, including Belarus. At the request of the House Banking Committee, in 1999 Zeltser provided expert testimony at the Congressional Hearings on Bank of New York, Russian Organized Crime and Money Laundering Matters, and numerously appeared in print and broadcast media as an expert on these matters.

29.    As a long-time attorney for the substantial investors in Belneftekhim, Zeltser is well familiar with the circumstances of their investment and ownership in Belneftekhim. Combined with his expertise in the Soviet and post-Soviet laws, practices and customs, Zeltser was in a unique position to institute his clients' claims against the Belneftekhim Defendants in connection with a commercial conflict over their equity investment in Belneftekhim.

**Plaintiff Vladlena Funk**

30.    Vladlena Funk, a naturalized U.S. citizen, was at all relevant times was a resident of New York and New Jersey and was Zeltser's legal assistant. Funk was also a freelance journalist.

31.    In March 2008, following a series of telephone contacts and two meetings with Defendants in New York City, Funk, pursuant to Defendants' invitation, accompanied Zeltser to London in order to continue the settlement negotiations and possibly resolve the commercial dispute between the Plaintiffs' clients and the Defendants. In London Funk was secretly drugged and forcibly abducted by Defendants acting in concert with Berezovsky and Belarusian KGB operatives. Funk was then, against her will, secretly flown to Belarus aboard a private jet belonging to Berezovsky. In Belarus Funk was unlawfully detained, systematically tortured, threatened, emotionally degraded and dehumanized, and held hostage, without charges or trial, for 373 days, until released in response

to a continuous wave of worldwide outrage and threats of increased economic and political sanctions against Belarusian regime in general and Defendants in particular.

**Defendant Concern Belneftekhim**

32.    Belneftekhim a/k/a Concern Belneftekhim ("Concern Belneftekhim" or "BNTK") is a commercial petrochemical concern with headquarters at 73 Dzerzhinsky Ave., Minsk 220116 Belarus. At all relevant times, Concern Belneftekhim maintained a branch representative office in the U.S. at 13 Branch Street # 213, Methuen, MA 01844, 37 Sheridan Road, Andover MA 01810; and/or at 172 Haverhill Street, Andover, MA 01810.

33.    Concern Belneftekhim is one of the largest industrial complexes in Eastern Europe. BNTK was created in April 1997, during privatization of Belarusian commerce and industry, primarily, in order to attract much needed foreign equity investment into mismanaged and disintegrating Belarusian petrochemical industry, which is nearly the sole source of Belarus's export income, save for its arms sales[6]. Belneftekhim has since comprised essentially all Belarusian enterprises for crude oil production, refining and transportation, oil product sales, chemistry and petrochemistry. Belneftekhim manufactures over 500 kinds of petrochemical and chemical products and imports them to over 90 countries, including the U.S.A. Concern Belneftekhim's foreign trade surplus in 2013 increased to US$5.6 billion.

34.    Belneftekhim is a major contributor to the Belarusian economy and a principal source of wealth of the Lukashenko ruling regime.

35.    On November 13, 2007, the United States Treasury Department, froze the assets of Concern

---

[6]    Dubbed "terrorists arms depot" by the International League for Human rights, Belarus has a history of close cooperation with and arms sales to rogue states, sponsors of terrorism. *See*: "*Belarus's Terrorist Ties*" Washington Post  June 12, 2004.

Belneftekhim in the U.S. and shut down its commercial activities in the U.S. and elsewhere pursuant to the Executive Order 13405.

36.    Upon information and belief, following the imposition of sanctions by the U.S. Government, Defendants continued their commercial activity in the United States, both legally and otherwise, including but not limited to its interactions with Plaintiffs and Plaintiffs' clients for the purposes of settlement of the commercial dispute concerning ownership of Belneftekhim and its assets frozen in the U.S.[7]  In addition, of the approximately 500 companies comprising Concern Belneftekhim only a few were named as being subject to sanctions. Thus nothing prevented Belneftekhim from doing business through the companies, not specifically named by OFAC. In fact, Plaintiffs, at all relevant times, continued to do such business. Moreover, in 2008, the U.S. suspended sanctions with respect to two major Belneftekhim's companies - *Lakokraska* and *Polotsk Steklovolokno* – following the Lukashenko's ordering the release of several number of political prisoners. Upon information and belief, through these, *inter alia*, companies and a number of other Belneftekhim companies, which were not specifically named by OFAC, Concern Belneftekhim continued its commercial activity in the U.S. and the State of New York, including directly marketing and merchandising Belneftekhim's petrochemical products and fertilizers, and acting as an intermediary for marketing and sale in other countries.[8] Attached, as Exhibit C and incorporated by reference herein, is a recent report by the Wall Street Journal "Treasury Looking into Whether Belarusian Potash Miner Evaded Sanctions".

37.    Ownership of Concern Belneftekhim is in dispute. This dispute is a key factor giving rise to

---

[7]    On its official website Belneftekhim characterized the U.S. sanctions as "protectionism" and "unfair competition" and gave interviews stating that the U.S. was "afraid" because Belneftekhim's sales in the U.S. had been "astronomical" in comparison with that of the U.S. producers.

[8]    The sanctions against these companies have been re-imposed since January 31, 2011, following Lukashenko's bloody crackdown on protesters of the December 2010 rigged presidential elections.

the events alleged here. According to the U.S. Government, the ownership and control of Belneftekhim vests in Belarusian dictator Alexander Lukashenko and several other individual members of his family and ruling inner-circle, which formed the basis for U.S. sanctions against the Defendants. Defendant NBTK has claimed in this action that it is owned by the government of Belarus and is an "instrumentality" or "organ" of Belarus within the meaning of the FSIA. However, Belneftekhim made public statements that Belneftekhim is a privately owned and even expressed its frustration that some media members depicted it as "government-owned", which hampered Belneftekhim's efforts to secure much needed private investments.[9] Defendant NBTK and Lukashenko have made multiple public statements regarding the sale of NBTK's equity capital to private investors. Plaintiffs' clients and Plaintiffs are owners of significant equity interest in NBTK. Defendants operate as a commercial company in all respects, including the retail sale of gasoline at multiple gas stations operating under the name "Belneftekhim". Attached as Exhibit D and incorporated by reference herein is a recent photograph of two such gas stations.

38.     Plaintiffs do not dispute that all large commercial enterprises in Belarus, including Concern Belneftekhim, are controlled by Lukashenko, his family and corrupt inner-circle. In fact, the control exercised by Lukashenko and his regime over Belneftekhim Defendants is of such a level as to render them mere *alter egos* of that regime. Plaintiffs however hereby allege the majority of the true legal ownership interest in Belneftekhim vests in private investors, including the Plaintiffs' clients.

**Defendant Belneftekhim USA, Inc.**

39.     Belneftekhim USA, Inc. (BUSA), at all relevant times was a U.S. corporation formed under

---

[9]     The putative ownership of Concern Belneftekhim by Mr. Lukashenko and other Belarusian government officials does not accord Concern Belneftekhim immunity from suits under FSIA. The Supreme Court has ruled that FSIA's term "foreign state" does not include individual government officials. *See Samantar v. Yousuf*, 560 U.S. 305, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010).

the laws of the Commonwealth of Massachusetts, having its offices at 13 Branch Street # 213, Methuen, MA 01844; 37 Sheridan Road, Andover MA, 01810, and 172 Haverhill Street, Andover, MA 01810. Belneftekhim USA, Inc.'s sole purpose was to act as a representative office in the U.S. of Concern Belneftekhim. Through Belneftekhim USA Concern Belneftekhim conducted a multimillion dollar business in the U.S. and the State of New York.

40.     BUSA is not and cannot statutorily be a foreign sovereign, as FSIA expressly excludes U.S. corporations from such designation.

41.     Belneftekhim USA, Inc. is owned and controlled in all respects by the same individuals who control Concern Belneftekhim.

42.     In June 2006, the President issued Executive Order 13405, which blocked the property, and interest in property, within the United States or in the possession or control of United States persons, of Belarusian individuals who participated in " human rights abuses, public corruption ... diverting or misusing Belarusian public assets or ... misusing public authority [and] constitut[ed] an unusual and extraordinary threat to the national security and foreign policy of the United States..." The individuals so sanctioned included Belarusian dictator Alexander Lukashenko, his son and national security advisor Viktor Lukashenko, and other members of the Belarusian government. In November 2007, the Director of the Office of Foreign Assets Control (OFAC) designated Belneftekhim and Belneftekhim USA, Inc., as being the property of the designated nationals whose property and interests in property are blocked pursuant to Executive Order 13405. Lukashenko's ownership and control of Belneftekhim was the ground for the designation. As part of the sanctions imposed by the Executive Order approximately US$2 billion of Belneftekhim and Belneftekhim USA, Inc. was frozen in the U.S.

43.     Belneftekhim USA, Inc., actively aided, abetted, and participated in all phases of conduct alleged herein, to the same extent as Defendant Concern Belneftekhim.

### Defendants "John Does 1 - 50"

44.    Defendants John Does 1 - 50 (the "Doe Defendants") are individuals and entities sued here under fictitious name "John Doe". The Doe Defendants collectively and/or each and every one of them, aided, abetted and actively participated in all phases of the conduct complained of herein. Plaintiffs, at this point, do not know the identities of the Doe Defendants sufficiently in order to name them by names. Plaintiffs, upon information and belief, allege  that the Doe Defendants are Belarusian government agents acting in concert with Defendants and those acting in the capacity of outside contractors for the Belarusian regime and Defendants in carrying out its "*special endeavors*"[10]. Once the names are learned during the discovery process, Plaintiffs will seek leave of the court to substitute the real names of these Defendants, as they become known.

### Relevant Nonparties

45.    **Boris Berezovsky** is a now-deceased Russian national and notorious Russian "oligarch". At all relevant times, Berezovsky, a twice-convicted felon in his home country, was wanted by Interpol for massive fraud, multimillion dollar embezzlement, money laundering and participation in international organized crime. Multiple reports have linked Berezovsky to child molestation, numerous high-profile murders and other high crimes. Berezovsky was a substantial shareholder in Concern Belneftekhim and was hired by the Defendants as an "outside contractor" to assist in effecting the Plaintiffs' kidnapping and unlawful rendition to Belarus. Berezovsky died on March 23, 2013, in his multimillion dollar home in Surrey, a fashionable suburb of London, under murky

---

[10]    Term "special endeavor" or "special project" in Belarus refers to such tasks that are of particular importance to Lukashenko and his ruling regime. Special endeavors are accomplished under the direction of the KGB and the Belarusian state security council headed by Aleksandr Lukashenko's son Viktor Lukashenko (also subject of the U.S. sanctions pursuant to Executive Order 13405). Special endeavors usually are carried out in secrecy as covert operations using all facilities of the country and all means necessary, including most often by illegal and criminal acts, including unlawful detentions, murders and disappearances of unwanted persons (the disappearances are specifically noted in the Executive Order 13405, as one of the grounds for sanctions).

circumstances - - believed to have been murdered by members of his own inner circle. Berezovsky, for years had been a close friend and confidant of Mr. Lukashenko, and also acted as a "cashier" of Lukashenko's family's secret accounts in Western banks holding the monies given to Belarus by the IMF, the World Bank and other international institutions and stolen by Lukashenko and his son. The aggregate amount stolen by the Lukashenko family is estimated at over six billion U.S. dollars.

46. **Tatsyana Moysievitch**, BNTK and BUSA employee, and a senior officer of Belneftekhim in charge of its U.S. operations. Moysievitch took active participation in Defendants' fraud upon Plaintiffs and aided, abetted and participated in Defendants other wrongs practiced upon Plaintiffs.

47. **Vladimir Volkov**, first vice-chairman of Belneftekhim at all relevant times. Volkov took active participation in Defendants' fraud upon Plaintiffs and aided and abetted Defendants in other wrongs practiced upon Plaintiffs. Upon information and belief, Volkov currently is in prison in Belarus having been convicted for official corruption by a Belarusian court. Charges against Volkov were levied in close time proximity to Plaintiffs' first seeking to examine Volkov regarding his public statements that Belneftekhim is a privately owned commercial enterprise [ECF 8].

48. **Viktor Voronin**, BNTK and BUSA employee, holding himself out to be a "legal advisor" and self-proclaimed "commissar" of Belneftekhim.[11] Voronin took active participation in Defendants' fraud upon Plaintiffs and aided, abetted and participated in Defendants' other wrongs practiced upon Plaintiffs.

49. **Igor Zhilin**, BNTK and BUSA employee, Belneftekhim's consultant at all relevant times, and since 2011, the chairman of BNTK. Zhilin took active participation in Defendants' fraud upon Plaintiffs and aided, abetted and participated in Defendants' other wrongs practiced upon Plaintiffs.

50. **Alyaksandr Lukashenko**, Belarusian dictator, illegally elected president of Belarus and a

---

[11]    "Commissar", in the former Soviet Union and some post-Soviet countries, including Belarus refers to a political officer in the military and large companies, appointed by the KGB.

principal equity owner of BNTK and BUSA. Lukashenko sanctioned the Defendants' and the KGB's fraud upon Plaintiffs and the unlawful and barbaric actions against Plaintiffs alleged herein.

51.     **John Doe-1**, BNTK and BUSA employee, Belneftekhim's consultant at all relevant times, and since 2011, the chairman of BNTK. John Doe-1 took active participation in Defendants' fraud upon Plaintiffs and aided and abetted Defendants in other wrongs practiced upon Plaintiffs.

52.     **John Doe-2**, BNTK and BUSA employee, who interacted with Plaintiffs in London, where Plaintiffs were fraudulently lured. John Doe-2 took active participation in Defendants' fraud upon Plaintiffs and aided, abetted and participated in Defendants' other wrongs practiced upon Plaintiffs.

53.     **John Doe-3**, BNTK and BUSA employee, who interacted with Plaintiffs in London, where Plaintiffs were fraudulently lured. John Doe-2 took active participation in Defendants' fraud upon Plaintiffs and aided, abetted and participated in Defendants' other wrongs practiced upon Plaintiffs.

## FACTS

54.     Over the period beginning in or about 1997 to in or about 2004, an investment group, a client of the Plaintiffs, made significant investment, in cash and in kind, in Belneftekhim Defendants and companies comprising the Concern, in exchange for a block of stock of Concern Belneftekhim and an option to acquire a controlling stake in Belneftekhim. Most of the negotiations and execution of this investment agreements took place in New York City. By virtue of an arrangement with their clients Plaintiffs also have a direct interest in Belneftekhim Defendants' ownership and property, including the interest in the funds blocked by OFAC. Following the imposition of U.S. and E.U. sanctions against the Belarusian dictator Lukashenko and Belneftekhim Defendants in 2006-2007, which the U.S. Government determined to be Lukashenko's property, Belneftekhim Defendants failed and refused to honor the agreement with the Plaintiffs' clients, and failed and refused to return the Plaintiffs' clients' investment, or provide any compensation theretofore.

55.    Since at least the latter part of 2006, Defendants and Plaintiffs' clients were involved in a dispute over the ownership of Belneftekhim Defendants and the Plaintiffs' clients investment in Concern Belneftekhim. Multiple meetings between Plaintiffs and Plaintiffs' clients and Defendants were held in New York in an effort to resolve the dispute — to no avail.

56.    Plaintiffs were instructed by their clients to take all lawful steps in recovering their clients' investment and enforcing the agreement between Plaintiffs' clients and Belneftekhim, including, if necessary, bringing legal actions against Belneftekhim in the U.S. and other jurisdictions.

57.    Plaintiffs advised Defendants that Plaintiffs, on behalf of their clients contemplated bringing legal action(s) against the Defendants in the U.S. and, possibly in other jurisdictions for controlling stake in Belneftekhim Defendants, and to assert interest in the Defendants' funds blocked by OFAC.

**Defendants Fraudulently Induce Plaintiffs to Travel to from New York to London in Order to Effect Their Criminal Scheme of Depriving Plaintiffs and Their Clients of Ownership in Belneftekhim Defendants**

58.    In the latter part of 2007 and January and February of 2008, Defendants telephoned Plaintiffs in New York City ostensibly to discuss with them potential resolution of the conflict between the Defendants and Plaintiffs' clients. During these telephone conferences Defendants pretended that they sought, in good faith, to resolve the dispute "fairly" to all parties.

59.    Each of the telephone calls were initiated by Belneftekhim's executives and representatives, including: **Tatsyana Moysievitch**, who introduced herself as "a director and senior officer of Belneftekhim in charge of its U.S. operations"; **Vladimir Volkov**, first vice-chairman of Belneftekhim at the time; **Boris Berezovsky**; **Viktor Voronin**, who held himself out to be "legal advisor" and "commissar" of Belneftekhim, and **Igor Zhilin**, then Belneftekhim's consultant, and since 2011, its chairman.

60.    In or about late November - early December of 2007, Zhilin informed Plaintiffs that

Berezovsky, a close personal friend of Lukashenko and a substantial shareholder in Belneftekhim himself, was appointed by Belneftekhim to act as its principal intermediary and negotiator on behalf of Belneftekhim in order to resolve the equity ownership dispute between Plaintiffs/Plaintiffs' clients and Belneftekhim.

61.    On or about December 27, 2006, Berezovsky wrote a letter to Plaintiffs stating *inter alia*:

> Emanuel, as you know, *Bat'ka*[12] and Belneftekhim appointed me special representative to conduct negotiations with you and your clients. You also know, I own substantial equity interest in Belneftekhim myself. I also hold *Bat'ka*'s and his family's equity interest in Belneftekhim as their trusted person, since he cannot officially own the company. I assure you, they are serious this time. *Bat'ka* does not want any publicity on that matter. Perhaps, it would be best if you and I come to Minsk, meet with *Bat'ka* and Belneftekhim's fellows - I am pretty sure, we can resolve all controversies there.

62.    Following several phone conversations, on or about February 29, 2008, Volkov, Voronin and Berezovsky made a conference call to Zeltser in New York City and proposed a face-to-face meeting with the Plaintiffs to resolve the ongoing ownership and financial dispute between Plaintiffs' clients and Defendants. Berezovsky reiterated his suggestion to meet in Minsk. He said that since there is no direct air connection between U.S. and Belarus, Plaintiffs may come to London, where Berezovsky resided at the time and he (Berezovsky) would provide his private jet for Plaintiffs' travel to Belarus.  Berezovsky added though that perhaps it would be a good idea not to apprise anyone of this meeting, or of the Plaintiffs' travel to Minsk, until the conclusion of the discussion. This statement appeared somewhat concerning to Plaintiffs. Although Plaintiffs certainly did not and could not anticipate that Defendants would engage in their evil plan of abducting Plaintiffs, they declined the invitation. Voronin then stated that Moysievitch was currently in Massachusetts and

---

[12]    "Bat'ka", literally translated from Russian and Belarusian as "father" or "godfather" is Lukashenko's known nickname in Belarus. Lukashenko is known to like that name and encourages its usage when referring to him.

could travel to meet Plaintiffs in New York. Voronin added that he may also travel to New York to join the discussions with Plaintiffs.

63.     In the beginning of the next week Moysievitch and Voronin met with Plaintiffs in New York City. The first meeting was held at the Carnegie Club, a fashionable bar on West 56th Street.[13] Present were from Defendants' side Voronin and Moysievitch. Moysievitch spoke to the Plaintiffs previously by phone and took an apparently leading role in the settlement discussions. Also present by telephone were two senior executives of Belneftekhim in Minsk, Volkov and another person, whose name Plaintiffs do not recall at this time and reference him as "John Doe-1" here, and also Berezovsky. From the Plaintiffs' side, in addition to the Plaintiffs, present were the Plaintiffs clients' Russian lawyer "Xenia" and their U.S. representative "Samantha".[14]  Conversation was conducted in Russian.

64.      Initially, Moysievitch showed to the Plaintiffs a number of false documents, ostensibly filed with U.S. federal and state authorities, including a "Letter of Agreement" on the letterhead of Belneftekhim USA, Inc. purporting to be counter-signed by the Plaintiff's client and "agreeing" to return their ownership interest in Belneftekhim in exchange for Belneftekhim's bonds of negligible value. Plaintiff Funk quickly pointed to the obvious inconsistencies in the Defendants' documents and the so-called "agreement", and further noted that the purported signature of their client was a crude forgery.

65.     Voronin then stated that Belneftekhim Defendants would not honor its agreement with the

---

[13]     This venue for settlement discussions was mutually selected because the Carnegie was one of the few New York public places where smoking was permitted, given that Voronin and Zeltser were smokers.

[14]     "Xenia" and "Samantha" are assumed names. Plaintiffs know the actual names of these individuals. However, given the currently ongoing campaign of intimidation and harassment of potential witnesses by Defendants and their KGB cohorts, Plaintiffs do not disclose these names here. Plaintiffs are prepared though to disclose the names of these persons under such confidentiality and protective arrangement, as this Court may deem necessary and appropriate under the circumstances.

Plaintiffs' clients because of "political turbulence" caused by the U.S. sanctions against Defendants. John Doe-1 further stated that as a result of the U.S. sanctions the Defendant-companies suffered grave financial losses and are unable to return to the Plaintiffs' clients their investment. Voronin offered instead that Plaintiffs and their clients be recompensed ten cents on the dollar in the form of non-negotiable bonds and/or preferred stock of Belneftekhim, payable ten years from the time of issue. Later, when Voronin was visiting Plaintiffs in their captivity, he admitted that even that offer was untrue and Belneftekhim never intended to honor it. Zeltser and "Xenia" declined this proposition and reiterated that lawsuits would shortly be filed to assert ownership rights in the Belneftekhim Defendants and their frozen U.S. assets. Both Moysievitch and Voronin however expressed their desire to continue negotiations and requested that lawsuits not be filed — seconded by Volkov and John Doe-1. Another meeting was scheduled in a couple of days in Zeltser's office on the Upper West Side.

66.     The meeting in Zeltser's office took place two days later. Present were: Moysievitch and Voronin in person, and Berezovsky and John Doe-1 on the phone. From the Plaintiffs' side, present were Zeltser, Funk and "Xenia". The second meeting appeared to be much more positive. Moysievitch informed Plaintiffs that Lukashenko had signed or was about to sign a decree removing governmental control in management of private enterprises, including Belneftekhim — opening the door to Plaintiffs' clients renewed ownership stake in Belneftekhim.[15]  Berezovsky stated that he spoke with Lukashenko earlier that day and is confident that the parties will reach a "mutually satisfactory resolution". Berezovsky reiterated his suggestion for Plaintiffs to travel to Minsk in order "to close the deal". When Plaintiffs declined, Moysievitch and Voronin suggested an

---

[15]     Indeed, on March 4, 2008, Lukashenko signed a Decree № 144, voiding his previous decree № 125 providing for government right to ownership and management control over strategic commercial enterprises.

alternative: Plaintiffs would travel to London, where Berezovsky resided at the time (as a fugitive from criminal charges and convictions in Russia and Brazil). Berezovsky concurred. Voronin added that several senior officers of Belneftekhim would be present at the closing. Mosievitch requested that Plaintiffs bring with them the original documents relating to the Plaintiffs' clients' ownership interest in Belneftekhim and its assets, which she said would be necessary for her colleagues to review in order to conclude the settlement. Voronin added that he is confident that in London all interested parties would conclude the settlement arrangement. Berezovsky Volkov and John Doe-1 - all seconded.  Voronin reiterated that the parties have an agreement in principle, to wit, that Belneftekhim would confirm the ownership of Plaintiffs' client in the Belneftekhim Defendants, without voting rights. Volkov then re-confirmed that Belneftekhim appointed Berezovsky, as its principal intermediary to lead the continuing settlement negotiations on behalf of Belneftekhim and to conclude the transaction, and suggested that such would take place in the presence of Berezovsky and Defendants' senior executives in London. All others present at the meeting in person and by telephone concurred.

67.     Unbeknownst to Plaintiffs, but it true and in fact, all statements made by Defendants' representatives, Voronin, Berezovsky, John Doe-1, Moysievitch, Zhilin and Volkov, were untrue. Defendants and their above-named representatives invited Plaintiffs to travel from New York to London, not because they had any interest in settling the ownership dispute with Plaintiffs or their clients. Instead, Defendants' intent was to lure Plaintiffs from New York to London in order to place Plaintiffs in condition conducive to effect Plaintiffs' kidnaping and unlawfully transport Plaintiffs to Belarus against their will aboard Berezovsky's private jet. Defendants' intent was to "eliminate" Plaintiffs, especially Emanuel Zeltser, a long-time attorney and trustee for his clients, who was in the best position to successfully assert the claims on behalf of his clients in the U.S. and other jurisdictions. Defendants indeed contracted with Berezovsky but not to conduct legitimate settlement

-22-

discussions with Plaintiffs, but to aid Defendants in arranging for Plaintiffs' "rendition" to Belarus, where they could be unlawfully detained, tortured and/or permanently silenced.

68.     Defendants and their representatives knew of the falsity of their representations to the Plaintiffs at the time of their meetings in New York City, *i.e.*, Defendants knew that the real purpose of their suggestion to continue the settlement discussion in London was the Defendants' scheme to lure Plaintiffs into the hands of their abductors and use Berezovsky and his private jet to effect the Plaintiffs unlawful transportation to Belarus against their will. Defendants and their representatives present at the meetings knew that Plaintiffs in Belarus would be unlawfully detained and tortured by the KGB, a notoriously nefarious Gestapo-like secret paramilitary force of the Soviet era. Defendants intended this very result in order to permanently squelch the Plaintiffs and/or get them, under torture, to persuade their clients to renounce their equity ownership interest in Belneftekhim Defendants.

69.     In the first month of their unlawful captivity in Belarus, Voronin and Berezovsky visited Plaintiffs in the KGB detention. Berezovsky glowingly explained to Plaintiffs that after the Plaintiffs declined Defendants' "invitation" to a meeting in Minsk Belarus, Defendants' "next best bet" was to bring them to Belarus against their will. Berezovsky further explained that effecting such scheme would not be possible in the U.S. for a several reasons: [a] there were no direct flights from any U.S. city to Belarus; [b] transporting Plaintiffs from New York to Belarus against their will by a commercial airliner would be too risky and too uncertain; [c] air travel time from London to Minsk is approximately three hours, or a quarter of air travel from New York. Voronoin confirmed Berezovsky's story. Publicly, thereafter, Berezovsky confirmed to the media that he provided his jet for the Plaintiffs' travel to Belarus but denied that this was kidnaping.

70.     Hence, Defendants, by their representatives, Berezovsky and Voronin admitted that they

purposely made misrepresentations to Plaintiffs during the meetings and telephone conferences held in New York, intending for Plaintiffs to rely on their misrepresentations, so as to lure the Plaintiffs to London and induce them to meet with Defendants and Berezovsky under the circumstances more conducive to effect kidnaping of Plaintiffs and transporting them to Belarus against their will.

71.     Plaintiffs, believing that Defendants in good faith wished to settle the matter agreed to continue the settlement discussions in London. Plaintiffs expended US$11,100.00 for air travel, and further expended funds for booking rooms in London's Halkin Hotel, and on or about March 10, 2008, Plaintiffs traveled from New York City to London to attend meetings with Berezovsky and other representatives of Defendants, believing that this was for the purpose of settlement of the equity ownership dispute between Belneftekhim Defendants and Plaintiffs' clients.

**Defendants Abduct Plaintiffs in London**

72.     The first meeting between Plaintiffs and Defendants' representatives in London took place during the daytime on March 11, 2008, at the London Halkin Hotel, where the Plaintiffs stayed. In addition to Berezovsky, from the Defendants' side present were two men (John Doe-2 and John Doe-3) who gave Plaintiffs their business cards showing them to be employed by Belneftekhim as senior legal advisor and vice-president respectively. Moysievich and Voronin participated by phone. John Doe-2 and John Doe-3 took a cursory look at the original documents evidencing the Plaintiffs' clients' ownership in Belneftekhim and appeared to be fully satisfied. Thereafter, Berezovsky proposed to continue negotiations and possibly conclude the transaction the same evening at London's Nobu restaurant.

73.     Unknown to Plaintiffs at the time but in true and in fact, Defendants Representatives invited Plaintiffs to Nobu, not to continue the discussions aimed at resolving the ownership dispute but in furtherance of their plan to abduct Plaintiffs which started in New York City. Defendants intended to  spike Plaintiffs' drinks with benzodiazepine or like drug, make them and unable to resist their

kidnaping, and then, with the help of KGB operatives awaiting at Nobu, place Plaintiffs in Berezovsky's limousine, drive them to a private airport, place them, against their wills in Berezovsky's private jet and unlawfully transport them to Minsk, where Defendants' Representatives knew Plaintiffs would be unlawfully held and tortured.

74.    At the meeting at Nobu, Berezovsky was accompanied by Voronin and two other men and a woman, whom he introduced as his "associates". As Berezovsky and Voronin later explained, during Plaintiffs' captivity, these men were in fact Belarusian KGB operatives.

75.    During the meeting Plaintiffs suddenly started feeling light-headed and sleepy, although neither of them consumed any alcohol. Plaintiffs requested to adjourn the meeting for the next day. Plaintiffs excused themselves and proceeded to the door of the restaurant intending to get a cab back to the Halkin Hotel. Instead, the KGB operatives accompanying Berezovsky quickly ushered Plaintiffs to Berezovsky's Maybach limousine standing at the entrance to Nobu with its motor running and quickly but forcefully "helped" the Plaintiffs into the limousine and also got in. The limousine then drove the Plaintiffs, who were effectively restrained, to a private airport in the outskirts of London. Berezovsky's men accompanied them to Berezovsky's private jet - - *en route* to Minsk, Belarus. Plaintiffs were fully conscious of their being transported against their will but had been unable to resist because of the effect of the drugs placed in their coffee by the Defendants' representatives acting in concert with them KGB operatives.  Later, during the Plaintiffs' captivity in Belarus, Defendants' representatives, including Berezovsky and Voronin, visiting the Plaintiffs in the KGB detention facility, explained that during the meeting at Nobu, Plaintiffs' coffee was spiked with benzodiazepine-based drug (similar to "date-rape" drugs) in dozes sufficient to make the Plaintiffs unable to resist and/or call for help.

76.    Berezovsky's jet with Plaintiffs onboard took off at approximately 1:00 AM Zulu time and

landed in Minsk, Belarus at approximately 4:30 AM local time on March 12, 2008. Upon arrival Plaintiffs were immediately detained and transported to the KGB detention facility *Amerikanka*. There, both Zeltser and Funk were repeatedly subjected to torture and other cruel, unusual, inhuman and degrading treatment. After being stripped bare and severely beaten, they were placed in small solitary boxes without heat, windows or ventilation. Thereafter, Plaintiffs were repeatedly dragged from their cells to basement interrogation rooms for lengthy "interrogation" sessions comprised of severe physical beatings and other, more imaginative torture methods. In addition, Ms. Funk was threatened with sexual assault and gang rape. Between the torture sessions, Plaintiffs were deprived of food, water and sleep.

77.     Defendants representative, including Voronin, were present during many of the interrogations-torture episodes and observed and directed their KGB comrades' activities.

78.     Defendants, including Voronin and Berezovsky, demanded, *inter alia*, that Plaintiff Zeltser telephone the Halkin Hotel in London and authorize the release of the original documents relating to his clients' ownership in Belneftekhim to representatives of Berezovsky, computer equipment containing copies of these documents, other privileged documents relating to the Plaintiffs' clients, and other personal effects. Defendants also demanded that Plaintiff Funk telephone the Plaintiffs' clients in the U.S. and Russia and beg them to renounce their ownership interests in Belneftekhim. Under torture, the Plaintiffs succumbed to both Defendants' demands. While making the calls to clients, Funk was subjected to further acts of torture in order to cause her to scream.

79.     Defendants then demanded that Plaintiffs, especially Funk,  "confess" that Zeltser came to Minsk his own free will on a spying mission. Voronin and Berezovsky explained to Funk that Defendants must have this "confession" in order to portray Plaintiffs' kidnaping as a legitimate "official" act of the Belarusian government, rather than a criminal act based on fabrications made by Belneftekhim for a purely commercial gain. Plaintiffs' refusal prompted further acts of torture.

In addition, Plaintiff Zeltser, a diabetic who also suffered from arthritis, was denied critical medications, which gravely exacerbated his ailments and caused him severe pain and permanent damage to his health.

80.    As noted, Berezovsky visited Plaintiffs in the KGB detention facility. He was visibly proud of his "successful operation" in abducting the Plaintiffs and delivering them to "his friend Lukashenko" in Belarus. Bursting with joy, Berezovsky provided Plaintiffs with a detailed story of how he and other Defendants' Representatives conceived of and executed "the mission" on behalf of Belneftekhim. Berezovsky suggested that the Plaintiffs should comply with his "KGB friends' requests " if [they] still hope to see the light of day".

81.    From the outset, and throughout their unlawful KGB detention, both Zeltser and Funk were subject to torture, cruel, inhuman and degrading treatment.  Aside from repeated beatings and other form of torture designed to compel "confessions" and force Plaintiffs to comply with Defendants' demands, they were deprived of basic, life-sustaining necessities including food, water, sleep and medications.  The bedding in Zeltser's cell was removed altogether, compelling him to sleep on bare plank-bed.

82.    Zeltser was also denied access to the critical, physician-prescribed medications for treatment of diabetes and arthritis.  Combined with inhumane prison conditions, this caused his health to rapidly deteriorate and placed him at risk of imminent death.

83.    On April 12, 2008, pursuant to the directives of Defendants and their KGB henchmen, Zeltser was involuntarily transferred to a state psychiatric hospital for "psychological testing" - - which is a common practice used by the KGB to demoralize political prisoners and amounted to further physical and psychological torture. After two weeks of "psychological testing", Zeltser was returned to KGB cell.

**U.S. AND WORLD  REACTION**

84.    As noted heretofore, fortunately for the Plaintiffs, the outrageous actions of Defendants and their KGB abettors, acting in concert with them, sparked international outrage.

85.    On March 20, 2008, U.S. Senator Charles E. Schumer alerted the U.S. Department of State of the abduction of Mr. Zeltser and the atrocious conditions of his detention, and requested that the State Department "do all in its power to see that Mr. Zeltser's serious medical conditions are attended to, and that his detention matter is brought to a quick, successful conclusion."

86.    On April 14, 2008, Tom Casey, Deputy Spokesman of the U.S. Department of State, released Statement No. 2008/280, entitled "Belarus: Access to Imprisoned U.S. Citizen", which provided:

> "The United States is concerned about the welfare of American citizen Emanuel Zeltser, imprisoned in Belarus. Mr. Zeltser suffers from serious pre-existing health conditions and requires daily medications. Despite repeated requests for consular access to Mr. Zeltser, we have been permitted only one visit on March 27. The Government of Belarus failed to provide timely notification of his arrest, information about his medical condition, and did not inform the U.S. Embassy of his recent transfer to a state psychiatric hospital. Consular access in Belarus has long been a concern for the United States. We urge the Government of Belarus to comply with their international legal obligations and provide immediate and regular consular access to Emanuel Zeltser."

87.    On April 23, 2008, Jonathan Moore, U.S. *Chargé d'Affaires* in Belarus, was summoned to the Belarusian Ministry of Foreign Affairs:

> "At the meeting, the Chargé was told that the Ministry "requested" that the Embassy provide a list of the five U.S. diplomats who would remain in Belarus on April 30. Mr. Moore protested this news, and noted that there would be grave consequences as a result of this unprecedented and unwarranted step by the Belarusian authorities. Mr. Moore also protested the continued lack of access to American citizen Emanuel Zeltser, whom the Embassy has not been able to visit since March 27, and expressed concerns about the state of Mr. Zeltser's health."

88.    On that same day, the New York City Bar Association sent a strongly worded letter to Lukashenko condemning KGB abuse of Zeltser and Funk and demanding their immediate release. The Bar Association Letter stated, *inter alia*:

"I write ... to express our concern over the continued detention and physical mistreatment of Mr. Emanuel Zeltser, an American attorney, and the detention of his assistant, Ms. Vladlena Funk, a permanent resident of the United States, in Belarus."

\*\*\*

"It has … been reported, to the Association's great concern, that Mr. Zeltser has suffered severe physical and mental mistreatment while in detention. It has been reported that since being detained four weeks ago, he has been repeatedly subject to beatings in jail, including direct blows to the head … Most recently, Mr. Zeltser has reportedly been transferred to a state psychiatric hospital. We also understand that Mr. Zeltser, a patient of several medical conditions, including diabetes, arthritis, heart problems, and stomach ulcer, has been denied medications critical to his health. As reported, these medicines have been withheld ..., despite a medical report from Mr. Zeltser's physician provided to the Belarusian authorities stating that Mr. Zeltser may not survive without the medications indicated. We have been informed that due to his critical health condition, Mr. Zeltser has twice been taken by ambulance to an emergency room, although in neither case was he provided medical attention, as no physicians were on hand. Mr. Zeltser suffers from a severe form of arthritis, among other serious conditions, and is reportedly in constant pain without his medications. According to his Belarus-appointed lawyer, he is in increasingly precarious health."

\*\*\*

In addition to the physical mistreatment, we understand that Mr. Zeltser has been repeatedly denied access to a U.S. consul, despite diplomatic protests filed by the United States Department of State with the Belarus Ministry of Foreign Affairs. The one visit that was granted, more than two weeks after his arrest, was reportedly held in the presence of a KGB official and thus was not confidential."

89.    The Bar Association Letter further stated that the charge that the KGB claimed to have brought against Zeltser and Funk "appears to have no basis to it", lacks "any explanation or detail," and "concerns have thus been reported that this is a fabricated charge, created to justify their unlawful detention," and that Boris Berezovsky "may have instigated action against Mr. Zeltser for his work on behalf of a particular client."[16]

---

[16]    As addressed heretofore and hereafter, in reality, not even these fabricated charges have ever even been presented to the plaintiffs. Instead, responding to the unprecedented international pressure, the KGB press office released a false statements that Mr. Zeltser and Ms. Funk had been "detained," "tried" and "convicted" for "attempted economic espionage" against Belneftekhim, in a "close door trial".

90.    On April 25, 2008, the U.S. State Department summoned the Belarusian *chargé d'affaires*

in Washington to call for Zeltser's release. That same day, U.S. consular officer Caroline Savage

visited Mr. Zeltser in the KGB detention center. Ms. Savage reported that Mr. Zeltser was

"considerably weaker and thinner than when a consular officer was last permitted to visit him on

March 27," according to a statement by the U.S. Embassy in Minsk issued on April 29, 2008.  The

statement added that the U.S. Embassy is "deeply concerned for his health and welfare."

91.    On April 29, 2008, the U.S. Embassy in Minsk, following its second visit to Mr. Zeltser on

April 25, 2008, issued a statement calling for Mr. Zeltser's release on humanitarian grounds:

> "The United States is deeply concerned about the deteriorating health of
> American citizen Emanuel Zeltser, imprisoned in Belarus. Since his detention
> on March 12, the U.S. Embassy in Minsk has only been permitted to visit
> him on two occasions, March 27 and April 25. During the visit on April 25,
> the consular officer from the U.S. Embassy noticed a significant physical
> deterioration of Mr. Zeltser's health since the previous visit on March 27.
> Mr. Zeltser lost a considerable amount of weight and was very weak. Despite
> all efforts by the U.S. Embassy, his lawyer, and his U.S. doctor to comply
> with prison procedures, Mr. Zeltser has not been permitted to take his
> required daily medications, which may be causing irreversible internal
> damage. The United States is extremely concerned for the health and safety
> of Mr. Zeltser should he remain in the care and custody of the Government
> of Belarus. On April 25, the Department of State requested the Government
> of Belarus to release Emanuel Zeltser on humanitarian grounds immediately.
> We urge the Government of Belarus to favorably consider this request in
> order to save the life of an American citizen suffering in its custody."

92.    On April 29, 2008, the U.S. Department of State officially requested by diplomatic note that

the Government of Belarus release Mr. Zeltser on humanitarian grounds.

93.    On May 2, 2008, Union of Councils for Jews in the Former Soviet Union (UCSJ), a human

rights NGO, forwarded a letter to Lukashenka concerning the unlawful abduction, detention and

torture of Zeltser and Funk.  The UCSJ letter stated that UCSJ was "extremely concerned by reports

that US citizen Emanuel Zeltser has been detained and imprisoned by the Belarusian authorities,

denied critically needed medical treatment, beaten and otherwise physically abused, then involuntarily placed in a psychiatric institution." The UCSJ letter further stated:

> We respectfully request that you immediately look into these allegations of abuse to determine the extent of Mr. Zeltser's injuries and order an investigation of those officers who may be responsible. The fact that Mr. Zeltser suffers from diabetes, a heart condition, and severely painful arthritis, makes the denial of proper medical treatment he has suffered while in custody especially alarming, to the point of putting his life in danger. Mr. Zeltser's placement in psychiatric detention raises a variety of questions about the legal bases for the state's case against him. Involuntary placement into psychiatric facilities was an especially horrific form of repression against dissidents during the Soviet period which resulted in an enormous amount of negative publicity around the world. Placing him in psychiatric custody leaves the impression that the state is striving to isolate Mr. Zeltser and deal with him in an extra-legal fashion.

94.     The USCJ letter pointed out that "serious concerns had been raised ... about the nature of the charges that Mr. Zeltser and his secretary, Vladlena Funk, face" and urged Belarusian authorities "to release Mr. Zeltser and Ms. Funk immediately, to allow Mr. Zeltser access to his medications, and to ensure that they are subject to no further torture or cruel or degrading treatment, including interrogation under inhumane conditions."

95.     On May 7, 2008, Amnesty International issued an emergent alert, UA 121/08, entitled: "Torture and other ill-treatment/health concern", advising that Mr. Zeltser was "interrogated and beaten, and has been denied the medicine he needs urgently to treat his diabetes and arthritis." Amnesty International further advised that "the US Consul, Caroline Savage, reported that Emanuel Zeltser's health was failing, noting that he had lost weight, was very weak and had difficulty walking and talking, and that he had been beaten two or three times while in custody." Amnesty International advised all of its adherents to "send appeals to arrive as quickly as possible ... calling on the authorities to ensure that Emanuel Zeltser receives immediately the medication his doctor has prescribed ... to order an urgent, independent investigation of reports that Emanuel Zeltser has been tortured or otherwise ill-treated, and to bring those responsible to justice... [and] "urging the

authorities to ensure that Emanuel Zeltser is protected from further torture and other ill-treatment, and given regular access to US consular representatives, lawyers of his choice and any medical attention he may require."

96.     On that same day, Hon. Jerrold Nadler, Chair of the House Subcommittee on Constitutional Civil Rights and Civil Liberty, wrote to the Belarusian prosecutor general Grigorii Vasilevich regarding the abuse of Mr. Zeltser by the Belorusian KGB, including the physical abuse and denial of regular access to medication.  In his letter, Congressman Nadler urged Mr. Vasilevich "to treat Mr. Zeltser in a fair and humane manner, as specified in Article 36 of the Vienna Convention" and stated that "Mr. Zeltser has the basic human right not to be beaten or physically banned [and] is entitled to food and medication which keep him from serious illness or death."

97.     On June 15, 2008, MT~Newswire™ released a transcript of an interview with Marina Sivoy, who was then a recently released prisoner of Amerikanka, where Ms. Funk was held and who was a cellmate of Ms. Funk for nearly a month.  Ms. Sivoy reported that Ms. Funk was subjected by the KGB to psychological abuse that was "much worse than physical beating which [Sivoy] once received there."  "[Ms. Funk] was dragged to interrogations, sometimes four or five times a day, usually in the middle of the night", Sivoy said.  "After she was brought back to the cell she was hysterical, often incoherent, could not talk … It would take her at least an hour to calm down but, as she was finally falling asleep, the guards would walk in and order her in a rude and insulting manner to go back to interrogation room, I was worried that she would lose her mind."  Ms. Sivoy also described the humiliating and degrading conditions which female prisoners endured in KGB internment.

> "There are no separate male/female cellblocks in Amerikanka. Women and men are held in the same small ward... all prison guards are men. They conduct daily searches of the cells, our personal things, personal hygiene items ... do body frisks. Strip searches are done by the prison nurse but there are always two male guards present in the cell, even though they usually turn

around, it was incredibly humiliating. Men accompanied us to the bathroom twice a day, 6 AM and 6 PM, sometimes they ordered us to leave the bathroom door open so that men-guards and men-inmates who would pass by could see the inside of the bathroom, when we were using it. .... Some cells have a toilette inside, which is not separated at all and less than a meter away from a small table where we ate. Guards open peephole every 2-3 minutes and the toilette is in plain view. Showers were permitted only once a week, often there was no hot water.... Male guards accompanied women to the shower room. When we entered the shower room, guards locked the door from the outside. But the shower room door had a window ... the entire shower room could be seen ... some guards sincerely felt embarrassed themselves even apologized to us, like, what can we do, here we are almost the same prisoners here as you...."

98.    On June 16, 2008, Amnesty International issued a second emergent alert, entitled "Further Information on Torture and other ill-treatment/serious ill health: Emanuel Zeltser", advising that: "Emanuel Zeltser is still being refused the medication that he desperately needs to treat his diabetes and arthritis. Since his arrest on 12 March 2008, the Belarusian authorities have denied Emanuel Zeltser the treatment he needs and he is now in a great deal of pain, is unable to walk and has difficulty talking."

99.    After numerous requests by the U.S. Department of State and calls of human rights organizations, on June 26, 2008, Belarusian authorities allowed Zeltser to be examined by an independent U.S. physician, Dr. Albert Benchabbat - - after Zeltser had been imprisoned for over three months. Dr. Benchabbat's report revealed the harrowing results of the torture – that Zeltser's continued physical degeneration had brought him near the point of death. In his report of the examination of Zeltser, Dr. Benchabbat noted Zeltser's pain from debilitating gout and spondylosis, that Zeltser's joints were inflamed, that he had high blood pressure, hypercholesterolemia, microproteinuria, and hypocalcaemia; severe kyphosis of the spine and was unable to stand without assistance. The medical report further noted that Mr. Zeltser was suffering from excruciating pain and stated that "it is imperative to resume the patient medications that were taken away before his incarceration," concluding: "Upon review and comparison of the patient's medical history, his chart

from March 17, 2008 to June 3, 2008 and results of examination of the current condition of the patient, I can definitely conclude that the patient's health is in a very poor state, his medical condition is rapidly deteriorating and having taken into consideration the current medical treatment which is clearly rudimentary and insufficient for these serious illnesses, Emanuel Zeltser may not survive his detention ..."

100.    On June 26, 2008, the U.S. Department of State presented Dr. Benchabbat's report to Belarusian authorities.  On June 27, 2008, the KGB spokesman, Valery Natodchaev, in a false press statement incredulously "interpreted" Dr. Benchabbat's report to mean that Zeltser was found to be "in satisfactory health and fit to remain in prison."   Nodchaev noted however, that Belarusian authorities had allowed for an independent medical exam of Zeltser to demonstrate to the U.S. its "goodwill [and] desire for an open dialogue."

101.    On July 31, 2008, Amnesty International renewed its emergent alert "Further Information on Torture and other ill-treatment/health concern: Emanuel Zeltser" advising the world of the "closed door trials" of Mr. Zeltser and Ms. Funk and the refusal of Belarusian authorities to permit presence of the representatives of the U.S. State Department.

102.    On August 2, 2008, FrontierNews™ reported that a Belarusian court clerk confirmed that no trial of Zeltser and/or Funk is reflected in Belarusian court records.

103.    On September 16, 2008, at a Hearing of the Commission on Security and Cooperation in Europe (the US Helsinki Commission), Assistant Secretary of State, David J. Kramer stated:

> "In addition to the [undemocratic] conduct of elections in Belarus, another key issue in improving the relations between the U.S. and Belarus is Belarusian authorities' treatment of imprisoned U.S. citizen Emanuel Zeltser ... Despite our many repeated requests, we ... were denied access to his closed trial. And despite our many efforts, including facilitating an exam by an American doctor and even bringing his medications to prison officials, Mr. Zeltser reports he has not been allowed access to all his prescription medicines or their comparable Belarusian equivalents. Our consular officer and the American doctor reported such a severe deterioration to his health

since his imprisonment that we have requested Mr. Zeltser's release on
humanitarian grounds. With a real possibility for a significant improvement
in the relationship between U.S. and Belarus, we hope there will be a quick,
humanitarian resolution in Mr. Zeltser's case."

104.    On September 24, 2008, Amnesty International issued new alert stating: "Amnesty

International is concerned that the U.S. Embassy officials were not granted access to any court

hearings, and Emanuel Zeltser's lawyer was obliged to sign a non-disclosure clause."

59.    On November 4, 2008, Belarusian authorities moved the Plaintiffs to a transit holding facility

known as "Volodarka" while they awaited further transfers to KGB penal colonies.  Their lawyer,

who observed Volodarka, reported that Zeltser and Funk "are deprived of the elementary sanitary

facilities, there are no mattress, Emanuel is totally deprived of all his medications, his handcuffs are

so tight that there is no blood circulation in his hands, he is denied food I brought to him … they are

under totally inhuman, degrading conditions and are subject to constant humiliation."  Notably,

*Volodarka* prison had been also observed by Oleg Volcheck, former prosecutor and member of the

Minsk City Council, who reported in the June 2008 Report of the International Federation for

Human Rights:

> "I was shocked. Overcrowded cells, small windows, an hour of walking per
> day. The building of the detention facility is old, and 1800 people were kept
> in it, which exceeded the norm by 4.5 times. Some detainees had to sleep
> under the beds as there was not enough space for everybody. I was
> astonished by the windows: in the cell with 50 people (actually designed for
> 25), there was only one window measuring 50 by 50 cm, which was totally
> covered by so called 'eyelashes'. It was damp and moist in the cells, there
> was no fresh air, and sometimes the door had to be opened at night. The jail
> is miserable for non-smokers. All the walls were greasy, covered in dirt and
> moist. The toilet was in the general view and only separated by a small
> screen. It reminded me of stories about jails during Tsarist times. The top
> floors of the building had a better `climate', but those in the basement cells
> had their limbs rotting away, and their skin covered in boils."

105.    On or about November 10, 2008, a day before their transfer to the KGB penal colonies, Funk

was driven blindfolded to a location approximately 30 minutes away from the *Volodarka* detention facility.  When her blindfold was removed, she found herself in a lavishly decorated room, where she had been apparently awaited by two well dressed men.  The men introduced themselves as principal executives of Belneftekhim and offered Funk a drink. One man, who identified himself as "Vladimir," explained to Ms. Funk that the U.S. sanctions against Belneftekhim are suffocating the company and the Belarusian economy, and causing the Belarusian people great hardship. "Vladimir" advised that Zeltser's abduction in London was carried out at the request of Belneftekhim "to bring the United States to its senses", and that Funk was simply in the wrong place at the wrong time.  The Belneftekhim representatives advised Funk that she should sign "confessions" regarding Zeltser's "spying" on Belneftekhim, explaining that such "confessions" would embarrass the U.S. and force it to lift its sanctions against Belneftekhim. "Vladimir" suggested that the signing should take place before consular representatives of the Russian Federation and, in exchange, Funk would be permitted to walk out with the consular representatives and leave Belarus. Funk declined to sign false documents and was again blindfolded and driven back to *Volodarka*.

106.    On November 11, 2008, Zeltser was transferred to a KGB penal colony near Mogilev. The train-cell in which Mr. Zeltser was transported, was designed to transport four persons; however the convoy squeezed in 19 (!) men, literally on top of one another.  There was no food or drinking water and no one was allowed to go to the bathroom during the 11-hour trip.  Immediately upon arrival, Zeltser was brought to the prison hospital barrack with severe chest pain and a sharp rise in blood pressure. Yet, the KGB authorities, acting in concert with Defendants, continued to withhold his physician-prescribed medications.  He received intravenous fluids for nutrition.  A nurse attended to him, but no doctor was on staff.

107.    The following day, Funk was transported a KGB penal colony # 4 near the town of Gomel

- - in a similar wretched manner.

108.    On December 18, 2008, an urgent letter signed by eight ranking Members of the U.S.

Congress was dispatched to Belarusian dictator Lukashenka demanding the immediate release of

Zeltser, stating:

> "... we are writing to you today to express our grave concern regarding the
> health and well-being of Emanuel Zeltser, a U.S. citizen imprisoned in
> Belarus... We are deeply troubled by Mr. Zeltser's arrest as well as the
> inhumane treatment he has received while in your government's custody...
> during Mr. Zeltser's internment in Belarus he has been denied regular
> independent medical evaluation and the U.S. consul in Minsk has reported
> that he has been physically assaulted and abused while in detention. This
> abuse is unconscionable and has been reported by Amnesty International,
> which has urged authorities in Belarus not to subject Mr. Zeltser to "further
> torture and other ill-treatment." As you know, the U.S. Department of State
> has also directly expressed "deep concerns about the state of his health," and
> has repeatedly called for Mr. Zeltser's release on humanitarian grounds, as
> has Representative Alcee L. Hastings, Chairman of the Commission on
> Security and Cooperation in Europe. We share their concerns and strongly
> urge your government to immediately and unconditionally release Mr.
> Zeltser..."

109.    On December 22, 2008, the Washington D.C. law firm, Patton Boggs, filed a complaint with

the United Nations Human Rights Committee on behalf of Zeltser. (The Complaint notes that

although the Complaint centers on Zeltser, the facts therein relate to Ms. Funk as well).   The

Complaint stated that Belarusian authorities violated Zeltser's civil and political rights, noting that

Zeltser faced "physical beatings, inhumane and unsanitary treatment, including withholding

physician-prescribed medications" during his KGB detention.  The case of unlawful detention was

also brought up before the UN Special Rapporteur on Torture.

110.    On January 9, 2009, MSNBC aired a report ("Countdown with Keith Olbermann") which

accurately summarized the plight of Zeltser and Funk:

> "Number one, torture-gate. The story is all too familiar, a citizen of another
> country is drinking coffee at a café in a bustling city center. Before he passes
> out, he vaguely realizes the coffee has been spiked. Next thing he knows, he
> is on a private plane being renditioned to another country. He wakes next in

a cold cell and when he tells them he needs medication for diabetes and arthritis and a heart condition, they instead torture him, and they move him from country to country and cell to cell, while at home, his desperate friends and neighbors try to find out what happened to him and how to save his life. Finally, he is tried in an extra-constitutional court, where he is permitted only the most perfunctory of defenses. He is convicted on manufactured evidence that he can neither see nor challenge and he is told he will stay in prison indefinitely. Some alleged terrorists rotting at Gitmo, awaiting the moment that we as a nation come to our senses? No, this is the journey of Emanuel Zeltzer of New York. He's a lawyer. The city from which he was kidnapped last March was London. The place he was taken to was in Belarus. And the place he languishes to this day is a KGB penal colony. His alleged crimes? Economic espionage against Belarus, using false official documents, and possession of illegal drugs. Until he was renditioned, Zeltzer had never been in Belarus and the illegal drugs he was convicted of possessing, his medication for diabetes and arthritis and a heart condition.  A private law firm and Amnesty International and our State Department are doing all they can to rescue this New York attorney.

111.    On January 16, 2009, Amnesty International once again issued an emergent alert advising that Zeltser was being held at a penal colony in Eastern Belarus: "His health has deteriorated further, and the Belarusian authorities are continuing to deprive him of essential medication for various ailments, including diabetes, heart problems and severe arthritis."

112.    In the beginning of January 2009, succumbing to international pressure, Belarusian authorities permitted Zeltser to be examined again by an independent U.S. physician, Dr. Benchabbat.  Dr. Benchabbat traveled to Belarus and examined Zeltser in the KGB prison.  His report dated January 9, 2009, stated that "the problem must be addressed as soon as possible" and further that Zeltser's continuing detention in Belarus "is equivalent to a death sentence."

113.    Notably, in addition to Dr. Benchabbat, Zeltser was examined by several top Belarusian physicians personally appointed by Lukashenka.  Remarkably, their report was consistent with the report of Dr. Benchabbat.

114.    On February 5, 2009, Robert Wood, acting U.S. State Department spokesman, said during

the daily briefing that the State Department continued calls for Zeltser's release, noting that he was subjected to "abuse in prison" and that they have formally protested the mistreatment to the Belarusian government. "We don't use the word lightly," Wood said Thursday, referring to the abuse. "It's a very troubling situation there, and the Secretary [of State] is focused on this" Mr. Wood added.

115.    On February 11, 2009, Chair of the Commission on Security and Cooperation in Europe (The Helsinki Commission) Senator Benjamin L. Cardin denounced the purported "closed doors trial" over Zeltser and Funk and noted:

> "The U.S. Embassy in Minsk criticized the proceedings, noting that it was denied the opportunity to observe the trial. The State Department has repeatedly called for Mr. Zeltser's release on humanitarian grounds. So have others in Congress, especially my colleague on the Helsinki Commission, co-chairman Representative Alcee Hastings."

Senator Cardin further stated:

> "The poor human rights record of President Lukashenka's regime is well known. No American--indeed no human being--should be subjected to the kind of treatment Mr. Zeltser has been forced to endure during his incarceration. Despite Mr. Zeltser's grave health condition--he suffers from heart disease, type 2 diabetes, severe arthritis, gout, and dangerously elevated blood pressure—Belarusian authorities have repeatedly refused to provide Mr. Zeltser with his prescribed medications."

116.    Pressure on Belarus intensified. "It's very exceptional," said Jonathan M. Moore, the U.S. chargé d'affaires in Belarus in his February 15, 2009 interview with the New York Times. "This is the only time in my knowledge that a citizen of any country was arrested immediately upon arrival, held by the KGB, sentenced in a closed trial and has been held for so long when the state of his health is such a concern." Mr. Moore noted that Belarusian authorities detained Zeltser, who was accompanied by his assistant Funk, "under mysterious circumstances ... moments after he landed at the airport in Minsk" and "tried him in closed court against the protests of American diplomats."

117.    After being held in various KGB detention facilities for 373 days, Funk was finally released on March 20, 2009, amidst international pressure and after the Russian ambassador to Belarus indicated that her continuous detention may have a negative impact upon the relationship between the two countries.

118.    Lukashenko however still sought to use the U.S. concern for Zeltser as an opportunity to lift sanctions against Belneftekhim and was delaying his release while trying to negotiate a deal with the U.S. Government to trade  Zeltser's freedom for the lifting of the sanctions.

119.    In the beginning of June of 2009, Zeltser went on a hunger strike widely reported by international media.  Reuters in its report "US Citizen Jailed In Belarus On Hunger Strike" noted that Zeltser, "who once testified before Congress on Russian organized crime, was jailed in the ex-Soviet republic last year under murky circumstances".

120.    U.S. and international pressure on the government of Belarus to free Zeltser grew more intense.  However, the U.S. government took a firm stance against using a citizen held hostage as a "bargaining chip" said Jonathan Moore, U.S. *chargé d'affaires* in Belarus.

121.    On June 12, 2009, President Barack Obama continued the sanctions imposed against Belneftechim Defendants and Belarusian regime pursuant to the *Notice on Continuation of the National Emergency With Respect to the Actions and Policies of Certain Members of the Government of Belarus and Other Persons That Undermine Democratic Processes or Institutions in Belarus*.

122.    On June 30, 2009, a delegation of U.S. Senators and Congressmen traveled to Belarus and demanded the immediate release of Zeltser.  Fearing additional harsher sanctions, Belarusian dictator Lukashenka signed an order decreeing Zeltser's release.  "I never thought that this man could become an issue in relations between our  states," Lukashenka said, "[but] if it is very important to America and our relations and may contribute to the normalization of our relations, I'll

sign the edict today." Zeltser was released from the KGB detention later the same day, after 473 days in captivity.

123.    Two hours prior to his release, Zeltser was brought to an office inside the KGB facility, where Voronin of Belneftekhim was awaiting. Voronin (who, as alleged heretofore, identified himself as Belneftekhim legal advisor) started by saying he wanted to caution Zeltser "as one colleague to another". Voronin said that his "sincere advice" would be to be grateful to God and to U.S. intervention on Zeltser's behalf and to enjoy his freedom and forget the word "Belneftekhim". Voronin said that as someone who was born and raised in Russia, Zeltser should realize that "Belneftekhim and the KGB are owned by the same master, Mr. Lukashenko" and therefore any attempted legal action against Belneftekhim would be futile. "Belneftekhim has never heard of you", Voronin said. To Zeltser's remark that he certainly knew Voronin, the latter replied with a smile: "Belneftekhim has never heard of me either".

124.    Plaintiffs' captivity and torture had a grave impact on the Plaintiffs' health, especially on Zeltser. Zeltser is a diabetic who suffers from debilitating arthritis. As stated heretofore, Defendants, through their KGB cohorts, for months deprived Zeltser of his physician-prescribed medication, that were necessary to maintain his diabetes and arthritis stable.  It took many months of treatment until Zeltser was able to return to practicing law on a limited basis.

125.    Following Plaintiffs' release, Defendants continued their terror campaign against Funk. They have made repeated death threats on Funk as a reprisal for any civil action ever commenced on Plaintiffs' behalf. In addition, capitalizing on the fact that Funk's family resided in Russia, where Funk visited them on a regular basis, Defendants reminded Funk that Russia is an ally and a sponsor state of Belarus and threatened that Russian government would readily turn Funk over at Belarus's request, where she would again find herself in the KGB dungeons. By doing that, Defendants affirmatively delayed and frustrated the Plaintiffs' ability to seek justice and the filing of this action.

Until Funk became a U.S. citizen in June 2012, and could rely upon the protections accorded to the U.S. citizens, neither she nor Zeltser could take any such legal action without endangering her life or welfare. Only after Funk became a U.S. citizen, she no longer was forced to live in fear of the vicious credible threats of Defendants.

126.     As a result of the Plaintiffs' unlawful captivity in inhumane conditions and acts of torture committed, initiated, aided, abetted and participated in by Defendants, Plaintiffs suffered great mental and physical distress, in addition to personal injuries resulting in Plaintiffs becoming sick, sore, lame and disabled and may continue be so sick, sore lame and disabled for some time to come; was obliged to and necessarily did engage and procure medical aid and attention in an endeavor to cure themselves of their hurts and wounds and did necessarily pay and become liable therefore.

127.     In addition, Plaintiffs lost a year and 16 months of earing, Zeltser lost most of his lucrative law practice and significant commercial opportunity.

## CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF:
COMMON LAW FRAUD

128.     Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

129.     As heretofore alleged, in early March, 2008, at Defendants request, Plaintiffs and Defendants, including Mr. Voronin and Ms. Moysievich met, first in Carnegie Club in New York City, and then in Mr. Zeltser's office on the Upper West Side in Manhattan. Defendants represented to the Plaintiffs that the meetings were held for the purposes of settlement negotiations between the Defendants and Plaintiffs' clients with the objective of resolving ownership and financial dispute and avoiding litigation. Initially, Defendants attempted to deny the Plaintiffs' clients' ownership by showing the Plaintiffs forged documents on the letterhead of Belneftekhim USA.

130.    At the conclusion of the meetings, Defendants represented to the Plaintiffs that they may have reached an agreement in principle and wanted to continue the discussion in London.

131.    Defendants reasonably relied upon the Plaintiffs' representations, believing that Defendants wanted to continue good faith settlement negotiations to conclusion in London.

132.    Unknown to the Plaintiffs at the time, but in true and in fact, Defendants requested that Plaintiffs travel to London, not for the purposes of "settlement negotiations" but to facilitate their abduction and unlawful transportation to Minsk Belarus, using the facilities of their hired henchman Boris Berezovsky, including his private jet.

133.    Defendants knew of the falsity of their representations to the Plaintiffs at the time of their meeting in New York City, *i.e.*, Defendants knew that the real purpose of their suggestion to continue the settlement discussion in London was the Defendants' scheme to use Berezovsky and his private jet to effect the Plaintiffs unlawful transportation to Belarus against their will. Defendants knew that Plaintiffs in Belarus would be unlawfully detained and tortured by the KGB, a notoriously nefarious Gestapo-like secret paramilitary force of the Soviet era.[17] Indeed, Defendants intended this very result in order to permanently squelch the Plaintiffs and/or get them, under torture, to persuade their clients to renounce their commercial ownership interest.

134.    In the first month of their unlawful captivity, Defendants explained to Plaintiffs that after the Plaintiffs declined Defendants' "invitation" to a meeting in Minsk Belarus, Defendants' next best bet was to bring them to Belarus against their will. Defendants further explained that effecting such scheme would be much more difficult from the U.S. for a number of reasons: [a] there are no direct flights from any U.S. city to Belarus; [b] transporting Plaintiffs from New York to Belarus against

---

[17]    Belarus is the only country of the former USSR republics to retain the name "KGB", deemed by many as synonymous to evil.

their will by commercial airline would be too risky and too uncertain; [c] air travel time from London to Minsk is approximately three hours, approximately a quarter of air travel from New York.

135.    Defendants purposely misrepresented to the Plaintiffs, intending for the Plaintiffs to rely on their misrepresentations, so as to lure the Plaintiffs to London and induce them to meet with Defendants and Berezovsky under the circumstances more conducive to effect kidnapping of the Plaintiffs and transporting them to Belarus against their will.

136.    As a direct and proximate cause of Defendants' fraud, Plaintiffs sustained grievous injuries suffered great mental and physical distress, pain, suffering and injury to their health as a result of continuous torture and detention in inhumane conditions; loss of income and business opportunities while remaining in unlawful custody; and significant expenses connected with their rescue.

137.    By virtue of an agreement with their clients Plaintiffs also have a direct interest in Belneftekhim's ownership and property, including the interest in the funds blocked by OFAC.

138.    As a direct and proximate consequence of Defendants' fraud, Defendants diverted the ownership and financial interest in Belneftekhim to themselves, for their own enrichment and/or enrichment of Lukashenko, his family and his corrupt inner-circle, all to the Plaintiffs' detriment and damage.

139.    As a direct and proximate cause of the aforementioned fraud by the Defendants, Plaintiffs suffered great financial damages, the amount of which is still being ascertained.

SECOND CLAIM FOR RELIEF:
ASSAULT AND BATTERY

140.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

141.    As heretofore alleged, on or about March 11, 2008, Defendants, acting in concert with

Berezovsky and the KGB, unbeknownst to Plaintiffs and without their consent, caused the Plaintiffs to ingest benzodiazepine sedatives drugs in a doses sufficient to make them sleepy and unable to resist Defendants' actions in furtherance of their abduction.

142.    Once Plaintiffs were sufficiently sedated, Defendants forced the Plaintiffs in Berezovsky's limousine and transported them to and placed Plaintiffs aboard a private jet bound for Belarus - - all against the Plaintiffs' will.

143.    The above wrongful acts involved intentional touching of, administering illegal drugs, and application of force to, the bodies of the Plaintiffs in a harmful and offensive manner, and without their consent.

144.    The Defendants intended to cause a harmful or offensive contact in order to facilitate the Plaintiffs' unlawful abduction and transportation to Minsk.

145.    In addition, during their unlawful captivity, for 12 and 16 months respectively, Plaintiffs had been subjected to torture, including severe physical beating and other forms of cruel, inhuman and degrading treatment involving application of physical force to the bodies of the Plaintiffs in a harmful and offensive manner, and without their consent.

146.    The Defendants intended to cause the above-described offensive contact in order to coerce the Plaintiffs to comply with Defendants' demands.

147.    The Defendants orchestrated and in substantial manner aided, abetted, participated in and directed in the above mentioned assault and battery.

148.    As heretofore alleged, Defendants utilized services and facilities of a private third-party contractor, Berezovsky, and his facilities in order to accomplish their afore-described nefarious objectives.

      THIRD CLAIM FOR RELIEF:
      FALSE IMPRISONMENT

149.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

150.    As heretofore alleged, on March 10, 2008, Plaintiffs traveled to London for a business meeting with Defendants' representatives, including Berezovsky. During their meeting, unbeknownst to Plaintiffs, Defendants, acting in concert with Berezovsky and the KGB laced their drinks with a sedative drug, forced them into Berezovsky's limousine, transported them to a private airport, placed them on a private jet, *en route* to Minsk, Belarus — all against their wills.

151.    By confining Plaintiffs in Berezovsky's limousine and his private jet, leading to the Plaintiffs' subsequent confinement in the Belarusian KGB facilities, Defendants, acting in concert with the KGB,  interfered with Plaintiffs personal interest of freedom from restraint of movement.

152.    The Defendants intended to unlawfully confine the Plaintiffs.

153.    As heretofore alleged, Plaintiffs were conscious of the confinement, and neither Zeltser nor Funk consented to any of the aforementioned confinement.

154.    The Defendants orchestrated and in substantial manner aided, abetted and participated in the above mentioned wrongful conduct, including but not limited to, the Plaintiffs confinement in (i) Berezovsky's limousine; (ii) his jet; and (iii) subsequent confinement in the KGB facilities for 12 and 16 months respectively.

155.    The above-described confinements were wholly unlawful and were not privileged.

156.    As heretofore alleged, Defendants utilized services and facilities of a private third-party contractor, Berezovsky, and his facilities in order to accomplish their afore-described confinements.

157.    Plaintiffs suffered damages as a result of the aforementioned conduct by the Plaintiffs.

        FORTH CLAIM FOR RELIEF:
        INTENTIONAL INFLICTION OF
        EMOTIONAL DISTRESS

158.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and

-46-

effect as if fully set forth at length herein.

159.    For reasons afore alleged, Defendants, acting in concert with Berezovsky and the KGB, engaged, in extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society.

160.    The Defendants, by their extreme and outrageous conduct intentionally caused severe emotional distress to the Plaintiffs.

161.    The Defendants orchestrated and in substantial manner aided, abetted and participated in the above mentioned wrongful conduct.

162.    Plaintiffs suffered damages as a result of the aforementioned conduct by the Plaintiffs.

> FIFTH CLAIM FOR RELIEF:
> TORTIOUS INTERFERENCE WITH
> CONTRACTUAL RELATIONSHIP

163.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

164.    As heretofore alleged, at all relevant times, Plaintiffs had valid contracts with a number of clients for the provision of legal and advisory services.

165.    The Defendants knew about the existence of these contracts and sought to cause the breach of the contracts.

166.    By intentionally and unlawfully detaining the Plaintiffs, for 12 months and 16 months, respectively, the Defendants, acting in concert with Berezovsky and the KGB procured the actual breach of contracts.

167.    As heretofore alleged, the Defendants orchestrated and directly participated in unlawful abduction and rendition of Plaintiffs to Belarus, where the Plaintiffs were, at the behest and with active participation of the Defendants, unlawfully detained and held for 12 and 16 months respectively.

168.    As a direct result of Defendants' actions, including Plaintiffs' unlawful detention and confinement, numerous breaches of contract for provision of legal and advisory services by Plaintiffs occurred, causing Plaintiffs substantial ascertainable damages.

169.    The Defendants, acting in concert with Berezovsky and the KGB, intended to harm Plaintiffs by interfering with their contractual relationship with clients.

170.    The Defendants' actions were unlawful, criminal, wanton and actuated by malice and had no privilege, excuse or justification.

171.    The Defendants orchestrated and in substantial manner aided, abetted and participated in the above mentioned wrongful conduct.

172.    Plaintiffs suffered damages resulting from the Defendants' intentional interference with the contractual relationship alleged herein, the precise amount of which is still being ascertained.

SIXTH CLAIM FOR RELIEF:
TORTIOUS INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE

173.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and effect as if fully set forth at length herein.

174.    As heretofore alleged, Plaintiffs had an economic relationship with their clients, including but not limited to the Plaintiffs' interest in their clients' investment interest in Belneftekhim Defendants, their ownership and assets, including without limitations the funds blocked by OFAC.

175.    This economic relationship contained significant probability of future economic benefit to Plaintiffs.

176.    The Defendants knew of the existence of the relationship between Plaintiffs and their clients and sought to disrupt this relationship.

177.    The relationship was actually disrupted.

178.    Defendants' actions were unlawful, criminal, wanton and actuated by malice and had no

privilege, excuse or justification.

179.    Plaintiffs suffered actual damages directly and proximately caused by unlawful and malicious the acts of Defendants.

> SEVENTH CLAIM FOR RELIEF: CONVERSION OF
> OWNERSHIP AND FINANCIAL INTEREST IN
> BELNEFTEKHIM DEFENDANTS AND THEIR ASSETS

180.    As heretofore alleged, Plaintiffs' investor-clients had substantial interest in the ownership of Belneftekhim Defendants and their assets. By virtue of an agreement with their clients Plaintiffs also have a direct interest in Belneftekhim's ownership and property, including the interest in the funds blocked by OFAC pursuant to the Executive Order 13405.

181.    As heretofore alleged, Defendants, acting in concert with Berezovsky and the KGB, choreographed Plaintiffs' abduction and rendition to Belarus. There Defendants coerced Plaintiff Zeltser under torture to telephone the Halkin Hotel in London and "authorize" the release Plaintiffs' originals and copies of documents relating to their ownership in Belneftekhim Defendants and their assets and further coerced Plaintiff Funk, under torture, to telephone the Plaintiffs' clients and plead with them to forfeit their ownership and financial claims and interest in Belneftekhim Defendants and their assets,  including the interest in the funds blocked by OFAC pursuant to the Executive Order 13405.

182.    Plaintiffs had legal proprietary and possessory right and interest in this specific identifiable property taken by the Defendants with intent to permanently deprive Plaintiffs of their property.

183.    Belneftekhim Defendants wrongfully took the Plaintiffs' interest in ownership and assets of Belneftekhim Defendants for their own enrichment, and/or enrichment of Lukashenko, his family and his corrupt inner-circle, intending to permanently deprive the Plaintiff of their use and ownership.

184.    Defendants wrongfully exercised and continue to wrongfully exercise dominion over

Plaintiffs' interest in ownership and assets of Belneftekhim Defendants in derogation of Plaintiffs'

rights, and in violation of international law.

185.    Defendants' actions constitute a distinct act of dominion wrongfully exerted over Plaintiffs'

interest in property in denial of or inconsistent with Plaintiffs' rights therein.

186.    Plaintiffs suffered damages as a direct and proximate cause of Defendants' conversion  in

the form of their loss of ownership and financial interest, in addition to economic loss in the amount

to be proven at trial.

> EIGHTH CLAIM FOR RELIEF:
> CONVERSION OF PLAINTIFFS'
> PERSONAL PROPERTY

187.    As heretofore alleged, Defendants, acting in concert with the KGB, choreographed

Plaintiffs' abduction and rendition to Belarus. There Defendants coerced Zeltser by torture to

telephone his hotel in London and "authorize" the release Plaintiffs' original documents , and

personal effects left at the hotel, to Defendants' representatives in London.

188.    Such effects included original documents, computer equipment, valuable jewelry and

wristwatches, clothing and travel items, and £5,740 in cash.

189.    The Defendants wrongfully took possession of the above referenced property with intent

to permanently deprive the Plaintiff of their use and ownership.

190.    Plaintiffs had legal proprietary and possessory right and interest in this specific identifiable

property taken by the Defendants with intent to permanently deprive Plaintiffs of their property.

191.    Defendants wrongfully exercised and continue to wrongfully exercise dominion over

Plaintiffs' personal property in derogation of Plaintiffs' rights.

192.    Defendants' actions constitute a distinct act of dominion wrongfully exerted over Plaintiffs'

personal property in denial of or inconsistent with Plaintiffs' rights therein.

193.    Plaintiffs suffered financial damages as a direct and proximate cause of Defendants' conduct.

NINTH CLAIM FOR RELIEF:
PRIMA FACIE TORT

194.    Plaintiffs repeat and reallege all of the allegations set forth above with the same force and

effect as if fully set forth at length herein.

195.    In the unlikely event, the Court finds that the Defendants' acts and series of acts were lawful,

the Defendants should be held liable under the prima facie tort doctrine.

197.    As afore alleged, the Defendants, acting in concert with the KGB, engaged in intentional and

malicious actions, causing the Plaintiffs harm and special damages.

198.    As a direct and proximate cause of Defendants' intentional, malicious, and wanton actions,

the Defendants inflicted harm upon the Plaintiffs.

199.    The harm inflicted upon the Plaintiffs by the Defendants, acting in concert with the KGB

was without excuse or justification.

200.    As a direct and proximate cause of the Defendants' intentional, malicious, and wanton

actions, Plaintiffs suffered special damages, such as legal fees and other direct expenses, expended

by the Plaintiffs in securing their release from the Belarusian KGB.  In addition, Plaintiffs have

suffered special damages in the form of unnecessary legal fees and related expenses in defending

bogus proceedings in various jurisdictions, and further suffered loss of specific valuable property.

201.    The above alleged financial losses are specific and capable to be measured in money, and

will be reduced to a specific documented sum at the time of the trial.

DEMAND FOR PUNITIVE AND EXEMPLARY DAMAGES

202.    Defendants' conduct as heretofore and hereinafter alleged was willful, wanton and

outrageous beyond the ability of ordinary human beings to comprehend and such that the conduct

of was oppressive and malicious, warranting punitive damages.

JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action and all issues so triable.

WHEREFORE, Plaintiffs demand a final judgment against the Defendants, on each and all causes of action in the complaint on behalf of each and all Plaintiff(s), against each and all Defendant(s), for compensatory damages in the sum to be evidenced at trial, and punitive damages, along with interest, attorneys' fees, costs and disbursements of this action, and such other further and alternative relief as this Court may deem just and proper.

Dated: November 2, 2015
New York, New York

STERNIK & ZELTSER

by:    /s/ Emanuel Zeltser
1562 First Avenue
New York, NY 10028
(212) 656-1810
email: lawmail@mail.ru

*Attorneys for Plaintiffs*
Vladlena Funk and
Emanuel Zeltser