UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                                :

VLADLENA FUNK and EMANUEL     :
  ZELTSER,                                 :

                          :       **MEMORANDUM DECISION AND**
                Plaintiffs,    :       **ORDER**
                          :

         - against -       :      14-cv-0376 (BMC)

                          :

BELNEFTEKHIM a/k/a CONCERN    :
BELNEFTEKHIM, BELNEFTEKHIM USA, :
INC., and JOHN DOES 1-50,       :

                          :

              Defendants.   :
--------------------------------------------------------- X

**COGAN**, District Judge.

      This is a state-law tort suit brought by two U.S. citizens against Belarusian oil and

holding company Belneftekhim, its U.S. subsidiary, Belneftekhim U.S.A., and 50 unnamed

individuals for damages relating to plaintiffs' abduction and torture. Plaintiffs Vladlena Funk

and Emanuel Zeltser moved for sanctions against defendants based on their failure to comply

with Court-ordered discovery on whether Belneftekhim qualifies as an agency or instrumentality

of a foreign state under the Foreign Sovereign Immunities Act. Defendants, in turn, have

renewed their motion to dismiss the amended complaint on numerous grounds.

      For the reasons stated below, I grant plaintiffs' motion for sanctions and deny defendants'

motion to dismiss.

**BACKGROUND**

      The Court has previously discussed at length the allegations underlying this suit, see

Funk v. Belneftekhim, No. 14-cv-0376, 2015 WL 6160247, at *1-3 (E.D.N.Y. Oct. 20, 2015),

and will not repeat them here. Plaintiffs originally filed suit in New York state court in 2012;

defendants removed to federal court in January 2014 and moved to dismiss the complaint arguing, *inter alia*, that this Court lacked subject-matter jurisdiction. Plaintiffs then cross-moved to remand to state court. In December 2014, this Court reserved decision on both motions and ordered discovery on two narrow factual questions on threshold issues. The one relevant here is whether Belneftekhim qualifies as an "agency or instrumentality of a foreign state" under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1603(b).[1]

The parties were unable to agree on a discovery plan, so on February 2, 2015, the Court set one: The parties were to serve all written discovery requests, including document requests, interrogatories, and deposition notices, by February 9, with responses or objections filed by February 20. All depositions were to be taken by March 9. In the discovery schedule order, the Court also instructed the parties to file any supplemental motions on the jurisdictional issue by March 20. The Court later granted the parties' joint motion to extend the deadline to file supplemental motions to April 3.

During the two months that followed, defendants did not provide any documents or make available any of the deponents plaintiffs requested. But they did file an extensive supplement to their motion to dismiss on March 23, 2015. The supplement included arguments about the disputed jurisdictional question, but also included new arguments on entirely unrelated issues. Attached to the supplemental motion were 17 provisions of Belarusian law and a declaration by Dmitry Gvozdev, who identified himself as the head of Belneftekhim's Legal Department. Gvozdev declared that Belneftekhim was and is owned entirely by the Belarusian government, that it was not a joint-stock company, and that it had not issued shares. His declaration

---

[1] The other disputed factual question was whether defendants were properly served. Defendants subsequently waived their challenge to the sufficiency of process.

referenced the attached 17 provisions, which included resolutions by the Council of Ministers,[2] presidential decrees, and portions of the civil code that purportedly established that Belneftekhim is either owned by or an organ of Belarus.

Gvozdev cited extensively to the resolution by the Council of Ministers that established Belneftekhim in 1997 (Resolution No. 359, dated April 17, 1997) and the resolution that approved Belneftekhim's charter (Resolution No. 788, dated June 27, 1997).  According to Gvozdev's declaration, Belneftekhim's charter and various subsequent presidential decrees establish that:  Belneftekhim's assets are national property; Belneftekhim's head, a chairperson, is appointed or dismissed directly by the Council of Ministers, with the approval of the President; and that Belneftekhim must submit its operational and accounting records to the Belarusian government.

Gvozdev also cited Presidential Decree No. 289 (dated May 5, 2006), which he stated established that state organizations subordinate to the Council of Ministers are "included in the system of national organs of state administration," and which he said lists Concern Belneftekhim as one of those subordinate state organizations.  Gvozdev cited another resolution of the Council of Ministers, No. 903 (dated June 18, 2001), as declaring that the government sets the number of employees and the budget for those employees' salaries for state organizations.  He also cited Resolution No. 156 (dated February 17, 2012) and various presidential decrees as reserving certain state functions for Belneftekhim alone, including, among other things, setting excise duties for certain goods and licensing wholesale and retail trade in petroleum products.

Citing the Gvozdev declaration, the referenced provisions of law, and a 2013 U.S. Congressional Research Service Report which referred to Belneftekhim as a "state-owned oil and

---

[2] According to defendants' supplement to their motion to dismiss, the Council of Ministers is a central administrative body of Belarus which exercises executive power.

petrochemicals firm," defendants argued that Belneftekhim is wholly owned by the foreign state of Belarus, because it has not issued shares and because all of its assets are property of the Belarusian Government. Defendants also argued that Belneftekhim is an organ of Belarus based on the five factors in <u>Filler v. Hanvit Bank</u>, 378 F.3d 213 (2d Cir. 2004): (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the foreign country; and (5) how the entity is treated under foreign law.

Defendants argued that Resolution No. 359, which established Belneftekhim, shows that it was created for a national purpose; that Belarus actively supervises Belneftekhim because the Council of Ministers and the President directly appoint its chairperson and deputy chairs and the Resolution requires Belneftekhim to submit operational and accounting records; that the Belarusian government regulates Belneftekhim's employees by setting their number and compensation; that Belneftekhim has the exclusive right to perform certain functions like setting excise duties and prices for petroleum products and licensing wholesale and retail trade in petroleum products; and that, as a "concern," Belneftekhim is considered a national organ under Presidential Decree No. 289.

In response, plaintiffs submitted their own supplemental filing, which included an affidavit by Russian legal expert Alexander Fishkin. Fishkin's affidavit challenged both the completeness of defendants' representation of Belarusian law and the accuracy of defendants' translations.

Fishkin's affidavit claimed that defendants' "eclectic selection" of administrative edicts were only a portion of the relevant laws and that they do not reflect subsequent amendments.

For example, Fishkin pointed out that Resolution No. 359 indicates that it has been amended at least three times between 1997 and 2006, but that defendants did not provide any of these amendments. Fishkin claimed that shortly after Resolution No. 359 was passed on April 17, 1997, it was amended to include the following language:

> To accept the suggestion of State Concern on Oil and Chemistry . . . on the inclusion in this concern the open stock societies and the leased enterprises in accordance with the Annexes 1 and 2. Belarus State Concern on Oil and Chemistry shall implement, in accordance with law, *the management of the shares of those joint-stock companies included in the concern* [and] appoint state representatives in the organs of their governance.

ECF 45-1, at 8 (brackets in original).[3] Fishkin pointed out that this later-added language seriously undermined defendants' argument that Belneftekhim was not made up of joint-stock companies (at least in part), and that omissions like this one undermined the credibility of all of defendants' representations of Belarusian law.

Fishkin also alleged that even the portions of laws that defendants did provide were not reliable. For example, he noted that the original 1997 version of Resolution No. 359 referred to establishing Belneftekhim

> [w]ith the purpose of improving [State] management of the petrochemical sector of the Republic of Belarus, *securing domestic and foreign investments within the framework of* [*sic*] *privatization program* the Council of Ministers of the Republic of Belarus and implementation of a unified economic technical and technological policy in the respective industries . . . .

ECF 45-1, at 9 (emphasis added). Fishkin pointed out that the version supplied by defendants omits the emphasized language, and adds the bracketed term "State." Fishkin stated that he could not find this original version of Resolution No. 359 in any Belarusian legal databases (although he did not provide any additional proof of its existence).

---

[3] All ECF page references are to the ECF pagination, not internal pagination.

Fishkin also noted that although Belneftekhim's website states that it manufactures over 500 types of petrochemical and chemical products (Gvozdev stated the same thing in his declaration), nothing in Resolution No. 788, which defendants cite as Belneftekhim's charter, mentions anything about Belneftekhim manufacturing products, but instead refers to Belneftekhim conducting market research and providing assistance or certification to enterprises. Fishkin posited that in reality, there are two different "arms" of Belneftekhim: a governmental arm, which is the subject of the legal provisions defendants provided, and a separate, purely commercial arm, which is comprised of individual joint-stock companies and which sells equity interests to private investors. Fishkin concluded that the commercial arm of Belneftekhim, at least, is not owned or controlled solely by the Belarusian government.

Fishkin also claimed that the translations of Gvozdev's declaration and of the provisions of Belarusian law he cited were faulty to the point of being misleading or inaccurate. First, Fishkin pointed out that defendants did not submit a certificate setting forth the translator's qualifications, nor did the translator's cover page state that the certifying individual personally translated the documents. Next, Fishkin pointed out that the translations were nearly incomprehensible in English, suggesting that they were reverse translations, that is, that they were originally drafted in English to track the requirements of the relevant legal test, then translated into Russian, and then back to English.

Next, Fishkin posited that the translation misrepresented Gvozdev's qualifications – his title was not akin to chief legal counsel, as "Head of the Legal Department" might convey, but instead referred to a middle-management employee in charge of a small section within the legal department, someone who reports to a deputy chief. To support his conclusion that Gvozdev

was not the equivalent of chief counsel, Fishkin noted that, as of a search conducted January 30, 2015, he could not find Gvozdev's name in the register of lawyers for the Minsk region where Belneftekhim is located.

Fishkin also claimed that Gvozdev's declaration that "Belneftekhim is not a business entity (a joint-stock company) and has not issued shares" really should have been translated as "Belneftekhim is not an *administrative entity*." Fishkin noted that what he claimed was an incorrect translation conveyed a very different meaning, one much more favorable to defendants' theory. Fishkin also stated that whether Belneftekhim had issued shares is completely irrelevant to whether it is owned by member companies or individuals, because many large Belarusian companies do not issue shares, but instead issue "vouchers" or "units of interest," which are functionally the same thing. Fishkin also took issue with the translation of Gvozdev's declaration that:

> Concern 'Belneftekhim' includes, *with rights of independent legal entities*, a number of organizations producing crude oil, refining, transporting and selling petroleum, chemical and petrochemical products, several scientific, research, construction, repair and *start-up and setting up organizations*.

ECF 45-1, at 5, quoting ECF 34-3, at ¶ 4 (emphases added). Fishkin stated that the Russian-language version of Gvozdev's declaration states that Belneftekhim is "comprised of organizations," not that it "includes, with rights of independent legal entities, a number of organizations," and that "start-up and setting up organizations" should actually be "commissioning projects," which refers to engineering companies which perform certain electrical techniques and procedures.

Plaintiffs had also previously submitted a declaration by reporter Viktor Lushin, stating that during an interview in October 2006, Belneftekhim executives told him that Belneftekhim "was a commercial company owned by private investors and not by the government of Belarus,"

and that media "mischaracteriz[ations]" of Belneftekhim as "government owned" had made it difficult "to solicit private foreign investments."

Based on Fishkin's affidavit and the reporter's declaration, plaintiffs argued that defendants had failed to make out a *prima facie* case that Belneftekhim is an agency or instrumentality of Belarus, because the evidence that defendants produced that may have supported their arguments was incomplete and unreliable. Plaintiffs argued that, even assuming some portion of Belneftekhim is a governmental entity, there is also a large, purely commercial consortium with the same name that is profit-driven, that sells equity interests, and that operates without any national purpose – and *that entity* is not an agency or instrumentality of Belarus. Plaintiffs argued that, regardless of whether Belneftekhim had issued shares, none of defendants' evidence established that Belarus owns a majority of the entity Belneftekhim, and that without evidence on what proportion of the entity was what they called the "commercial arm," the Court could not determine if the entire entity was actually an organ of or majority owned by Belarus.

Because defendants failed to produce discovery prior to filing their supplemental submission, the parties stipulated that by May 12, 2015, they would either agree on the discovery to be produced, or bring the discovery dispute to the Court's attention. At defendants' request (but with plaintiffs' consent), this deadline was extended to June 3, 2015. The parties' joint discovery-dispute letter, filed with the Court on June 3, 2015, was essentially a motion to compel by plaintiffs, based on defendants' failure to produce discovery in accordance with the Court's December 31, 2014 order.

On July 9, 2015, this Court ruled on the discovery dispute. First, the Court noted that many of plaintiffs' interrogatories and document requests sought information that defendants intended to use in support of their claims, and so defendants acted appropriately by providing

only those provisions of Belarusian law on which they intended to rely. But the Court admonished defendants for refusing to provide any documents or a Rule 30(b)(6) witness in response to plaintiffs' seventh interrogatory, which sought information about Belneftekhim's ownership and structure. Specifically, the seventh interrogatory asked defendants to "[i]dentify all subsidiaries of Concern Belneftekhim, stating for each whether it is wholly or partly owned by Concern Belneftekhim, and whether it is owned in part by any private investor(s) and, if owned in part by any private investor(s), identify the private investor(s) and the percentage of their respective ownership." The Court ordered defendants to produce the documents by July 31, 2015, and to permit a deposition by August 21, 2015.

The day before the documents were due, defendants filed a notice of appeal from the July 9 discovery order. While that appeal was pending, plaintiffs moved for sanctions based on defendants' failure to comply with the July 9 order. On August 13, 2015, this Court granted plaintiffs' motion and imposed monetary sanctions of a single $5,000 payment to plaintiffs, and $2,000 per day to the Court until defendants complied with the discovery order. The next day, defendants filed a notice of appeal from the August 13 sanctions order. Defendants also filed a motion to stay the proceedings in this Court pending the resolution of their two appeals. This Court denied the motion to stay, reiterating – as it had in the past – that defendants' appeals were not subject to the collateral-order doctrine, and were therefore frivolous. That day, plaintiffs again moved for sanctions based on defendants' failure to provide discovery and failure to pay the previously imposed sanctions.

On October 6, 2015, the Second Circuit dismissed both of defendants' interlocutory appeals for lack of appellate jurisdiction because the Court's orders were "not final or immediately appealable." Despite this Court's denial of their motion to stay, defendants did not

provide any discovery or pay the accruing sanctions during the two months that their frivolous appeals were pending. Those sanctions eventually totaled $136,000 to the Court plus $5,000 to plaintiffs.

On October 20, 2015, this Court granted plaintiffs' August 24 motion for sanctions. Recognizing that monetary sanctions were having no effect on defendants, and that Rule 37 permitted more severe sanctions, including striking the incorrigible party's pleadings, the Court struck defendants' sovereign-immunity defense. Consistent with their prior approach to this case, defendants immediately appealed that sanctions order to the Second Circuit.

While that third appeal was pending, plaintiffs filed a second amended complaint and defendants responded with a motion to dismiss. Plaintiffs cross-moved for an order directing discovery, and the parties briefed the motions.

On June 29, 2017, the Second Circuit affirmed much of this Court's October 20, 2015 sanctions order, including the Court's decision to impose monetary sanctions and the Court's conclusion that a sanction "aimed at 'put[ting] plaintiffs in the same position they might have been in had defendants complied' with the Second Discovery Order, was warranted." Funk v. Belneftekhim, 861 F.3d 354, 369 (2d Cir. 2017) (alteration in original) (quoting Funk, 2015 WL 6160247, at *5).

But the Second Circuit reversed the portion of this Court's order striking defendants' sovereign-immunity defense outright. The Circuit expressed concern that striking the defense could result in this Court assuming jurisdiction it might not have. Nevertheless, the Second Circuit noted that, consistent with the Federal Rules of Civil Procedure, this Court could have imposed an evidentiary sanction and then resolved the jurisdictional dispute based on the record

as limited by that sanction.  <u>Funk</u>, 861 F.3d at 371-72.  Defendants petitioned for a rehearing by the Second Circuit panel; their petition was denied.

On remand, defendants renewed their motion to dismiss plaintiffs' second amended complaint.  This motion to dismiss is one of the two motions presently before me.  Attached to their motion to dismiss was a statement by O. L. Slizhevsky, the Minister of Justice of Belarus, translated from Belarusian into English.  Slizhevsky's translated statement echoed the statements about Belneftekhim's status under Belarusian law made in Gvozdev's declaration.  Among the other attachments were documents from the State Committee on the Assets of the Republic of Belarus and from the Ministry of Justice which purported to show that the Council of Ministers owns all of Belneftekhim.

A few days later, plaintiffs moved for sanctions again – the other motion before me now.  Plaintiffs request sanctions in the form of an order:  (1) establishing an evidentiary presumption that the documents and witnesses that defendants refused to provide would have refuted defendants' claims of sovereign immunity, and (2) preventing defendants from submitting any additional evidence on the sovereign-immunity issue.


**DISCUSSION**

I.      **Plaintiffs' Motion for Rule 37 Sanctions**

Rule 37 of the Federal Rules of Civil Procedure allows a court to impose sanctions when a party disobeys the court's discovery order.  These sanctions may include a contempt order or an order deeming certain facts established, prohibiting the disobedient party from supporting certain defenses, striking pleadings, or granting a default judgment.  <u>See</u> Fed. R. Civ. P. 37(b)(2)(A).  Under Rule 37, the district court has discretion to impose "just" sanctions.  <u>Id.</u>  But

there are some limits – sanctions that effectively dismiss a case "should be imposed only in extreme circumstances." World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., 694 F.3d 155, 159 (2d Cir. 2012) (internal quotation marks and citation omitted).  And where a defense goes to the court's subject-matter jurisdiction, the court may not strike that defense outright if doing so would risk the court exercising jurisdiction it may not have.  Funk, 861 F.3d at 371.

As the Second Circuit recognized in its opinion, the "practical difference between an evidentiary sanction and one striking defendants' foreign sovereign immunity claim may appear small."  Id. at 372.  But courts can only decide jurisdictional questions on the evidentiary record before them.  Here, the paucity of materials available to the Court to decide the immunity question is the result of defendants' obstruction.  What matters is that this Court decide the jurisdictional question, see id., even if that decision is based on a record constricted by defendants' obstruction and the resulting evidentiary sanctions against them.

This Court has already concluded, and the Second Circuit has affirmed, that some kind of sanction under Rule 37 is available based on this Court's factual finding that defendants' failure to comply with discovery orders was and continues to be "willful."  Id. at 368.  Defendants' record of delay and defiance speaks for itself.  Even after the Second Circuit's mandate issued in defendants' most recent appeal (the latest meritorious, the first two frivolous), defendants have refused to produce any of the requested discovery or to pay their overdue monetary sanctions.

In the motion before me, plaintiffs asked me to impose the sanctions proposed by the Second Circuit:  (1) according an evidentiary presumption against defendants that the withheld discovery would refute their claim that Belneftekhim is an agent or instrumentality of Belarus, and (2) prohibiting defendants from offering further evidence on that issue.  Id. at 371.

After careful consideration, I grant plaintiffs' motion. Specifically, I will accord an evidentiary presumption against defendants and assume that the documents and witnesses that defendants withheld would refute their claim that Belneftekhim is an agency or instrumentality of Belarus – that is to say, any evidence that Belneftekhim is an organ of or majority-owned by the government of Belarus. <u>See</u> Fed. R. Civ. P. 37(b)(2)(A)(i). I will presume that the withheld evidence would have established certain facts as asserted in plaintiffs' evidence: first, that the government of Belarus exerts some undetermined degree of authority over Belneftekhim, but not ownership of it, and second, that while some portion of Belneftekhim may be owned by the Council of Ministers, there is also another commercial-entity portion owned by individual corporate entities and private investors, and the commercial entity predominates such that Belneftekhim is neither majority owned by nor an organ of Belarus. I will also prohibit defendants from offering any further evidence on whether Belneftekhim is an agency or instrumentality of Belarus. In an effort to restore plaintiffs to the position they would have been in had defendants complied with my discovery orders, I will not consider any evidence defendants submitted after I first imposed monetary sanctions on August 13, 2015. <u>See</u> Fed. R. Civ. P. 37(b)(2)(A)(ii).

I am taking this path because, as plaintiff's submissions have abundantly shown, it is easy enough for a recalcitrant party to carefully select and characterize evidence as to which only that recalcitrant party has primary knowledge. The assertions that defendants have made could only really be tested by a complete document production and cross-examination at a deposition of defendants' representatives who have actual knowledge. Yet defendants have steadfastly blocked plaintiffs from probing defendants' assertions. The sanction imposed serves to restore

plaintiffs to the position they would be in had defendants adequately performed their discovery obligations.

## II.    Defendants' Motion to Dismiss

### A.  Lack of Subject-Matter Jurisdiction Based on Foreign Sovereign Immunity

Defendants move the Court to dismiss this case on the grounds that Belneftekhim is immune from suit under the FSIA as an "agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  The statute defines an agency or instrumentality as:  any entity which is (1) a separate legal person, and is (2) "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and is (3) neither a citizen of a state nor created under the laws of any third country.  Id. § 1603(b).

To successfully invoke sovereign immunity as a defense to suit, a defendant must first make a *prima facie* showing that it is a foreign sovereign.  See Matar v. Dichter, 563 F.3d 9, 12 (2d Cir. 2009).  Here, this means defendants must put forth some evidence that Belneftekhim is an organ of or majority-owned by Belarus.  Defendants argue in their renewed motion to dismiss that they have not only satisfied their *prima facie* burden, but have demonstrated as a matter of law that Belneftekhim satisfies the organ-of-or-majority-owned-by requirement.  Plaintiffs vehemently disagree.

The declaration by Dmitry Gvozdev, the provisions of Belarusian law, and the Congressional Research Service Report were the only evidence about Belneftekhim's ownership that defendants submitted in the first couple *years* of this jurisdictional dispute.  These documents, including resolutions by the Council of Ministers, presidential edicts, and civil laws

purported to show that: (1) Belneftekhim's assets are the property of Belarus as a matter of law; (2) the Belarusian government appoints Belneftekhim's chairperson and sets the number of its employees and their salaries; (3) Belneftekhim manages the Belarusian petrochemical industry and exclusively licenses trade in and sets prices for Belarus's petroleum products; and (4) that Belneftekhim provides regular reports of its activities to Belarusian government agencies.

But then plaintiffs presented evidence that the documents defendants relied upon give an incomplete picture of Belarusian law by omitting subsequent modifications or key annexed documents, and that the translations of these documents and of Gvozdev's declaration were misleading or inaccurate. Plaintiffs also presented affirmative evidence that Belneftekhim or some portion of it is a commercial company owned at least in part by private investors, and therefore not subject to sovereign immunity.

This conflicting evidence created a factual dispute about whether Belneftekhim is actually majority-owned by Belarus, rather than by other companies, private investors, or individual government agents. Defendants submitted evidence that appeared to satisfy their *prima facie* burden, but then plaintiffs made a colorable showing that defendants' information was so inaccurate and incomplete that it could not support a *prima facie* case.[4] The factual dispute necessitated discovery, which defendants refused to provide, thereby preventing me from assessing the validity of the evidence defendants originally submitted.

In light of the sanctions I applied against defendants in Part I, their sovereign-immunity claim fails. The evidence that defendants initially submitted, which was significantly

---

[4] Consistent with the sanctions imposed in Part I of this Order, I do not consider any factual materials defendants submitted after I first imposed monetary sanctions on August 13, 2015. Those materials include the attachments to defendants' August 16, 2017 submission (including the affidavit by O. L. Slizhevsky, the Minister of Justice of Belarus, and any supporting materials) and defendants' November 15, 2017 submission purportedly explaining why the Belarusian Minister of Justice does not have the authority under the Belarusian Constitution to take an oath on behalf of the Belarusian government in a U.S. court.

undermined by plaintiffs' response, is now clearly insufficient in light of the evidentiary

presumption. Based on that presumption – that the discovery defendants withheld would have

disproven the assertions they put forth about Belneftekhim's ownership structure and its status

under Belarusian law – defendants fail to demonstrate that they are entitled to immunity.

Because the evidentiary presumption rebuts defendants' only immunity evidence before the

Court, I therefore deny defendants' motion to dismiss on the grounds of foreign-sovereign

immunity.

## B. Lack of Diversity Jurisdiction

Defendants also claim that the Court lacks subject-matter jurisdiction over this action

because the parties are not diverse. This argument is frivolous. Defendants' equivocation in

their brief – "The Court lacks, or may lack, diversity jurisdiction" – is telling. Defendants sought

removal based on both diversity and federal-question jurisdiction. The Court has already

concluded that it has diversity jurisdiction over this case under 28 U.S.C. § 1332(a)(3), including

over the claims against Belneftekhim U.S.A. (BUSA). As this Court noted in the order denying

plaintiffs' motion to remand, the parties satisfy § 1332(a)(3)'s requirements because plaintiffs

seek more than $75,000 in damages and there is complete diversity among the parties:  plaintiffs

are citizens of New York and Florida, BUSA is a citizen of Massachusetts, and Belneftekhim is a

citizen or subject of Belarus.

Plaintiffs alleged in their original, first amended, and operative complaints that BUSA is

a Massachusetts corporation with three offices in Massachusetts. Defendants' removal notice

stated that BUSA is a Massachusetts corporation with its principal place of business in

Massachusetts. Defendants' argument – that these earlier allegations and admissions are

overcome by *a footnote* in plaintiffs' reply brief in support of its renewed cross-motion for

sanctions, in which plaintiffs stated that BUSA conducted business out of the Belarusian trade mission's New York office in 2007 and 2008 – is preposterous.

I also have jurisdiction over plaintiffs' state-law conversion claim, because, despite defendants' hand-waving about the citizenship of trusts and their beneficiaries, plaintiffs' second amended complaint makes clear that they are suing in their individual capacities, not as trustees. Plaintiffs allege that defendants wrongfully deprived them of their use of and ownership of their own direct interest in Belneftekhim, not their clients' interests. I have diversity jurisdiction over the state-law conversion claim.

Two years ago, defendants argued strenuously and successfully against remanding this action to state court for lack of federal jurisdiction. None of the arguments they raise in this latest motion to dismiss gives me reason to reverse course.

**C. Lack of Personal Jurisdiction**

Defendants also dispute the Court's personal jurisdiction over them. To exercise personal jurisdiction, a court must find that (1) plaintiffs properly served defendants; (2) the court has statutory jurisdiction over defendants generally (general jurisdiction), or, over the particular causes of action asserted by plaintiffs (specific jurisdiction); and (3) the court's exercise of jurisdiction comports with due process. Strauss v. Credit Lyonnais, S.A., 175 F. Supp. 3d 3, 16 (E.D.N.Y. 2016). A plaintiff must first demonstrate that the court has personal jurisdiction over the defendant under the relevant statute before the court considers whether that exercise of statutory jurisdiction is constitutional. Specific jurisdiction is claim-specific; a plaintiff must establish the court's jurisdiction with respect to each claim. Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004). Personal jurisdiction is assessed based on the defendant's contacts as of the date the suit is filed, but the court may consider "more than a

snapshot capturing a fixed moment in time." In re Terrorist Attacks on Sept. 11, 2001, 440 F.

Supp. 2d 281, 284 (S.D.N.Y. 2006).

On a motion to dismiss under Rule 12(b)(2), the plaintiff has the burden of demonstrating

that the court has personal jurisdiction over the defendant. Penguin Grp. (USA) Inc. v. Am.

Buddha, 609 F.3d 30, 34 (2d Cir. 2010). At the pleadings stage, the plaintiff need only make a

*prima facie* showing that jurisdiction exists, and can make this showing by pointing to facts in

the complaint or in affidavits, which, if credited, would suffice to establish jurisdiction. Id. If

the plaintiff's factual allegations in the complaint are uncontroverted by the defendant, the court

must take them as true. MacDermid, Inc. v. Deiter, 702 F.3d 725, 727 (2d Cir. 2012). And if the

defendant controverts the allegations, the Court must resolve all factual disputes in the plaintiff's

favor. Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft

v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993).

Defendants argue, and I agree, that I do not have general jurisdiction over defendants

because they are not "at home" in New York. See Daimler AG v. Bauman, 134 S. Ct. 746, 760

(2014).

Defendants also argue that the Court lacks specific jurisdiction because plaintiffs cannot

satisfy the requirements of New York's long-arm statute, and because the Court's exercise of

jurisdiction would deprive them of due process. On this point, I disagree.

Under Federal Rule of Civil Procedure 4(k)(1), service of a summons establishes a

federal district court's personal jurisdiction over a defendant if that defendant would be subject

to the jurisdiction of the state in which the federal court is located (here, New York). New

York's long-arm statute, § 302(a) of the New York Civil Practice Law and Rules, provides that

> [A] court may exercise personal jurisdiction over any non-domiciliary . . . who in
> person or through an agent:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act;

N.Y. Civ. Practice L. & Rules § 302(a)(1)-(2) (McKinney 2016).

To satisfy § 302(a)(1), a plaintiff must show that the defendant transacted business within the state and that the asserted claim arises from that business activity. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013). Transacting business requires purposeful, volitional activity in New York by the defendant. See Paterno v. Laser Spine Inst., 24 N.Y.3d 370, 376 (2014). The court examines the quality of the defendant's contacts with New York to determine if the defendant has purposefully availed itself of the New York forum through those contacts. A single transaction relevant to the claim is sufficient, Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999), and negotiations to a contract alone may also be sufficient, SAS Grp., Inc. v. Worldwide Inventions, Inc., 245 F. Supp. 2d 543, 548-49 (S.D.N.Y. 2003), if those negotiations form the basis for the plaintiff's claim.

To fulfill the "arises-from" prong of § 302(a)(1), "there must be an articulable nexus . . . or substantial relationship . . . between the business transaction and the claim asserted." Al Rushaid v. Pictet & Cie, 28 N.Y.3d 316, 329, 45 N.Y.S.3d 276 (2016) (quoting Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 339, 960 N.Y.S.2d 695 (2012)) (internal quotation marks omitted). But the transaction and the legal claim need not be causally linked; they need only be sufficiently related such that the "latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." Licci, 732 F.3d at 168-69 (quoting Licci, 20

N.Y.3d at 339).[5]  Of particular relevance here, § 302(a)(1) is not limited to breach of contract claims, but may also apply to actions in tort when there is a sufficient factual showing that the tort arose out of the relevant transaction.  <u>Bank Brussels</u>, 171 F.3d at 787 n.3.  Plaintiffs argue that this Court has jurisdiction over all of their claims except the fraud claim under NYCPLR § 302(a)(1), and that it has jurisdiction over the fraud claim under NYCPLR § 302(a)(2).

I have specific jurisdiction over plaintiffs' claims for conversion of personal property and ownership interests in Belneftekhim (Counts 7 and 8) and for tortious interference with contractual relationship and prospective economic advantage (Counts 5 and 6) because, as detailed in plaintiffs' second amended complaint, those claims arise out of settlement negotiations between plaintiffs and defendants that took place in New York in 2007 and 2008, which in turn were based on an ownership interest that defendants sold to plaintiffs' clients in New York.  <u>See</u> <u>id.</u> at 787.  Defendants' contacts with New York were purposeful:  according to plaintiffs' complaint, defendants initiated contact with and then met with plaintiffs in New York under the guise of renegotiating a business relationship that began in New York when plaintiffs' clients purchased a block of stock in Belneftekhim.  <u>See</u> <u>Licci</u>, 732 F.3d at 168.  That the settlement negotiations never resulted in an actual settlement is immaterial; it does not matter that the negotiations were preliminary or that the parties planned to perform the contract elsewhere.  <u>See</u> <u>SAS Grp.</u>, 245 F. Supp. 2d at 549.  Defendants' contacts with the forum – the phone calls and in-person meetings where defendants misrepresented their business relationship to plaintiffs – are inextricably intertwined with plaintiffs' claims and therefore satisfy the

---

[5] Defendants cite <u>Mantello v. Hall</u>, 947 F. Supp. 92 (S.D.N.Y. 1996), for the proposition that "[f]or a tort claim to arise out of transaction of business in New York, the connection between the transaction and the claim must be direct."  <u>Id.</u> at 100.  In <u>Mantello</u> and the cases that cite it, the defendants' actions in New York were attenuated from the claim and involved third parties, not the plaintiff.  As shown below, that is not the case here.

requirements for me to exercise personal jurisdiction over defendants as to the claims in Counts 5 through 8.

Plaintiffs' claims of assault and battery, false imprisonment, intentional infliction of emotional distress, and *prima facie* tort (Counts 2, 3, 4, and 9), are also within my jurisdiction under § 302(a)(1).[6] According to plaintiffs' second amended complaint, defendants' New York-based activities proximately caused the physical and psychological harm that plaintiffs suffered at the hands of KGB agents. Defendants and their representatives initiated telephone calls and wrote at least one letter to plaintiffs in New York, falsely claiming that they wished to "fairly" and "in good faith" resolve the ownership dispute and that they were "serious this time." Defendants met with plaintiffs twice in New York City to conduct the alleged settlement negotiations and convinced plaintiffs fly to London, ostensibly to complete the settlement talks, but actually (according to plaintiffs' complaint) with the purpose of handing off plaintiffs to KGB agents and directing those agents to inflict the physical and mental pain for which plaintiffs now seek to hold defendants liable in tort. Plaintiffs allege that defendants "directed" the KGB agents to interrogate and torture plaintiffs, "orchestrated" plaintiffs' confinement in the airplane that transported them to Belarus and then their imprisonment in KGB facilities for over a year, and "participated in" intentionally causing them severe emotional distress. That defendants' New York contacts were business-related does not insulate them from tort liability, see Bank Brussels, 171 F.3d at 787 n.3, and those contacts suffice to give me personal jurisdiction over defendants as to the tort-based claims in Counts 2, 3, 4, and 9.

---

[6] Defendants claim, in their reply to their motion to dismiss the second amended complaint, that plaintiffs cite only § 302(a)(3) to argue that this Court has jurisdiction over their personal tort claims (Counts 2, 3, 4, and 9). But plaintiffs raised arguments based on § 302(a)(1) in their opposition to defendants' notice of motion to dismiss the second amended complaint, and incorporated those arguments by reference in their opposition to defendants' renewed notice of motion to dismiss the second amended complaint. Any difficulty in reviewing the docket is due in no small part to defendants' refusal to file responsive briefs and their prior frivolous appeals.

And I also have jurisdiction over plaintiffs' common-law fraud claim under NYCPLR § 302(a)(2). As discussed above, plaintiffs allege that defendants contacted them multiple times in New York, by phone and in writing, and twice met with plaintiffs in New York City after representing to plaintiffs that the meetings were to settle an ongoing dispute between plaintiffs' clients and defendants. According to the second amended complaint, defendants told plaintiffs that "they may have reached an agreement in principle" and asked plaintiffs to fly to London to conclude the negotiations. Plaintiffs allege that defendants knew these representations were false and that defendants' real purpose was to get plaintiffs closer to Belarus, so it would be easier to abduct them and hand them over to the KGB. By alleging that plaintiffs knowingly made false statements in New York, and that those false statements were the proximate cause of plaintiffs' subsequent physical, emotional, and monetary harm, plaintiffs sufficiently allege that defendants "committ[ed] a tortious act within the state" for the purposes of NYCPLR § 302(a)(2).

Finally, defendants argue that the Court's exercise of personal jurisdiction over them based on plaintiffs' claims would be unconstitutional. The Due Process Clause protects a party's liberty interest in not being subject to the binding judgments of a forum with which the party has established no meaningful contacts, ties, or relations. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985). To assess whether due process concerns are satisfied, courts look to whether the defendant has certain minimum contacts with the forum and whether the exercise of jurisdiction is reasonable under the circumstances of the particular case. Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010).

The Supreme Court has emphasized that, for a court's exercise of specific jurisdiction to satisfy constitutional requirements, the suit must "arise out of or relate to the defendant's contacts with the forum." Bristol-Myers Squibb Co. v. Super. Ct., 137 S. Ct. 1773, 1780 (2017)

(quoting <u>Daimler</u>, 134 S. Ct. at 749) (internal alterations and quotation marks omitted). There must be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." <u>Bristol-Myers Squibb</u>, 137 S. Ct. at 1780 (quoting <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 564 U.S. 915, 919 (2011)) (internal quotation marks omitted). In short, there must be a "connection between the forum and the specific claims" brought by plaintiff. <u>Bristol-Myers Squibb</u>, 137 S. Ct. at 1781.

Here, the exercise of jurisdiction over these defendants vis-à-vis these claims easily comports with due process. There is a direct connection between defendants' purposeful contacts with and actions in the forum and plaintiffs' claims. Defendants contacted plaintiffs in and traveled to the forum for the ostensible purpose of conducting business negotiations, <u>see Walden v. Fiore</u>, 134 S. Ct. 1115, 1124 (2014), but (as alleged by plaintiffs), for the actual purpose of convincing plaintiffs to travel to a location closer to Belarus, so that defendants could more easily abduct them and later torture them. The business negotiations arose out of a contract that was originally entered into in the forum, and, as alleged by plaintiffs, defendants used that business connection to initiate in-person meetings in the forum during which they could convey the misrepresentations that led to plaintiffs' abduction. The phone calls in which defendants contacted plaintiffs, the in-person meetings, and the misrepresentations stated during those meetings all qualify as an "activity or an occurrence" in the New York forum. <u>Bristol-Myers Squibb</u>, 137 S. Ct. at 1780; <u>cf.</u> <u>Walden</u>, 134 S. Ct. at 1124.

Defendants argue that these contacts with New York are insufficient for this Court to exercise personal jurisdiction over them based on the combined reasoning in two cases: <u>Walden</u>, 134 S. Ct. 1115, and <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 538 F.3d 71 (2d Cir. 2008),

abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010) ("Terrorist Attacks III").  In Walden, the Supreme Court rejected the Ninth Circuit's conclusion that a defendant's knowledge of a plaintiff's significant connection to a forum gave that forum jurisdiction over the defendant.  134 S. Ct. at 1124-25.  The Supreme Court emphasized that the minimum-contacts analysis requires the court to examine the defendant's contacts with the forum itself, not the defendant's contacts with residents of the forum.  In concluding that the Walden Court lacked personal jurisdiction over the defendant, the Supreme Court noted that the defendant had never "traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [the forum]."  Id. at 1124.

In Terrorist Attacks III, the Second Circuit concluded that the district court lacked personal jurisdiction over claims against four Saudi Arabian princes accused of funding Muslim groups that in turn funded al Qaeda, the organization responsible for the September 11, 2001 terrorist attacks.  538 F.3d at 95.  The Second Circuit reasoned that the connection between the princes' conduct and plaintiffs' harm in the September 11 attacks was too attenuated – plaintiffs failed to show that the princes engaged in "'intentional, and allegedly tortious, actions . . . expressly aimed' at residents of the United States."  Id. (quoting Calder v. Jones, 465 U.S. 783, 789 (1984)).  The Second Circuit noted that the plaintiffs did not allege that the princes were the primary participants in the attacks, nor that the princes directed the attacks or commanded an agent to commit them.  Id. at 94.

Defendants argue that this Court lacks personal jurisdiction over them because, under Terrorist Attacks III, the KGB agents (and not they) were the primary participants in the scheme that resulted in plaintiffs' physical, mental, and financial harm.  From this starting point, defendants argue that because plaintiffs do not allege that the KGB agents traveled to New York,

or contacted plaintiffs in New York, or conducted activities in New York, the requisite New York connection is lacking.

Defendants' argument that their connections to New York are insufficient in light of Walden and Terrorist Attacks III is, to put it mildly, a stretch. Plaintiffs allege that defendants were the primary actors in the scheme designed to beat plaintiffs into surrendering their investments. In their second amended complaint, plaintiffs allege that defendants' representatives "were present at, observed, and directed the Plaintiffs' interrogation and torture," and that defendants "were fully aware of their representatives['] actions, closely monitored and directed their activity." Plaintiffs also allege that defendants "act[ed] in concert with [Boris] Berezovsky and the KGB" to drug them and facilitate their abduction, that defendants "intended to cause" plaintiffs' subsequent torture and degrading treatment.

And more to the point, these facts are very different from those in Terrorist Attack III. Unlike the Saudi princes, whose direct and indirect financial contributions to Muslim charities rendered them at least three degrees removed from the harm for which the Terrorist Attack III plaintiffs sought to recover, plaintiffs here allege a direct harm – one incurred through defendants' misrepresentations, through defendants' drugging of and abduction of plaintiffs, and through defendants' orders directing KGB agents to torture plaintiffs. And, unlike the defendant in Walden whose contacts with the forum were limited exclusively to an interaction outside the forum with plaintiffs who resided in the forum, defendants here "traveled to," "conducted activities within," and contacted plaintiffs in the forum. See 134 S. Ct. at 1124.

Although plaintiffs have not demonstrated that defendants' contacts are so continuous and systematic as to render them "at home" in New York (and therefore subject to general jurisdiction), they have alleged sufficient purposeful contacts with the forum to demonstrate a

"connection between the forum and the specific claims" and therefore have satisfied the due process inquiry.  See Bristol-Myers Squibb, 137 S. Ct. at 1780.

Because I conclude that I have jurisdiction over this action under 28 U.S.C. § 1332, I will not address plaintiffs' argument that I also have jurisdiction under § 1330(b).

## D.  Failure to State a Fraud Claim

Finally, defendants move to dismiss plaintiffs' fraud claim on the grounds that plaintiffs failed to allege that the fraud proximately caused their personal injuries.  To plead fraud under New York law, plaintiffs must allege that:  (1) defendants made a material misrepresentation; (2) defendants knew the representation was false; (3) defendants made the misrepresentation with the intent to defraud; (4) plaintiffs reasonably relied on the misrepresentation; and (5) plaintiffs suffered damages proximately caused by the misrepresentation.  Kaye v. Grossman, 202 F.3d 611, 614 (2d Cir. 2000).

Contrary to defendants' argument, plaintiffs did plead proximate causation.  In paragraph 136 of their second amended complaint, plaintiffs allege that, "[a]s a direct and proximate cause of Defendants' fraud, Plaintiffs sustained grievous injuries[,] suffered great mental and physical distress . . . [and] loss of income and business opportunities."  In paragraphs 138 and 139, plaintiffs allege that defendants' fraud directly and proximately permitted defendants to "divert[] the ownership and financial interest in Belneftekhim to themselves . . . to the Plaintiffs' detriment and damage," and directly and proximately caused plaintiffs to suffer "great financial damages."

Defendants further argue that intentional misconduct by KGB agents broke any causal chain between defendants' alleged misrepresentations and plaintiffs' personal injuries.  Specifically, they argue that plaintiffs' allegations – that defendants' misrepresentations "lured"

plaintiffs to London to "facilitate their abduction and unlawful transportation" to Belarus – amount only to alleged but-for causation, but not the required proximate causation, because the KGB agents were the proximate cause of plaintiffs' injuries.

This is another desperately absurd argument. A tortfeasor can sometimes be relieved of the damages caused by his negligent act if the damage occurs by reason of a third party's intervening criminal act. But that is because in many cases, a tortfeasor cannot be expected to reasonably foresee that a criminal will intervene to complete the causal chain of events. That is not at all what is going on here. The criminal act could not have been more foreseeable because, taking plaintiffs' allegations as true, the "intervening" act – plaintiffs' torture – is exactly what defendants wanted to happen. And this is not even a third-party criminal intervening; the torturers were put up to it by plaintiffs. Surely, a criminal tortfeasor cannot allow his own criminal acts, or criminal acts which he has supported or directed his own agent to undertake, to break the chain of causation.

Defendants overlook plaintiffs' allegations that defendants' agents directed the KGB to torture plaintiffs. Specifically, plaintiffs allege that senior officers of Belneftekhim and those appointed by them to act with full authority for defendants were present at, observed, and directed the plaintiffs' interrogation and torture. Actions taken at defendants' direction are not intervening acts, but a continuation of the earlier tortious conduct.

Defendants also contend that plaintiffs' fraud claim should be dismissed because plaintiffs do not allege any damages separate and distinct from the damages arising out of their intentional tort claims. Plaintiffs have alleged damages here in the form of lost commercial opportunity, lost income, and the cost of their trip to London. Defendants argue that plaintiffs "may recover" economic or pecuniary losses in connection with their personal-injury claims,

citing cases for the proposition that plaintiffs may be able to recover lost earnings if they prevail on personal tort claims.  See Garzilli v. Howard Johnson's Motor Lodges, Inc., 419 F. Supp. 1210 (E.D.N.Y. 1976); Papa v. City of N.Y., 194 A.D.2d 527, 598 N.Y.S.2d 558 (2nd Dep't 1993).  But they do not cite any cases suggesting plaintiffs can recover for lost commercial opportunity and the costs of their trip to London through these other tort claims.  I therefore deny defendants' motion to dismiss the fraud claim on this basis as well.


### CONCLUSION

Plaintiffs' motion for sanctions [122] is GRANTED.  Defendants' motion to dismiss [118] is DENIED.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      November 17, 2017