UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                       :

VLADLENA FUNK and                 :
EMANUEL ZELTSER,            :
                                         :
                    Plaintiffs,    :   **<u>MEMORANDUM DECISION</u>**
                                       :   **<u>AND ORDER</u>**
        - against -           :
                                       :   14-cv-376 (BMC)
BELNEFTEKHIM and BELNEFTEKHIM  :
USA, INC.,                       :
                                       :
                  Defendants.    :
                                       :
                                       :
-------------------------------------------------------- X

**COGAN**, District Judge.

       Before me is defendants' motion for partial summary judgment to dismiss six of

plaintiffs' nine causes of action.  Defendants contend that, because plaintiffs have conceded they

are seeking only "noneconomic damages" (<u>i.e.</u>, emotional distress for pain and suffering), under

New York law, plaintiffs cannot recover any damages for these remaining causes of action.

Defendants are correct, and their motion is therefore granted.

       Defendants also seek reconsideration as to various *in limine* rulings I made on June 22,

2020.[1]  The motion is granted in part and denied in part.

**BACKGROUND**

       The Court has taken the facts set forth below from the parties' second amended joint

pretrial order and other filings on the docket.[2]

---

[1] <u>See</u> Order, Dkt. No. 323.

[2] Defendants did not submit a Local Rule 56.1 statement.  Rather, they simply directed the Court to two filings on the docket, namely, the second amended joint pretrial order and plaintiffs' opposition to defendants' previous motion *in limine*.  The material facts at issue in the instant motion are clear, and therefore the Court will overlook

Plaintiff Emanuel Zeltser, a United States citizen, represented a group of investors who, in the late 1990s and early 2000s, purchased a block of stock in Belnheftekhim, a Belarusian petrochemical cooperative.  In 2006 and 2007, the United States imposed sanctions on members of the Belarusian government, including its President, Alexander Lukashenko, and other Belarusian entities, including defendants.  Sometime later, defendants abrogated their agreement with Zeltser's clients and refused to compensate them for the breach.  Zeltser then threatened legal action and a series of meetings occurred as the parties tried to resolve their dispute.

In March 2008, defendants' representatives met twice with Zeltser and his assistant, plaintiff Vladlena Funk, in New York City to explore the possibility of a settlement.  Plaintiffs were invited to travel to Belarus for an additional meeting, but they declined this offer.  Instead, the parties met in London later that month.  Once in London, plaintiffs allege that they were drugged, kidnapped, and flown to Belarus under the direction of defendants' representatives.

Plaintiffs were then confined in a Belarusian detention facility.  They claim to have been tortured and denied adequate food, water, and medical treatment.  After intervention by the United States Government and others, Funk and Zeltser were released in March and June of 2009, respectively.  This lawsuit followed a few years later.

In June 2018, defendants filed a motion *in limine* to preclude plaintiffs from offering evidence of damages at trial.  The basis for this contention was that plaintiffs neither provided "a computation of each category of damages claimed," nor made "available for inspection and copying … the documents or other evidentiary material" underlying their damages claim, as

---

defendants' failure to submit a Local Rule 56.1 statement.  See Reza v. Khatun, No. 09-cv-233, 2013 WL 596600, at *2 (E.D.N.Y. Feb. 15, 2013); Bd. of Trustees of Local 50 Pension Fund v. Zucker & Co., No. 11-cv-1785, 2012 WL 2325351, at *1 n.1 (E.D.N.Y. June 19, 2012).

2

required by Fed. R. Civ. P. 26(a)(1)(A)(iii).  Nor did plaintiffs produce any damages-related documents under Fed. R. Civ. P. 34(a)(1).

In opposing that motion, plaintiffs acknowledged their failure to provide disclosures as to damages under those two rules.  However, they maintained that this was immaterial, because the damages they were seeking at trial were "largely for physical and emotional pain and suffering and are not amendable for computation."  Thus, plaintiffs argued that they "were not required to provide a computation of damages or to produce supporting discovery documents or exhibits."  This position was reaffirmed in their opposition, when they clarified that they sought "compensatory and punitive damages for non-economic losses arising from the atrocities and indignities committed by [d]efendants" and that "[p]laintiffs will seek only non-economic damages."

I later granted defendants' motion *in limine* as to the conversion of personal property claim, but otherwise denied defendants' motion because "an *in limine* pleading is generally not the appropriate vehicle for effecting dismissal of entire claims."  Funk v. Belneftekhim, No. 14-cv-376, 2019 WL 3035124, at *4 (E.D.N.Y. July 11, 2019) (quoting New Am. Mktg. FSI LLC v. MGA Entm't, Inc., 187 F. Supp. 3d 476, 481 (S.D.N.Y. 2016)).

Having received leave to file the instant motion, defendants are entitled to partial summary judgment as to six of the remaining nine causes of action.

## DISCUSSION

## I.   Standard of Review

"[S]ummary judgment may be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135 (2d Cir. 2013) (internal quotation marks omitted).  "In determining

whether there is a genuine dispute as to a material fact, [the court] must resolve all ambiguities and draw all inferences against the moving party." Id. In ruling on a motion for summary judgment, a district court "may rely on any material that would be admissible at a trial." Lyons v. Lancer Ins. Co., 681 F.3d 50, 57 (2d Cir. 2012) (internal quotation marks omitted); see also Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Pub. Corp., 635 F.3d 48, 52 (2d Cir. 2011) ("[T]he nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.") (internal quotation marks omitted). A dispute is not "genuine" if no reasonable jury "could return a verdict for the nonmoving party." Nabisco, Inc. v. Warner–Lambert Co., 220 F.3d 43, 45 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

### A. **Fraud**

To establish a claim for common law fraud under New York law, a plaintiff must allege: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997). "The damages incurred by reason of the fraudulent conduct must be actual pecuniary loss." Woods v. Sieger, Ross & Aguire, LLC, No. 11-cv-5698, 2012 WL 1811628, at *8 (S.D.N.Y. May 18, 2012) (citing Pope v. Saget, 29 A.D.3d 437, 441, 817 N.Y.S.2d 1, 4 (1st Dep't 2006)). In other words, "New York law does not allow recovery for non-economic damages, such as pain and suffering, in fraud." Zimmerman v. Poly Prep Country Day Sch., 888 F. Supp. 2d 317, 334 (E.D.N.Y. 2012). Because plaintiffs have conceded that they are seeking only damages due to their pain and suffering, they cannot maintain their fraud claim.

4

Plaintiffs cite Clearview Concrete Prod. Corp. v. S. Charles Gherardi, Inc., 88 A.D.2d 461, 453 N.Y.S.2d 750 (2nd Dep't 1982), for the proposition that they can still pursue a fraud claim because nominal damages are available to them.  However, Clearview is no longer good law on this point.  In Connaughton v. Chipotle Mexican Grill, Inc., 135 A.D.3d 535, 540, 23 N.Y.S.3d 216 (1st Dep't 2016), aff'd, 29 N.Y.3d 137, 143, 53 N.Y.S.3d 598 (2017), the First Department expressly declined to follow Clearview, holding that the plaintiff was not entitled to nominal damages in a fraudulent inducement case. The New York Court of Appeals affirmed, holding that the plaintiff was not entitled to nominal damages on the fraud claim because nominal damages are unavailable when actual harm is an element of the tort, as is the case in a cause of action for fraud.

## B. *Prima Facie* Tort

Under New York law, an action of *prima facie* tort consists of four elements: "(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be unlawful."  Curiano v. Suozzi, 63 N.Y.2d 113, 117, 408 N.Y.S.2d 446, 469 (1984).  "[A] critical element of the cause of action is that plaintiff suffered specific and measurable losses, which requires an allegation of special damages.  Such damages must be alleged with sufficient particularity to identify actual losses and be related causally to the alleged tortious act."  Epifani v. Johnson, 65 A.D.3d 224, 233, 882 N.Y.2d 234, 242 (2nd Dep't 2009) (internal quotation marks and citations omitted); see also Carlson v. Geneva City Sch. Dist., 679 F. Supp. 2d 355, 372 (W.D.N.Y. 2010) ("Alleging merely general damages for noneconomic loss is insufficient" for a *prima facie* tort claim).

In Berland v. Chi, 142 A.D.3d 1121, 1123, 38 N.Y.S.3d 57, 59 (2nd Dep't 2016), the Second Department held the trial court properly determined that the allegations in the complaint,

which amounted to a claim of emotional distress, "were insufficient to allege special damages." To prevail on its *prima facie* tort cause of action, the complaining party had to show "special damages, i.e., 'the loss of something having economic or pecuniary value.'" Id. (citation omitted).

In our case, plaintiffs' vague assertion of "non-economic" damages for their pain and suffering is equally insufficient. Plaintiffs were required to identify special damages and to provide adequate disclosures under the Federal Rules of Civil Procedure, but they did not. They therefore cannot maintain a *prima facie* tort claim.

### C.  Tortious Interference Claims

Under New York law, a party who is liable for interference with a contract owes damages for "(a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably expected to result from the interference." Rich v. Fox News Network, LLC, 939 F.3d 112, 128 (2d Cir. 2019) (quoting Restatement (Second) of Torts § 774A(1)); see also Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 197 n.6, 428 N.Y.S.2d 628, 636 n.6 (1980). "The only elements of a claim for tortious interference with economic advantage that differ from those for a tortious interference with contract are the level of the relationship interference with and the level of interference." G-I Holdings, Inc. v. Baron & Budd, 179 F. Supp. 2d 233, 254 (S.D.N.Y. 2001).

Here, plaintiffs contend that they may maintain their tortious interference with contract and prospective economic advantage claims based solely on their pain and suffering. They advance the peculiar argument that their choice to waive a recovery of pecuniary damages does not preclude them from also proving at trial that they sustained pecuniary or consequential

6

damages.  In other words, plaintiffs argue that proving damages and seeking damages are distinct concepts.  They offer no authority for this novel argument.

Defendants rely on <u>Tose v. First Pennsylvania Bank, N.A.</u>, 648 F.2d 879 (3d Cir. 1981), which has a lot of similarities to the instant case.  That case involved a business dispute in which a pro football team's owner brought an action against banks and others for intentional interference with "present contractual relations" and "prospective advantageous business relations."  On appeal, the Third Circuit held that, since the owner only claimed damages for emotional distress, his injury alone was not compensable in an action for interference with contractual or business relations.

The Court stated that the Restatement (Second) of Torts allowed recovery of emotional distress or actual harm to reputation if the plaintiff also proved pecuniary loss of the benefit of the contract or consequential losses legally caused by the interference under subsection (a) and (b) of § 774A.  To reach this result, it relied upon § 47 of the Restatement (Second) of Torts, which provided, "with exceptions not relevant to this case, that tortious conduct does not make the actor liable for an emotional distress which is the only legal consequence of his conduct." <u>Tose</u>, 648 F.2d at 898 (internal quotation marks omitted).  Thus, under Pennsylvania law, the owner could not prevail on these particular causes of action because he "only claim[ed] damages for emotional distress."  <u>See</u> <u>id.</u>

There is no cause to depart from this sound reasoning.  Although <u>Tose</u> interpreted Pennsylvania law, I find it persuasive as to how New York courts would reconcile the two relevant sections of the Restatement (Second) of Torts.[3]  The New York Court of Appeals has

---

[3] The Restatement (Third) of Torts: Liability for Physical and Emotional Harm, published in 2012, makes various revisions to the foregoing sections of the Second Restatement but does so while also carrying forward the Second Restatement's treatment of intentionally inflicted emotional harm.  <u>See</u> Third Restatement, § Scope.

adopted § 774A, see Guard-Life Corp., 50 N.Y.2d at 197 n.6, 482 N.Y.S.2d at 636, and the

Appellate Division has applied the limiting principle set forth in § 47.  See Stich v. Oakdale

Dental Ctr., P.C., 120 A.D.2d 794, 795, 501 N.Y.S.2d 529, 531 (3rd Dep't 1986).  Plaintiffs have

not directed me towards any authority suggesting that New York courts would decline to follow

the Third Circuit's lead in Tose.

  This result makes sense.  Permitting plaintiffs to recover under various intentional torts

when the resulting legal harm amounts to only emotional distress damages would circumvent the

historically high bar the Court of Appeals has set for proving an intentional infliction of

emotional distress (IIED) claim.  In Howell v. New York Post Co., 81 N.Y.2d 115, 120, 596

N.Y.S.2d 350, 352 (1993), for example, the Court expressed "two concerns, present even today,"

with permitting emotional injuries as an independent basis for recovery: (i) the potential flood of

litigation, and (ii) the ease with which emotional injury may be feigned without detection.  Thus,

to prevail on an IIED claim, the plaintiff had to prove four elements: "(1) extreme and

outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing,

severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe

emotional distress."  Id. at 121, 596 N.Y.S.2d at 353.

  New York law, therefore, imposes a "strict" standard for an IIED claim, the

"requirements" of which "are rigorous, and difficult to satisfy."  Id. at 122, 596 N.Y.S.2d at 353.

"Liability has usually been found only where the conduct has been so outrageous in character,

and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community."  Id. (citation omitted).  To allow

plaintiffs to seek and recover damages for only their pain and suffering under a less demanding

showing – under the guise of an interference with contract or economic advantage claim – would

render a separate IIED cause of action superfluous.  A plaintiff would have no reason to plead an IIED claim if he could simply bring a separate tort claim seeking only emotional damages without satisfying the many "strict" and "rigorous" elements of an IIED claim.[4]

The New York Court of Appeals has rejected plaintiffs' alternative arguments that they may still recover nominal or punitive damages.  See Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 96, 595 N.Y.S.2d 931, 935 (1993) ("To recognize nominal damages element of tort claims would be to wrest the cause of action from its traditional purpose – the compensation of losses – and to use it to vindicate nonexistent or amorphous inchoate rights … there is no compelling reason to do so."); Rocanova v. Equitable Life Assur. Soc. of U.S., 83 N.Y.2d 603, 605, 612 N.Y.S.2d 339, 345 (1994) ("A demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action[.]").

I therefore grant defendants' motion for partial summary judgment as to these two claims.

### D.  Conversion of Personal Property

By order dated November 30, 2018, I ruled that plaintiffs could not recover damages on their claim for conversion of personal property – jewelry, computer equipment, and a Rolex watch.  This claim sought compensation for specific items, the value of which could have been computed in advance as required by Fed. R. Civ. P. 26(a)(1)(A)(iii).  However, since plaintiffs never provided the required disclosures to defendants, I precluded plaintiffs from pursuing this claim.   Defendants' motion for partial summary judgment as to the conversion of personal property claim is granted.[5]

---

[4] Plaintiffs still maintain their IIED cause of action and may also seek emotional damages arising from their assault and battery and false imprisonment claims.

[5] For reasons stated below, plaintiffs cannot recover damages based solely on emotional distress related to their conversion of personal property claim.

### E.  Conversion of Belneftekhim "ownership interest"

For the same reason, plaintiffs cannot maintain their cause of action based on the alleged conversion of "ownership interest" in Belneftekhim.  "Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty and ambiguity."  McCarthy v. Olin Corp., 119 F.3d 148, 153 (2d Cir. 1997) (quoting Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994)).  The Court "must give proper regard to the decisions of a state's lower courts[,]" and "may also consider the decisions of federal courts construing state law."  Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 199 (2d Cir. 2003).  The Court of Appeals has never squarely addressed whether a plaintiff may also collect damages for emotional distress on a claim for conversion.

Defendants cite Fantis Foods v. Standard Importing Co., 49 N.Y.2d 317, 425 N.Y.S.2d 783 (1980), for the contention that plaintiffs cannot.  In Fantis Foods, the Court of Appeals held that "[t]he usual measure of damages for conversion is the value of the property at the time and place of conversion, plus interest."  Id. at 317, 425 N.Y.S.2d at 786.  They also argue that no court has ever found that a plaintiff could collect emotional damages arising from a conversion claim.

In opposition, plaintiffs rely on a trial court decision, Cauverien v. De Metz, 20 Misc. 2d 144, 188 N.Y.S.2d 627 (Sup. Ct. N.Y. Co. 1959).  There, the court stated that, "ordinarily, in absence of malicious intent, there could be no recovery in damages for mental anguish, humiliation, or emotional distress caused by conversion."  Id. at 147, 188 N.Y.S.2d at 631.  Thus, the court left open the possibility that one could recover "for mental suffering resulting from a malicious and willful conversion."  Id.  Two federal district courts have cited to

<u>Cauverien</u> for this rule, <u>see</u> <u>In re Bace</u>, No. 11-cv-6065, 2012 WL 2567153, at *10 (S.D.N.Y.

May 10, 2012); <u>Bhattal v. Grand Hyatt-New York</u>, 563 F. Supp. 277, 281 (S.D.N.Y. 1983), as

well as one New York trial court, <u>see</u> <u>Diamonds v. Nissanoff</u>, No. 714392/2017, 2020 WL

1652465, at *3 (N.Y. Sup. Ct. Feb. 28, 2020).

 Defendants nevertheless contend that I should reject plaintiffs' reliance on <u>Cauverien</u>,

principally because that case was a trial level decision and the relevant language is *dictum*.  In

defendants' words, <u>Cauverien</u> does not "allow the Court safely to predict" how the Court of

Appeals would answer this question.

 I need not resolve this unsettled area of New York law.  Even if I were to assume that the

Court of Appeals would permits a party to also seek emotional damages resulting from a

conversion claim, this does not necessarily equate to plaintiffs being able to sustain a conversion

claim based *solely* on emotional damages.  As I have stated above, this would eviscerate the

strict and rigorous requirements of a successful IIED claim set forth by the Court of Appeals.

<u>See</u> <u>Howell</u>, 81 N.Y.2d at 122, 596 N.Y.S.2d at 353.

 This interpretation is also consistent with § 47 of the Second Restatement of Torts:

"Except as stated in §§ 21-34 and in § 46, conduct which is tortious because [it is intended] to

result in bodily harm to another or in the invasion of any other of his legally protected interest

does not make the actor liable for an emotional distress which is the only legal consequence of

his action."  There is no reason to make an exception for plaintiffs here.

## II. <u>Motions *in limine*</u>

 The Federal Rules of Evidence favor the admission of all relevant evidence.  Fed. R.

Evid. 402.  Evidence is relevant if it has "any tendency to make the existence of any fact that is

of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Thus, a district court should "exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." See United States v. Ozsusamlar, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006). "[C]ourts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context." United States v. Chan, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).

A court's *in limine* ruling "is subject to change when the case unfolds … . Indeed even if nothing unexpected happens at trial, the district court is free, in the exercise of sound discretion, to alter a previous *in limine* ruling." Palmieri v. Defaria, 88 F.3d 136, 139 (2d Cir. 1996). In other words, "[i]t is inconceivable … that a trial court's 'decision' to … sustain an objection to a question, 'may not usually be changed unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent injustice.'" Colvin v. Keen, 900 F.3d 63, 71 (2d Cir. 2018) (citation omitted). Thus, the familiar standard for reconsideration applies only "to a decision that adjudicated a claim." Id.

With this background, the parties' remaining motion *in limines* and defendants' motion for reconsideration as to my prior evidentiary rulings are disposed of as follows:

**A.  Exhibits 2, 8 and 9**

At the second pretrial conference, I encouraged the parties to reach a stipulation as to sanctions imposed by the United States on Belarus. They have failed to come to an agreement. Plaintiffs have agreed to withdraw Exhibit 8, but a dispute remains as to Exhibits 2 and 9.

Exhibit 2 is President Obama's communication to Congress that he is extending sanctions previously imposed on certain Belarusian officials for another year. The exhibit will be admitted

into evidence with redactions.  It is relevant because President Obama's message is dated June 16, 2009, and Zeltser was released from Belarusian captivity around two weeks later.  Based on this timing, the jury may infer that Belarusian officials released Zeltser in an attempt to appease the United States, hoping that the extended sanctions would be lifted in the future.

I am ordering the redaction of the second sentence in the first paragraph because it accuses Belarusian authorities of undermining the democratic process, committing human rights abuses related to political repression, including detentions and disappearances, and engaging in public corruption.  Although the existence of sanctions is relevant in this case, evidence that Belarusian authorities have previously "detained and disappeared" political opponents will cause unfair prejudice to defendants.  See Fed. R. Evid. 403.

Furthermore, the second paragraph should also be redacted.  The accusation that the Government of Belarus poses "an unusual and extraordinary threat to the national security and foreign policy of the United States" is unduly prejudicial.  See id.

Exhibit 9 is actually comprised of six separate documents: (1) Executive Order 13405, which was issued on June 20, 2006;[6] (2) a memorandum from the Director of the Office of Foreign Assets Control (OFAC) stating that sanctions have been lifted as to two entities (not our defendants);[7] (3) a written statement by Ambassador Julie Finley to the United States Mission to the Organization for Security and Cooperation in Europe (OSCE), in which she states that defendants were added to the Treasury Department's list of entities impacted by the sanctions;[8] (4) an article from the "Belarus Digest" summarizing the sanctions; (5) a Press Release from the

---

[6] See https://www.govinfo.gov/content/pkg/CFR-2007-title3-vol1/pdf/CFR-2007-title3-vol1-eo13405.pdf.

[7] Plaintiffs have agreed to withdraw this portion of Exhibit 9.

[8] See https://www.osce.org/files/f/documents/a/7/28944.pdf

Treasury Department in which the agency states that it has designated defendant Belneftekhim as "being controlled by oppressive Belarusian president Alexander Lukashenko";[9] and (6) a letter from OFAC to the Secretary of the Commonwealth of Massachusetts describing how another defendant is subject to sanctions under EO 13405.[10]

As to EO 13405, I am excluding the majority of pages 2 and 3. This information is irrelevant, and alternatively, needlessly cumulative with other exhibits that will be introduced at trial. However, sections 4 and 5 of page 3 may be admitted into evidence, as these sections provide context for the Treasury Department's subsequent decision to designate defendants as entities subject to the sanctions. Page 1 of Exhibit 9, which describes the existence of sanctions, and page 4, in which the names and the positions of Belarusian individuals subject to the Executive Order, shall also be admitted into evidence. It is of course relevant that the Chairman of the Belarusian KGB and Minister of Justice, along with the other officials listed, (1) had a motive to participate in the alleged kidnapping, detention, and prosecution of plaintiffs in retaliation for American sanctions in March 2008; and (2) later had reason to change their minds and to effectuate plaintiffs' release in response to the extension of sanctions in June 2009.

Moving now to Ambassador Finley's statement to the U.S. Mission to OSCE, only the first paragraph of the document will be admitted into evidence. It is relevant that the Treasury Department froze defendants' assets in November 2007, only a few months before plaintiffs' alleged kidnapping and prosecution. However, the accusation that defendants undermined the democratic process, engaged in political repression, and were politically corrupt is unfairly prejudicial to them under Fed. R. Evid. 403. Paragraphs 2-4 must be redacted.

---

[9] See https://www.treasury.gov/press-center/press-releases/pages/hp676.aspx

[10] See Dkt. No. 336, Exhibit 9, page 9.

I am excluding page 7 of Exhibit 9, an article from the "Belarusian Digest." The article constitutes inadmissible hearsay, see Ladner v. City of New York, 20 F. Supp. 2d 509, 519 (E.D.N.Y. 1998), and the document is needlessly cumulative with other exhibits being introduced at trial. See Fed. R. Evid. 403.

As to the Treasury Department's Press Release announcing sanctions against defendants, the exhibit will be admitted into evidence, but the following portions should be redacted: (1) the word "oppressive" in the first paragraph; (2) in the second paragraph, the phrase: "and his cronies"; and (3) the final paragraph, except the first sentence which enumerates the Treasury Department's authority to designate certain individuals subject to sanctions. The existence of sanctions and who effectively "controlled" defendants are relevant, but the assertion in the last paragraph, attributing the sanctions to human rights abuse and political repression, is unfairly prejudicial to defendants under Fed. R. Evid. 403.

Finally, OFAC's letter to the Secretary of Massachusetts may be introduced into evidence. There is nothing unfairly prejudicial to defendants in the letter.

**B. Exhibit 3**

I previously ruled that plaintiffs could introduce portions of the CIA World Factbook on Belarus, which chronicled the country's relationship with Russia. I admitted it on the theory that the country's close ties to Russia made it more likely that KGB agents were able to operate with impunity within Belarus, thereby corroborating plaintiffs' allegations of an elaborate kidnapping and the inhumane prison conditions they experienced. Defendants' motion for reconsideration is denied. As plaintiffs point out, the Belarusian KGB worked closely with their Russian counterparts and defendants are free to cross-examine plaintiffs that the second amended complaint only mentioned Belarusian KGB agents – not Russian KGB agents.

15

### C.  **Exhibit 26**

This exhibit contains the Congressional testimony of a State Department official from September 2008.  Plaintiffs seek to introduce one paragraph from the official's testimony, highlighted in a red box, in which the official describes, among other things, how Zeltser was convicted "in a secret trial" and that he had been deprived of his prescription medication.

The exhibit is excluded.  "[T]estimony before a congressional committee" offered for the truth of the matter asserted therein is "manifestly hearsay."  See Pearce v. E.F. Hutton Grp., Inc., 653 F. Supp. 810, 815 (D.D.C. 1987).

### D.  **Exhibit 27**

The CNN article quoting former Secretary of State Condolezza Rice is inadmissible as hearsay within hearsay.  Newspaper articles are generally inadmissible hearsay under Fed. R. Evid. 801(c) when offered for the truth of the matter asserted.  See Ladner, 20 F. Supp. 2d at 519.  Furthermore, no hearsay exception applies to Secretary Rice's out-of-court statement to CNN.

### E.  **Exhibits 44, NN, and OO**

Defendants contend that my prior ruling admitting redacted portions of the Report of the United Nations' Special Rapporteur, Exhibit 44, opened the door to the specific Belarusian criminal judgments rendered against plaintiffs (i.e., Exhibits NN and OO).  I am not persuaded.

The judicial documents from Belarus are still inadmissible: they constitute hearsay and their probative value is substantially outweighed by their unfair prejudice to plaintiffs under Fed. R. Evid. 403.  This merely reflects another attempt by defendants to admit a foreign court's findings of facts and conclusions of law for the truth of the matter asserted in hopes of swaying the jury with documents plaintiffs cannot effectively challenge.  Specifically, the Belarusian

16

judgment was rendered after the trial judge heard testimony from 17 witnesses and considered extensive documentary evidence and physical evidence.  However, the witnesses and the evidence are unavailable to plaintiffs.  For reasons stated in my prior order, I will not permit defendants to introduce one-sided judicial determinations.

Defendants, however, raise a valid argument that it would be unbalanced to permit plaintiffs to introduce Exhibit 44, which describes the administration of justice in Belarus and how criminal defendants are not afforded adequate due process (i.e., outcomes are usually pre-determined, proceedings are closed, and judges rarely protect the Constitutional rights of criminal defendants), while categorically precluding defendants from rebutting this narrative.

I will therefore permit defendants to cross-examine plaintiffs on the level of "due process" generally afforded to them by the Belarusian judicial system (i.e., there was a trial; plaintiffs were represented by counsel; plaintiffs testified on their own behalf; and they appealed their convictions, etc.).  However, defendants may not admit the underlying judicial documents as extrinsic evidence.

### F.  Exhibit AAA

I previously excluded the English Judgment as inadmissible hearsay and under Fed. R. Evid. 403.  Defendants now offer a heavily redacted version of the exhibit.  This version of the English Judgment contains the case caption, the date on which the decision was rendered, and a few sentences from the case essentially describing: (1) that a man named "Badri" passed away and left a sizeable estate; (2) that Zeltser and his client, Joseph Kay, sought to claim Badri's estate for themselves through certain testamentary documents; (3) that another man named Berezovsky and Badri's family members sued in court to prevent this; and (4) that the English Court later ruled against Kay.

17

Defendants contend that the heavily redacted English judgment will serve as crucial impeachment evidence at trial, as they intend to argue that it formed the impetus for Zeltser's shifting narrative and current allegations against them.  Specifically, defendants' theory is that in 2009, while the case was still pending before the English court, Zeltser submitted a declaration to that court in which he blamed his kidnapping and detention in Belarus on Berezovsky and members of Bardri's family.  In other words, not our defendants.  In his prior statement, Zeltser explained that his client's adversaries sought to silence him from "contradicting their false allegations," which would provide them with "significant advantage in [the English] litigation." See Ex. CCC.[11]   A few years later, on May 31, 2012, the English court ruled against Kay. According to defendants, after this adverse and dispositive ruling, Zeltser no longer had a financial motive to blame his client's adversaries for his ordeal, as his client no longer had any chance to exert control over Badri's estate.

Defendants intend to argue that the English Judgment on May 2012 put Zeltser on notice that he needed a new "deep pocket" to target.  The timeline certainly suggests that the dispositive ruling could have provided Zeltser with a financial motive to blame defendants.  Only a few months after the English court ruled on the merits, plaintiffs filed a complaint against defendants on July 2012 in New York State Supreme Court, suddenly blaming them for plaintiffs' kidnapping and captivity.

I will permit defendants to explore Zeltser's bias or motive to fabricate on cross-examination.  See Justice v. Hoke, 90 F.3d 43, 48 (2d Cir. 1996).  However, this does not necessarily result in the English Judgment's introduction into evidence as extrinsic evidence. There is no reason for the jury to see a 10-page judicial opinion that has over 95% of its

---

[11] In my prior order, I ruled that this exhibit was admissible.

substance redacted.  This would only trigger the jury's curiosity and invite them to speculate as to the redacted content's substance.  Furthermore, for defendants to make their "shifting narrative" argument, there is no need to inform the jury that the English court ruled against Zeltser's client on the merits.  See Fed. R. Evid. 403.

Defendants may therefore cross-examine Zeltser with regard to the following facts without introducing the proposed exhibit into evidence: that Zeltser's former client was once involved in litigation against Berezovsky and Badri's family; that Zeltser submitted a declaration previously blaming his kidnapping and captivity on the parties adverse to his client (Ex. CCC); and that the English court dispositively ruled on the dispute on May 31, 2012, thereby bringing the English proceedings to an end.  The parties may not reveal who prevailed in that case. Zeltser's testimony at trial will thus permit defendants to attribute his "shifting narrative" to the termination of the English proceeding and allow them to argue that he only decided to blame defendants for his kidnapping and captivity a few months later.[12]

### G.  Exhibit K

Exhibit K is an email exchange between Zeltser and Ms. Duncan, Berezovsky's attorney, regarding the dispute as to Badri's estate.  In my prior order, I sustained plaintiffs' rule of completeness objection under Fed. R. Evid. 106.  Specifically, because Ms. Duncan had forwarded Zeltser's email to members of her litigation team on Friday, March 7, 2008, her short message to them had been redacted by Duncan's law firm as privileged work-product when it was produced to defendants in response to a subpoena, and thus both sides were in the dark on what Duncan had told members of her trial team in response to Zeltser's initial email.  I

---

[12] In the event Zeltser denies or otherwise equivocates on these rather undisputed matters, we will cross the bridge at that time.

permitted defendants to reissue the subpoena and directed the non-party law firm to submit the exhibit to the Court so I could review the substance of Duncan's email *in camera*.

Duncan's short email to her team states: "See below. On the agenda for Monday I think." This arguably shows that Duncan and her team discussed Zeltser and the matter of Badri's estate at the following Monday's meeting.

Assuming *arguendo* this communication reveals attorney work-product, Duncan waived the privilege as to this particular email by testifying about the meeting's content at length in her deposition. See Thomas v. F.F. Fin., Inc., 128 F.R.D. 192, 193–94 (S.D.N.Y. 1989); see also Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc., 130 F.R.D. 28, 32 (S.D.N.Y. 1990) (stating the work-product doctrine protects the attorney's materials, and consequently, the attorney may waive the benefit of the privilege). Duncan testified that on "Monday, March 10," she worked 8.5 hours on the "Berezovsky-Badri matter" and attended various meetings with members of her team referenced above, in which she and attorneys for Badri's family discussed "how we would cooperate" in dealing with Badri's estate and "the attempts that Mr. Zeltser and Mr. Kay were making to gain control of Badri's assets." Based on Duncan's deposition testimony, it is pretty obvious that Zeltser's email about Bardi's estate was on the agenda for her Monday meeting, and it is impossible to unring that bell.

Exhibit K will therefore be admitted into evidence. Zeltser's email to Duncan is the admission of a party opponent, see Fed. R. Evid. 801(d)(2)(A), and Duncan's short email to her team is no longer privileged based on her deposition testimony.[13]

---

[13] The Court will provide a copy of the exhibit to the parties.

### H.  Exhibit UU

I previously ruled that a redacted two-page letter from an attorney, Mr. Hoffman, in which Hoffman described how several recordings came into his possession, was inadmissible hearsay.  Although Hoffman was retained by Zeltser's brother, Mark, to represent Zeltser's interest in litigation before Judge Sullivan, Hoffman acknowledged in his letter that he had never spoken with or otherwise communicated with Zeltser, who was in captivity at the time.  Under those circumstances, because Zeltser did not hire or otherwise authorize Hoffman to act or speak on his behalf, I found that Hoffman's statements did not constitute the admission of a party opponent's agents on a matter within the scope of that relationship and while it existed under Fed. R. Evid. 801(d)(2)(D).

After reconsideration, however, it appears that my prior ruling did not appropriately consider the effect of Mark's decision to retain Hoffman on Zeltser's behalf under Fed. R. Civ. 17(c)(2).  Defendants contend that, because Mark was acting as his brother's "next friend," Hoffman's statement constitutes the admission of an authorized agent under Fed. R. Evid. 801(d)(2)(D).

The exhibit will be admitted into evidence.  Judge Sullivan concluded that Mark was acting as his brother's "next friend" in retaining Hoffman.  See Gudavadze v. Kay, 556 F. Supp. 2d 299, 301 n.2 (S.D.N.Y. 2008) ("Plainly, in this case, the 'next friend' requirements are satisfied on the basis of Emanual Zeltser's inaccessibility, due to his detention in Belarus, and Mark Zeltser's clear dedication to the 'best interests' of his brother.").  As Zeltser's "next friend," Mark was essentially his "alter ego".  See T.W. by Enk v. Brophy, 124 F.3d 893, 897 (7th Cir. 1997).  Mark was thus "authorized to act on behalf of his ward" and could "make all

appropriate decisions in the course of specific litigation," including the decision to retain

counsel.  See United States v. 30.64 Acres of Land, 795 F.2d 796, 805 (9th Cir. 1986); see also

Adem v. Bush, 425 F. Supp. 2d 7, 11 n.6 (D.D.C. 2006) (stating a next friend resembles guardian

ad litem who prosecutes or defends the case from start to finish on behalf of another).  However,

as a non-attorney, Mark could not represent his brother in federal court, see 28 U.S.C. § 1654,

and thus retained Hoffman's services to adequately represent Zeltser's interests.

Having laid that foundation, I see no reason to deviate from the well-settled rule that an

attorney's statement of fact constitutes a party admission.  See HSqd, LLC v. Morinville, No. 11-

cv-1225, 2013 WL 1131590, at *3 (D. Conn. March 18, 2013).  Although Zeltser did not hire

Hoffman, it would make little sense that a party could be bound by his next friend's decision to

prosecute or settle a case, but not by his next friend's freely made decision to retain counsel.

Hoffman made the statements at issue to protect Zeltser's interest.  Specifically, the letter

provided context to several recorded conversations, which I have admitted into evidence,[14] and

was submitted by Hoffman to rebut the opposing side's assertion that there was "no evidence"

that Zeltser was coerced by his captors into calling Kay to lure him to Belarus.  There is nothing

suggesting that Zeltser's rights were furtively being bargained away or that Hoffman was

speculating.  We have the recordings with Zeltser's and Kay's voice on them, and thus

Hoffman's letter merely explains how these came into his possession (Kay recorded his calls

with Zeltser and gave them to Hoffman).

Plaintiffs contend that Hoffman lacked personal knowledge as to the recordings'

foundation because he did not personally record the telephone calls and was not present during

the communication.  This argument lacks merit because Fed. R. Evid. 801(d)(2)(D) does not

---

[14] See Funk, 2019 WL 3035124, at *5.

22

impose such a requirement for admissibility purposes.  See Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 537 (2d Cir. 1992).  Zeltser is free to testify that he never spoke to Hoffman and that Hoffman was not present during his conversations with Kay.  It is up to the jury to decide Hoffman's credibility.  See Fed. R. Evid. 806 (stating that a hearsay declarant's credibility should in fairness be subject to impeachment as though he had in fact testified).

**I.  Exhibits XX and YY**

Defendants seek reconsideration as to my ruling that excluded as inadmissible hearsay two Belarusian newspaper articles in which plaintiffs are purported quoted.  I originally sustained plaintiffs' hearsay objection because no exception applied to the second layer of hearsay.  Defendants contend that these articles overcome the second layer of hearsay under Fed. R. Evid. 807, the residual hearsay exception to the rule, since the articles are "supported by sufficient guarantees of trustworthiness."  This argument fails.

The case on which defendants rely, In re Columbia Sec. Litig., 155 F.R.D. 466 (S.D.N.Y. 1994), is distinguishable.  In that case, the court admitted into evidence a Forbes magazine article and a Reuters news article offered by the plaintiff to prove that one of the defendants, Schulhof, uttered certain statements.  Judge Sand found that adequate "circumstantial guarantees of trustworthiness" were present because the Forbes reporter was available to testify at trial, and she "was an experienced reporter at a well-regarded publication and took contemporaneous notes as she spoke to Schulhof[.]"  Id. at 477.  The reporter also testified that she was heavily involved in the article's editing process throughout and required by Forbes to review the final version for accuracy.

When it came to the Reuters article, even though the author was not readily available to testify, defendants' own agent, Burke, was available for cross-examination at trial.  He was

23

physically present at the conversation between the reporter and Schulhof, had prepared a contemporaneous memorandum confirming the article's accuracy, and had testified to the memorandum's accuracy.  Based on Burke's contemporaneous corroboration, it was clear that the Reuters article had accurately reflected Schulhof's statements.

In our case, the Belarusian articles lack the same adequate "circumstantial guarantees of trustworthiness."  Notably, plaintiffs challenge the accuracy of certain statements attributed to them in these exhibits, have never testified as to the articles' accuracy, and there are no contemporaneous notes corroborating the articles' accuracy.  Nor have defendants presented a witness to lay adequate foundation for the articles.  Lastly, although one can reasonably contend that Forbes and Reuters are "well-regarded publications," the same cannot be said about these Belarusian news agencies.

To be clear, the Court will not preclude defendants from asking plaintiffs on cross-examination whether they made a prior inconsistent statement.  See Fed. R. Evid. 613.  The Belarusian articles provide defendants with a good faith basis to ask the question.  Moreover, if plaintiffs testify that they cannot recall making certain statements, defendants may even attempt to refresh their recollection with the articles under Fed. R. Evid. 612.  However, the articles themselves are inadmissible as extrinsic evidence when offered to prove the truth of the matter asserted (i.e., that Berezovsky, under a grant of immunity, testified at court against plaintiffs).

**J.   Deposition of Yuliy Dubov**

Finally, defendants request that I reconsider my ruling in which I prohibited deposition testimony that Zeltser's offer to split Badri's estate with Berezovsky amounted to a "criminal

conspiracy."[15]  They contend that this is relevant to show why Berezovsky later alerted Belarusian authorities, who then arrested and prosecuted plaintiffs.

Defendants, however, are still missing a witness or other admissible evidence demonstrating why Berezovsky's state of mind is relevant.  Namely, no Belarusian prosecutor or law enforcement official will be testifying at trial that they spoke to Berezovsky and "tipped off" by him (or any of his authorized agents).  In other words, defendants are merely speculating that Belarusian authorities initiated an investigation into plaintiffs based on this purported "criminal conspiracy."  Absent this logical link in the chain, the attorneys' out of court statement to Berezovsky constitutes hearsay and is also inadmissible under Fed. R. Evid. 403.

## CONCLUSION

Defendants' motion for partial summary judgment [340] is granted and defendants' motion for reconsideration as to certain *in limine* rulings is granted in part and denied in part.

**SO ORDERED.**

_____
                                            U.S.D.J.


Dated:  Brooklyn, New York
          September 21, 2020

---

[15] I ordered that the following testimony be redacted: (1) Berezovsky's attorneys' opinion that Zeltser's offer to Berezovsky amounted to a criminal conspiracy; and (2) that the attorneys strongly advised Berezovsky to reject the proposal.

25