UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

VLADLENA FUNK and EMANUEL
ZELTSER,

Plaintiffs,

-against-

BELNEFTEKHIM a/k/a
CONCERNBELNEFTEKHIM and
BELNEFTEKHIM USA, INC.,

Defendants.

Civil Action No. 14 Civ. 00376(BMC)

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION IN LIMINE RE COLLATERAL ESTOPPEL

Joseph Paukman, Esq.
1562 First Avenue # 205-1817
New York, NY 10028
(718)736-4050
336@tuta.io
*Attorney for Plaintiff Zeltser*

## **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

1. Defendants' Motion in Limine is an
<u>Untimely Motion for Summary Judgment</u>  1

2. <u>Defendants Bear the Burden of Proof</u>  3

3. Plaintiffs Had no Incentive to Litigate in the English
Probate Proceedings and Had No Opportunity or
<u>incentive to Appeal the English Judgment</u>  4

4. Joseph Kay Had no Incentive to
<u>Litigate in the English Probate Proceedings</u>  12

5. The Purported Testamentary Documents are
<u>Entirely Unrelated to This Action</u>  14

CONCLUSION  16

# **TABLE OF AUTHORITIES**

**Page**

*Auqui v. Seven Thirty One Ltd. Partnership*,
    22 N.Y.3d 246, 980 N.Y.S.2d 345, 3 N.E.3d 682 (2013)        10

*Augustine v Sugrue*,
    8 A.D.3d 517 (2d Dep't 2004)        6

*Barnes v. Harling*,
    368 F. Supp. 3d 573 (W.D. N.Y. 2019)        11

*Blonder-Tongue Laboratories, Inc. v.*
    *University of Illinois Foundation*,
    402 U.S. 313, 91 S.Ct. 1424, 28 L.Ed.2d 788 (1971)        4

*Bubel v. Board of Educ. of Saugerties Cent. School Dist.*,
    117 A.D.3d 1157, 984 N.Y.S.2d 661 (3d Dep't 2014)        10

*Carman Industries, Inc. v. Wahl*,
    472 F.Supp. 877 (D.N.J. 1976)        3

*Choi v. State*,
    74 N.Y.2d 933, 550 N.Y.S.2d 267, 549 N.E.2d 469 (1989)        11

*Church v. New York State Thruway Authority*,
    16 A.D.3d 808, 791 N.Y.S.2d 676 (3d Dep't 2005)        10

*Davis v. West Community Hospital*,
    786 F.2d 677 (5th Cir. 1986)
    *reh'g denied*, 790 F.2d 890 (1986)        3

*Donald v. J.J. White Lumber* Co.,
    68 F.2d 441 (5th Cir. 1934)        3

*Dowling v. United States*,
    493 U.S. 342, 350, 110 S.Ct. 664, 673, 107 L.Ed.2d 708 (1990)        3

*Downtown Acupuncture PC v. State Wide Ins. Co.*,
    50 Misc. 3d 461, 21 N.Y.S.3d 548 (N.Y. City Civ. Ct. 2015)        11

*Florida Insurance Guaranty Association, Inc. v.*
    *Carey Canada, Inc.*,
    749 F.Supp. 255 (S.D. Fla. 1990)        3

*Gadani v. DeBrino Caulking Associates, Inc.*,
    86 A.D.3d 689, 926 N.Y.S.2d 724 (3d Dep't 2011)           11

*Gilberg v. Barbieri*,
    53 N.Y.2d 285, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981)      10, 11

*Granham v. McGraw-Edison Co.,*
    444 F.2d 210 (7th Cir. 1971)           3

*Hunt v. OSR Chemicals, Inc.*,
    85 A.D.2d 681, 445 N.Y.S.2d 499 (2d Dep't 1981)         11

*In re JP Morgan Chase Bank, N.A.*,
    135 A.D.3d 762, 24 N.Y.S.3d 667 (2d Dep't 2016)         6

*Martin v. Rosenzweig*,
70 A.D.3d 1112, 894 N.Y.S.2d 228 (3d Dep't 2010)         11

*Montana v. United States*,
    440 U.S. 147, 99 S.Ct. 970, 59 L.Ed. 2d 210 (1979)       4, 5

*Nations v. Sun Oil Co.,*
765 F.2d 742 (5th Cir. 1983) (*per curiam*),
*cert. denied,* 444 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983)     4

*Parklane Hosiery Co., Inc. v. Shore*,
    439 U.S. 322, 99 S.Ct. 645, 58.Ed. 2d 552 (1979)       4, 5

*People v Medina*,
    208 A.D.2d 771 (2d Dep't 1994)         6

*Pinkney v. Keane*,
    920 F.2d 1090 (2d Cir. 1990),
    *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991)   5

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,*
    68 F.3d 1478 (2d Cir. 1995)         5

*Rice v. Massalone*,
    160 A.D.2d 861, 554 N.Y.S.2d 294 (2d Dep't 1990)       10

*Rozewski v. Trautmann*,
    151 A.D.3d 1945, 57 N.Y.S.3d 852 (4th Dep't 2017)       11

*Safe Flight Instrument Corp. v. McDonnell-Douglas Corp.,*
    482 F.2d 1086 (9th Cir. 1973),
    *cert. denied,* 414 U.S. 1113, 94 S.Ct. 843,
    38 L.Ed. 2d 740 (1973) ..... 3

*Schwartz v. Public Adm'r of Bronx County*,
    24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969) ..... 11

*Sepulveda v. Dayal*,
    0170 A.D.3d 420, 893 N.Y.S.2d 549 (1st Dep't 2010) ..... 12

*Shanley v. Callanan Industries, Inc.*,
    54 N.Y.2d 52, 444 N.Y.S.2d 585, 429 N.E.2d 104 (1981) ..... 11

*Southern Pacific Communications Co. v.*
    *American Telephone and Telegraph Co.,*
    740 F.2d 1011 (D.C. Cir. 1984) ..... 3

*Staatsburg Water Co. v. Staatsburg Fire Dist.*,
    72 N.Y.2d 147, 531 N.Y.S.2d 876, 527 N.E.2d 754 (1988) ..... 11

*Sterling Ins. Co. v. Chase*,
    287 A.D.2d 892, 731 N.Y.S.2d 778 (3d Dep't 2001) ..... 11

*Stewart Title Ins. Co. v. Bank of New York Mellon*,
    154 A.D.3d 656, 61 N.Y.S.3d 634 (2d Dep't 2017),
    *leave to appeal denied*, 30 N.Y.3d 909,
    71 N.Y.S.3d 2, 94 N.E.3d 484 (2018) ..... 10

*The Evergreens v. Nunan,*
    141 F.2d 927 (2d Cir. 1944),
    *cert. denied,* 323 U.S. 720, 65 S.Ct. 49,
    89 L.Ed.2d 579 (1944) ..... 5

*United States v. Berman,*
    884 F.2d 916 (6th Cir. 1989) ..... 5

*Whitley v. Seibel,*
    676 F.2d 245 (7th Cir. 1982) ..... 6

**<u>Other</u>**

Restatement (Second) of Judgments §28 (1982) ..... 5, 6

73A N.Y. Jur. 2d Judgments §345                                                          11

*Moore's Federal Practice,* Section 132.1                                                  3

Berezovsky v. Abramovich, 2007 Folio 942
    (downloaded from <u>Berezovsky abramovich summary amended (judiciary.uk)</u>     7

 Boris Berezovsky and Roman Abramovich case: Q and A
    (downloaded from <u>Boris Berezovsky and Roman Abramovich case: Q and A | Russia | The Guardian</u> )                                                                              7


The New York Times. *See, e.g., The Power of Money: How Autocrats Use
London to Strike Foes Worldwide*, NYT, June 18, 2021                                        13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VLADLENA FUNK and EMANUEL ZELTSER,<br><br>                              Plaintiffs,<br><br>          -against-<br><br>BELNEFTEKHIM a/k/a CONCERNBELNEFTEKHIM and BELNEFTEKHIM USA, INC.,<br><br>                              Defendants. | Civil Action No. 14 Civ. 00376(BMC) |

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION IN LIMINE RE COLLATERAL ESTOPPEL

Plaintiff, Paul Hoffman, as administrator of the Estate of Emanuel Zeltser, hereby submits his memorandum of law in opposition to the motion in limine re collateral estoppel [ECF 436] filed by Defendants, Concern Belneftekhim and Belneftekhim USA, Inc.

**1.      Defendants' Motion in Limine is an Untimely Motion for Summary Judgment**

Defendants' motion is a motion for partial summary judgment improperly couched as a motion in limine. Namely, Defendants seek rulings under the doctrine of collateral estoppel that: (a) that certain documents, which plaintiff Zeltser showed to English lawyer Michelle Duncan, are forgeries; (b) that contrary evidence and argument are precluded; and (c) that the Court will instruct the jury accordingly. Stated otherwise, Defendants seek enforcement of the English Judgment despite this Court's denial of that same request on Defendants' 2018 summary judgment motion.

Defendants' efforts to bind Plaintiffs by collateral estoppel to the findings in the English probate proceeding are "dispositive" and not "evidentiary" in nature. The only plausible ground for binding Plaintiffs to the findings in the English probate proceeding are to establish that Plaintiff were "lawfully" detained, arrested, convicted, and imprisoned in Belarus as a matter of law -

1

despite the preclusion of all such evidence on the ample evidence submitted by Plaintiffs that the executive branch of the Belarusian government is utterly corrupt and that the legislative branch is controlled by the executive branch to the extent that litigation outcomes are "predetermined." Defendants' attempts to seek an "end run" around this Court's preclusion orders and multiple denials of Defendants' prior motions relating to the English Judgment.

Furthermore, Defendants' motion is untimely. The Court's 2018 rulings precluding the English judgment and denying Defendants' motion for summary judgment are legal conclusions that resolved Defendants' affirmative defenses based on res judicata. The correct standard of review is the standard applicable to motions for reconsideration. The fact that the Court has discretion to revisit its prior rulings on the admissibility of evidence at any time does not grant Defendants free reign to usurp extensively briefed prior rulings on the eve of trial, on patently specious grounds, and based on a purportedly "new" development that occurred over five years ago. That this Court also opined in a 2018 decision that Plaintiffs may have been engaged in a joint effort to gain control of Badri's assets provides no excuse for a motion, filed more than five years later, based on a purportedly "new" development. There is nothing "new" about a decision rendered five years ago.

Defendants have moved several times for collateral estoppel based on the English judgment, and their efforts have been consistently denied by the Court.[1] In 2018, Defendants moved for summary judgment of collateral estoppel based on the English judgment, which was denied on May 16, 2018 [ECF 200]. On June 22, 2020, this Court denied Defendants' request for for admissibility of the English Judgment [ECF 323]. Defendants made no mention of collateral

---

[1] Defendants have sought for the Court to take judicial notice, to admit the English judgment as an exhibit, moved for summary judgment based on the English judgment, and moved to have the findings of the English judgment read into the record.

estoppel again until October 23, 2023, when they filed the instant motion for summary judgment couched as a motion in limine.

Furthermore, collateral estoppel must be raised in a timely fashion or it is waived. *Moore's Federal Practice,* Section 132.1; *Davis v. West Community Hospital,* 786 F.2d 677, 682 (5th Cir. 1986) *reh'g denied,* 790 F.2d 890 (1986); *Southern Pacific Communications Co. v. American Telephone and Telegraph Co.,* 740 F.2d 1011 (D.C. Cir. 1984); *Safe Flight Instrument Corp. v. McDonnell-Douglas Corp.,* 482 F.2d 1086, 1089 (9th Cir. 1973), *cert. denied,* 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed. 2d 740 (1973); *Granham v. McGraw-Edison Co.,* 444 F.2d 210 (7th Cir. 1971); *Donald v. J.J. White Lumber* Co., 68 F.2d 441 (5th Cir. 1934); *Florida Insurance Guaranty Association, Inc. v. Carey Canada, Inc.,* 749 F.Supp. 255 (S.D. Fla. 1990); *Carman Industries, Inc. v. Wahl,* 472 F.Supp. 877 (D.N.J. 1976).

In the instant case, Defendants waived collateral estoppel by their failure to raise the issue until three years after the court's denial of their summary judgment motion and five years after this Court initially noted (but did not determine) that Joseph Kay and Zeltser may have been engaged in a joint endeavor.

## 2.   **Defendants Bear the Burden of Proof**

The party asserting collateral estoppel has the burden of proof in establishing that the factual findings of one action are binding on the party in another action. *Dowling v. United States,* 493 U.S. 342, 350, 110 S.Ct. 664, 673, 107 L.Ed.2d 708 (1990). Defendants must establish that as a factual matter, Plaintiffs controlled and actively participated in the defense of the English probate proceedings. The facts, however, are just the opposite. It is clear that Plaintiffs did not directly or indirectly control the English probate proceedings, did not pay the legal fees for that action, nor direct the strategy of that action.

3

In fact, the evidence establishes that neither Plaintiffs nor Joseph Kay had any interest in Badri's assets. These facts are in sharp contrast to those in *Montana v. United States* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed. 2d 210 (1979), where the initial suit was brought by a contractor *at the direction of* the United States, contending that a Montana state tax unconstitutionally discriminated against the United States and the companies with which it dealt. The second paragraph of the opinion states, *"The litigation was directed and financed by the United States." Montana v. United States,* 440 U.S. at, 151, 99 S.Ct. at 972 (1979) (emphasis added*.*) No such direction or financing is present in the instant case.

There is no evidence whatsoever that Plaintiffs actively participated in the English probate proceedings. Furthermore, since Plaintiffs did not actively participate in the English probate proceedings, much important evidence relating to the purportedly forged documents at issue therein was never presented there. In summary, the English Court case was defended by an individual with insufficient resources to pay continuing attorney's fees.

**3.    Plaintiffs Had no Incentive to Litigate in the English Probate**
**Proceedings and Had No Opportunity or Incentive to Appeal the English Judgment**

Collateral estoppel is a doctrine of equitable discretion to be applied only when the alignment of the parties and the legal and factual issues raised warrant it. The discretion vested in trial courts to determine when it should be applied is broad. *Nations v. Sun Oil Co.,* 765 F.2d 742, 744 (5th Cir. 1983) (*per curiam*), *cert. denied,* 444 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983).

Collateral estoppel is based on the benefit of protecting litigants from the burden of relitigating an identical issue with a party, conserving judicial resources, *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1424, 28 L.Ed.2d 788 (1971); *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58.Ed. 2d 552 (1979) and fostering reliance on judicial action by minimizing the possibility of inconsistent decisions.

4

*Montana v. United States, supra, Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,* 68 F.3d 1478, 1485 (2 Cir. 1995).

Despite the economies achieved by use of collateral estoppel, it is not be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results ... Recognizing the force of this reasoning [of Judge Learned Hand in *The Evergreens v. Nunan,* 141 F.2d 927, 929 (2d Cir. 1944), *cert. denied,* 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed.2d 579 (1944)] the Supreme Court later stated that it would be unfair to allow collateral estoppel against a party that had little incentive to defend in the first action. *Parklane* 439 U.S. at 330, 99 S.Ct. at 651; *accord Pinkney v. Keane,* 920 F.2d 1090, 1096 (2nd Cir. 1990) ("lack of incentive to litigate vigorously may render the collateral estoppel doctrine inoperative"), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991); *United States v. Berman,* 884 F.2d 916, 924 (6th Cir. 1989) ("Unfairness can result when the party to be bound lacked an incentive to litigate in the first trial.") (internal quotation marks omitted); Restatement (Second) of Judgments §28 (1982) (issue preclusion may not apply where "the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action"). *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,* 68 F.3d1478, 1485 (2d Cir. 1995) citing *Parklane Hosiery, supra,* at 330.

In *Remington Rand,* the Second Circuit refused to apply collateral estoppel because the defendants had little incentive in the earlier trial to litigate the amount of damages awarded to a company whose loans it held. The Second Circuit found it unnecessary to reach the issues surrounding whether the banks controlled the earlier litigation. *Remington Rand,* 68 F.3d at 1485.

Hence the potential advantages of applying collateral estoppel are often outweighed by the need for fairness: "[A] party is not estopped to raise issues that he has had less, than a 'full and

fair opportunity to litigate' in a prior proceeding." *Whitley v. Seibel.* 676 F.2d 245, 250 (7th Cir. 1982).

As in the cited cases, Plaintiffs did not have a full and fair opportunity to litigate because *inter alia* they were not present in the English probate proceedings. Those proceedings, by the choice of the plaintiff therein, took place in a distant forum. Plaintiffs were not named as parties, nor was their testimony, indispensable to the determination of the forgery issues, even taken by deposition. Hence the trial judge's observation that there was no evidence presented by Joseph Kay in opposition to the plaintiff's summary judgment motion was not inadvertence.

Furthermore, Plaintiffs had no opportunity to appeal the English Judgment, as they were not parties to the English probate proceedings, it did not adjudicate any of their rights, and they were, therefore, not aggrieved by the judgment. A party who did not have the opportunity to appeal a determination did not have a full and fair opportunity to contest it. *In re JP Morgan Chase Bank, N.A.*, 135 A.D.3d 762, 24 N.Y.S.3d 667 (2d Dep't 2016) (citing *Augustine v Sugrue*, 8 A.D.3d 517, 519 (2d Dep't 2004); *People v Medina*, 208 A.D.2d 771, 772 (2d Dep't 1994); Restatement (Second) of Judgments §28, Comment a)).

The application of collateral estoppel would unjustly deprive Plaintiffs of their constitutional right to a full and fair hearing on their case. Plaintiffs not only had little incentive to litigate the English probate proceedings, they were not even parties to the action. Defendants should not be allowed to wield the sword of collateral estoppel against Plaintiffs, "a party who has not previously had his day in court." *Whitley*, 676 F.2d at 248, n.1.

The English probate proceedings involved a challenge filed by one of Badri's *two* widows to testamentary documents which appointed Badri's cousin, non-party Joseph Kay, as executor of

6

Badri's "letter of wishes" for the distribution of his assets to his two wives and their children (as well as Badri's parents and sibling).

As discussed in greater detail at ¶¶ 16-30 of the Zeltser Declaration filed on May 8, 2018 [ECF 189] ("Zeltser Dec."), Plaintiffs were not parties to the English probate proceedings and should not be collaterally estopped by any findings therein. Plaintiffs did not participate in those proceedings, did not direct, control, finance, act as counsel, or advise Joseph Kay in those proceedings, were not deposed in those proceedings, had no opportunity to depose any witnesses, had no access or opportunity to examine any evidence, and had no opportunity to retain any expert(s). Nor do Plaintiffs have any contacts with England, much less the minimum contacts necessary to satisfy Constitutional requirements.

Furthermore, neither Joseph Kay nor Plaintiffs stood to gain any benefit by Kay's appointment as executor of Badri's estate. Neither Kay nor Plaintiffs were to inherit anything under the purportedly forged testamentary documents. What Defendants argue was a plot to gain control and possession of Badri's assets was nothing more than an effort by Zeltser, on behalf of Kay, to locate potentially billions of dollars in Badri's assets throughout the World held in secretive trusts under the names of unknown trustees, nominees, and entities.[2] Neither Kay nor Plaintiffs had any financial or other incentive whatsoever to vigorously defend the challenge to Kay's appointment as executor.

Not only did Plaintiffs lack any interest in the subject matter or outcome of the English probate proceedings, but they were never even served with notice or any documents in those

---

[2] There have been numerous litigations over disputed claims to assets purportedly owned by Badri and held in the name of other persons. Once such litigation, Berezovsky v. Abramovich, 2007 Folio 942, Berezovsky abramovich summary amended (judiciary.uk) was the largest private litigation in the history of the U.K. Boris Berezovsky and Roman Abramovich case: Q and A | Russia | The Guardian At issue there was a claim to over $5 billion based on disputed claims to ownership of a former Russian state-owned oil company.

proceedings. In fact, when the English probate proceedings were commenced, Plaintiffs were being held captive in Belarus and could not possibly participate in those proceedings. Plaintiffs first learned of the English probate proceedings in or about October 2009 (long after they were commenced), when U.K. lawyers representing Joseph Kay, who was then Zeltser's client in unrelated matters,[3] requested Zeltser to provide them with a statement (drafted by the U.K. lawyers and revised where necessary by Zeltser) that certain documents purporting to originate from Zeltser's computer did not so originate.

The English Court ultimately found that testamentary documents allegedly found on Zeltser's computer were forgeries deliberately created to support the claim by Joseph Kay to be appointed as the executor of Badri's estate. However, as further explained in the Zeltser Dec., the electronic images of documents on "Zeltser's computer" found to be forgeries were planted by Defendants and their KGB associates. No such documents were ever stored on Zeltser's computer before it was seized by Defendants. The images were created by the Belarusians to aid and abet Defendants and their agent, Boris Berezovsky, a close friend of Belarusian dictator Lukashenko, to aid Defendants in discrediting Plaintiffs' clients' claims to an ownership interest in Belneftekhim and to justify Plaintiffs' abduction, captivity, and torture.

As explained in the Zeltser Dec., the electronic images of documents planted by Defendants and their KGB associates in the English probate proceedings and found by the English court to be forgeries are probably forgeries. However, those documents were neither created nor stored on Zeltser's computer prior to it being seized. The images were not created by Zeltser; they were created by the Belarusian KGB to aid and abet Berezovsky, a close friend of Belarusian dictator

---

[3] Zeltser did not represent or advise Kay at all in the English probate proceedings.

Lukashenko, to "win" in the English court and to aid Defendants in discrediting Plaintiffs and their clients — to justify Plaintiffs' abduction, captivity, and torture.

If Plaintiffs had an opportunity (or any incentive) to participate in the English probate proceedings, they would have easily demonstrated so, and the findings of facts in those proceedings would have been different. But Plaintiffs had no right or opportunity to control or participate in the proceedings, and most certainly lacked the ability to present expert testimony, examine the alleged "Zeltser's computer", or cross examine the expert testimony presented on behalf of Joseph Kay's adversaries. Indeed, Joseph Kay did little to nothing to defend the action. The English probate proceedings were well underway while Plaintiffs was held captive in Belarus. And after Zeltser was rescued by the U.S. Department of State and senior member of the U.S. Congress, he was in a very poor state of health and unable to participate even if I had been given the chance to do so. Further, Zeltser had absolutely no reason or ability to expend the vast resources and time needed to participate in an overseas proceeding brought by a billionaire, the outcome of which did not affect or concern Plaintiffs at all. Badri's testamentary documents have no bearing on this action.

Plaintiffs had no opportunity, motivation or incentive to defend any claim in the English probate proceedings; to cross-examine witnesses, to offer witnesses of their own, to examine what they referred to as Zeltser's computer (but without any chain of custody evidence whatsoever), to question the purported expert who examined "Zeltser's computer" planted by Defendants and the KGB, or offer an expert of their own.

The English probate proceedings were part of a series of related probate actions in which Berezovsky and Badri's estranged widow, Inna Gudavadze, were on the same side against Kay, then on opposite sides when Gudavadze later learned that Berezovsky claimed ownership of 50%

9

of all of Badri's assets - whether or not related to any Berezovsky/Badri business venture. Zeltser had no opportunity to review the entire volume of the documents presented to the English Court by Berezovsky, which Berezovsky claims came from "Zeltser's computer." However even a cursory review of the documents that were provided to Zeltser made clear that many "documents" are crude forgeries by whoever presented them to the English Court. No such documents were ever been stored (or existed) on Zeltser's computer prior to March 12, 2008, the date when Plaintiffs were unlawfully detained by the Byelorussian KGB. Portions of some of the "documents" resemble Zeltser's draft writings but contain numerous alterations, changes, cut-and-pastes from other documents and writings, and manufactured "additions". Others simply are entirely fabricated.

New York law is in accord with federal law. The question whether a party has had a full and fair opportunity to contest a prior determination cannot be resolved in a formulaic manner; for instance, it cannot be established by a finding that the party against whom the determination is asserted was accorded due process in the prior proceeding. Rather, the question involves a practical inquiry into the realities of the prior litigation,[4] including the context and other circumstances that may have had the practical effect of discouraging or deterring a party from fully litigating the determination. *Gadani v. DeBrino Caulking Associates, Inc.*, 86 A.D.3d 689, 926 N.Y.S.2d 724

---

[4] For instance, in *Rice v. Massalone*, 160 A.D.2d 861, 554 N.Y.S.2d 294 (2d Dep't 1990), a wrongful death action arising from vehicular collision, the court properly refused to apply collateral estoppel to findings of the administrative law judge at the prior traffic infraction hearing (that defendant failed to yield to a right-of-way) since (1) the incentive to litigate the traffic infraction was not as compelling as in the present trial, which involved a potential liability of over $2 million; and (2) only two witnesses testified at the hearing, whereas several additional witnesses testified at the trial. *See also, Auqui v. Seven Thirty One Ltd. Partnership*, 22 N.Y.3d 246, 980 N.Y.S.2d 345, 3 N.E.3d 682 (2013); *Gilberg v. Barbieri*, 53 N.Y.2d 285, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981); *Stewart Title Ins. Co. v. Bank of New York Mellon*, 154 A.D.3d 656, 61 N.Y.S.3d 634 (2d Dep't 2017), *leave to appeal denied*, 30 N.Y.3d 909, 71 N.Y.S.3d 2, 94 N.E.3d 484 (2018); *Bubel v. Board of Educ. of Saugerties Cent. School Dist.*, 117 A.D.3d 1157, 984 N.Y.S.2d 661, 303 Ed. Law Rep. 942 (3d Dep't 2014); *Church v. New York State Thruway Authority*, 16 A.D.3d 808, 791 N.Y.S.2d 676 (3d Dep't 2005).

(3d Dep't 2011). A party has not had a full and fair opportunity to contest a prior determination where the size[5] or significance[6] of the prior claim is small in comparison to the present claim; the forum of the prior litigation is markedly different from that of the present claim;[7] the party lacked the incentive or initiative to litigate the issue in the prior forum.[8] 73A N.Y. Jur. 2d Judgments §345. Other factors to consider in determining whether a party had a full and fair opportunity to litigate are the actual extent of the litigation; the competence and experience of counsel; the absence of counsel; the availability of new evidence; differences in the applicable law; the foreseeability of future litigation; and indications of a compromise verdict. *Id.*

Thus, for instance, in *Staatsburg Water Co. v. Staatsburg Fire Dist.*, 72 N.Y.2d 147, 531 N.Y.S.2d 876, 527 N.E.2d 754 (1988), the N.Y. Court of Appeals held that the opportunity to participate in a Public Service Commission ("PSC") rate-making hearing did not give the fire department a full and fair opportunity to contest the PSC's determination that the fire department had no right to withhold payment to a water company for alleged inadequate service. The fire department was not collaterally estopped from disputing the adequacy of the service before the supreme court since it had no direct stake in the hearing given the PSC's inability to compel the fire department to pay for the service. Moreover, the potential estoppel effect of the PSC's

---

[5] *Barnes v. Harling*, 368 F. Supp. 3d 573 (W.D. N.Y. 2019); *Gilberg v. Barbieri*, 53 N.Y.2d 285, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981); *Schwartz v. Public Adm'r of Bronx County*, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969); *Sterling Ins. Co. v. Chase*, 287 A.D.2d 892, 731 N.Y.S.2d 778 (3d Dep't 2001).

[6] *Barnes*; *Choi v. State*, 74 N.Y.2d 933, 550 N.Y.S.2d 267, 549 N.E.2d 469 (1989); *Rozewski v. Trautmann*, 151 A.D.3d 1945, 57 N.Y.S.3d 852 (4th Dep't 2017); *Martin v. Rosenzweig*, 70 A.D.3d 1112, 894 N.Y.S.2d 228 (3d Dep't 2010).

[7] *Hunt v. OSR Chemicals, Inc.*, 85 A.D.2d 681, 445 N.Y.S.2d 499 (2d Dep't 1981) (stating that the formality of the trial is one of the factors bearing on the acceptable use of collateral estoppel).

[8] *Barnes*; *Choi*; *Shanley v. Callanan Industries, Inc.*, 54 N.Y.2d 52, 444 N.Y.S.2d 585, 429 N.E.2d 104 (1981); *Gilberg*; *Schwartz*; *Martin*; *Downtown Acupuncture PC v. State Wide Ins. Co.*, 50 Misc. 3d 461, 21 N.Y.S.3d 548 (N.Y. City Civ. Ct. 2015).

determination could not be deemed to have provided sufficient incentive to litigate the issue at the hearing since such ruling would "ill serve" the litigation-limiting purposes of collateral estoppel and would simply encourage over-litigation at an earlier stage.

Similarly, in *Sepulveda v. Dayal*, 70 A.D.3d 420, 893 N.Y.S.2d 549 (1st Dep't 2010), the plaintiffs were not collaterally estopped from asserting medical malpractice claims against doctors, arising from the alleged failure to diagnose neuroblastoma in ultrasounds taken of the infant plaintiff. In the plaintiffs' first action, the court did not decide the ultimate issue of whether the doctors were negligent and the plaintiffs did not have a full and fair opportunity to litigate their claims since by the time the doctors in the first action moved for summary judgment, the plaintiffs were aware that those defendants had not been involved in their medical treatment and there was no reason to raise the merits of their claims.

**4.     Joseph Kay Had no Incentive to Litigate in the English Probate Proceedings**

Defendants' argument that Plaintiffs and Joseph Kay were in privity is irrelevant since neither Plaintiffs nor Joseph Kay had any incentive to participate in the English probate proceedings. Badri's purportedly forged "letter of wishes" left Joseph Kay (and Plaintiffs) with nothing. Kay's appointment as Badri's executor was an effort by Badri to avoid public embarrassment to his family. Unbeknownst to Badri's "family" during his lifetime, Badri had two wives concurrently, and had children with both wives. Badri's cousin and trusted business partner, Joseph Kay, was appointed by Badri to supervise the distribution of Badri's assets to both his wives and their respective children to avoid the otherwise-inevitable publicity and humiliation that would otherwise result. However, by the time the English probate proceedings were commenced,

Badri's "secret" had become known, leaving Kay with little or no incentive or reason to litigate over his appointment as executor of Badri's estate.[9]

Nor did Kay have the resources needed to vigorously defend an action in which he stood to gain nothing. Despite the legitimate ongoing ownership dispute over more than $500 million in assets owned by Joseph Kay and held in trust for his family, counsel for Badri's estranged widow Inna Gudavadze obtained a worldwide asset seizure against Joseph Kay during the course of an ongoing litigation in Gibraltar and seized all of Kay's assets, including his bank accounts, offices, homes, and business records, making it impossible for Kay to defend any action or participate in the accounting proceeding that had been ordered by the Gibraltar court to determine who owned those assets. As a result, Joseph Kay was left unable to participate in the accounting proceeding, was defaulted in Gibraltar, and left unable to further participate in the English probate proceedings.

The conduct of Gudavadze's counsel, Hogan Lovells, in abusing English courts to obtain highly questionable worldwide asset seizures has been the subject of scrutiny by journalists, including coverage in The New York Times. *See, e.g., The Power of Money: How Autocrats Use London to Strike Foes Worldwide*, NYT, June 18, 2021 (describing "questionable tactics" used by Hogan Lovells in the service of autocratic foreign governments including how Hogan Lovells lawyers "pursue their foes by winning what one judge called a legal 'nuclear weapon' — court orders freezing a defendant's assets worldwide. These orders are similar to the ones the U.S. government uses against terrorists or arms dealers, except they emerge from civil proceedings.")[10]

---

[9] Joseph Kay asserted no claim to any of Badri's assets, and was not entitled to any of Badri's assets. Nor did Kay, or Zeltser, have any ability to transfer any of Badri's assets to themselves as alleged by Defendants in this action. Kay's appointment as executor would have entitled him to nothing. Nor did Kay have any claim to ownership of Belneftekhim. Unlike Kay, Plaintiffs had a direct interest in Belneftekhim by virtue of an arrangement with their clients, as alleged at ¶27 of Plaintiffs' Second Amended Complaint ("SAC"). Joseph Kay was never one of these clients.

[10] Downloaded from
https://www.bing.com/search?pglt=43&q=The+Power+of+Money%3A+How+Autocrats+Use+London+t

Although the English Court granted summary judgment against Joseph Kay, the record shows that the judgment was granted without opposition by Kay, the defendant in the English probate proceedings. Kay was financially unable to continue litigating and could not afford the legal fees needed to successfully challenge the summary judgment motion. Joseph Kay was hauled into English court by Badri's estranged billionaire widow and did very little to support his position or his alleged appointment as executor. Indeed, as noted by the English court, Joseph Kay "did not ... file any evidence before the court to support his position." *Gudavadze v. Kay*, [2012] WTLR 1754 (Def's Ex. AAA, at pg. 1).

**5.**    **The Purported Testamentary Documents are Entirely Unrelated to This Action**

There is no rational or cognizable basis to conclude that the testamentary documents are relevant to any issue in this action. As further explained in the Zeltser Dec., Plaintiffs have not and do not intend to rely in these proceedings on any of the documents found to be "forgeries" by the English court. Defendants argue without support that Plaintiffs and Joseph Kay had the "same" claim to ownership of Belneftekhim based on these alleged testamentary documents. Defendants essentially rely on ¶27 of Plaintiffs' Second Amended Complaint ("SAC") which alleges:

> At all relevant times Mr. Zeltser was an attorney for an investment group, which, over the period of 10 years has made significant investment, in cash and in kind, in Belneftekhim Defendants, in exchange for a block of equity ownership of Belneftekhim and an option to acquire a controlling stake in Belneftekhim. As part of his fee arrangement with his clients, Zeltser also acquired an individual interest in Defendants' ownership and property. In addition, in 2006, in order to facilitate Zeltser's efforts in Belneftekhim Defendants, Plaintiffs' clients conveyed their

---

o+Strike+Foes+Worldwide&cvid=81a70c11b13d46cfbf8dad724dea487f&gs_lcrp=EgZjaHJvbWUyBgg
AEEUYOdIBCDI5NTZqMGoxqAIAsAIA&FORM=ANNTA1&PC=U531

Indeed, Ms. Gudavadze (represented by Hogan Lovells) and the government of the Republic of Georgia (represented by White and Case, Defendants counsel herein), entered into a written agreement in which Ms. Gudavadze procured a judgment against Joseph Kay in the Supreme Court of Georgia in exchange for providing the Georgian government with various assets. The transfer of assets was to take effect upon issuance of an adverse decision against Joseph Kay. A Georgian trial court and appellate court had already ruled in favor of Joseph Kay before this agreement was executed. Days after the written agreement was executed, the Georgian Supreme Court reversed the ruling.

investment and ownership interest in Belneftekhim to Plaintiffs as trustees. Plaintiffs remain trustees of their clients' investment and ownership in Belneftekhim Defendants to this day.

From the above-quoted paragraph, Defendants somehow deduce without support that the "investment group" referenced in this paragraph means "Badri's estate". This is untrue. The SAC nowhere mentions the name "Badri." Nor does the name "Badri" appear in the original complaint or first amended complaint. Badri was one of Zeltser's clients for almost 15 years. It is also true that Badri had an equity interest in Belneftekhim. However by the time of Badri's death in February 2008, Badri's interest in Belneftekhim and in the "investment group" represented by the undersigned was reduced to being nominal.

Nor is there anything in the record of this action suggesting that it was Kay (or Badri), who "conveyed their investment and ownership interest in Belneftekhim to Plaintiffs as trustees". The assignment was executed by another client acting on behalf of the largest investors - exclusive of Kay or Badri.[11] As alleged in ¶78 of the SAC, Defendants under torture coerced Plaintiffs to phone the Halkin Hotel in London, where Plaintiffs were staying on the day of their abduction, and ask the management to release to Defendants' original documents showing their clients' investment in Belneftekhim. Simultaneously, Defendants also stole Plaintiffs electronic media containing copies of these documents. Remarkably, Defendants now are using their criminal acts and refusal to provide any discovery in an effort to prevail in these proceedings.

Nor have Plaintiffs ever had any contract with Joseph Kay to share the alleged ownership interest in Belneftekhim as Defendants have falsely alleged. Joseph Kay never had or claimed to have any equity ownership interest in Belneftekhim.

---

[11] Badri spent a great deal of his fortune financing his unsuccessful 2006 presidential election campaign in the Republic of Georgia, and on Berezovsky's political adventures. Hence, he was forced to divest of many of his holdings, including vast majority of his equity interest in Belneftekhim to his business associates, including to the members of the investment group represented by the undersigned.

15

Hence, the testamentary documents (whether they are real or forgeries) have nothing to do with Plaintiffs' or their clients' interest in Belneftekhim and Defendants' motion based solely upon these documents should be denied for that reason alone.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' respectfully submit that Defendants' motion in limine should be denied in all respects.

Dated: November 13, 2023

Respectfully submitted

By:  */s/ Joseph Paukman*
1562 First Avenue # 205-1817
New York, NY 10028
(718)736-4050
336@tuta.io
*Attorney for Plaintiff Zeltser*

16